FILED
2016 Apr-08  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT  2

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION
CIVIL ACTION NO. 2:15-CV-274-MHH

BRIANA WALKER, individually and on behalf of
herself and all others similarly situated,
     Plaintiffs,
vs.
FREEDOM RAIN, INC., d/b/a THE LOVELADY CENTER,
et al.,
     Defendants.

DEPOSITION OF MIYOSHI BATES
Wiggins Childs Pantazis Fisher & Goldfarb
301 19th Street North
Birmingham, Alabama  35203
October 19, 2015

REPORTED BY:  Laura H. Nichols
     Certified Realtime Reporter,
     Registered Professional
     Reporter and Notary Public

---

Page 2

```
 1        A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4      Messrs. Robert J. Camp
 5        and Russell W. Adams
 6      Attorneys at Law
 7      Wiggins Childs Pantazis
 8        Fisher & Goldfarb
 9      The Kress Building
10      301 19th Street North
11      Birmingham, Alabama 35203
12      205.314.0500
13      rcamp@wigginschilds.com
14      radams@wigginschilds.com
15
16
17
18
19
20
21
22
23
```

---

Page 3

```
 1      A P P E A R A N C E S  (Continuing)
 2
 3    FOR THE DEFENDANTS:
 4      Mr. T. Matthew Miller
 5        and Ms. Anne Knox Averitt
 6      Attorneys at Law
 7      Bradley Arant Boult Cummings LLP
 8      One Federal Place
 9      1819 Fifth Avenue North
10      Birmingham, Alabama 35203
11      205.521.8000
12      tmmiller@babc.com
13      aaveritt@babc.com
14
15    OTHERS PRESENT:
16      Ms. Laketta Mackins
17      Ms. Melinda MeGahee
18
19
20
21
22
23
```

---

Page 4

```
 1           INDEX OF EXAMINATION
 2
 3                      Page:
 4    EXAMINATION BY MR. MILLER          7
 5    EXAMINATION BY MR. CAMP          142
 6    REEXAMINATION BY MR. MILLER     153
 7    REEXAMINATION BY MR. CAMP       156
 8
 9
10         INDEX OF PLAINTIFFS' EXHIBITS
11
12                      Page:
13    Plaintiffs' Exhibit 1          147
14
15
16
17
18
19
20
21
22
23
```

1 (Pages 1 to 4)

1      INDEX OF DEFENDANTS' EXHIBITS
2
3                           Page:
4    Defendants' Exhibit 1              16
5       (Responses to Interrogatories)
6    Defendants' Exhibit 2              62
7       (Financial Obligation Agreement
8    Between Resident and Lovelady
9    Center/TLC, Residential
10   Rehabilitation)
11   Defendants' Exhibit 3              74
12      (Statement of Understanding and
13   Agreement)
14   Defendants' Exhibit 4              98
15      (Success Program documentation)
16   Defendants' Exhibit 5              100
17      (Resident Rights and
18   Nondiscrimination Policy)
19   Defendants' Exhibit 6              121
20      (Opportunity credit sheet)
21   Defendants' Exhibit 7              132
22      (Answers to Interrogatories)
23

1           S T I P U L A T I O N
2           IT IS STIPULATED AND AGREED, by
3    and between the parties, through their
4    respective counsel, that the deposition of
5    MIYOSHI BATES may be taken before Laura H.
6    Nichols, Commissioner, Certified Realtime
7    Reporter, Registered Professional Reporter and
8    Notary Public;
9           That the signature to and reading
10   of the deposition by the witness is waived, the
11   deposition to have the same force and effect as
12   if full compliance had been had with all laws
13   and rules of Court relating to the taking of
14   depositions;
15          That it shall not be necessary for
16   any objections to be made by counsel to any
17   questions, except as to form or leading
18   questions, and that counsel for the parties may
19   make objections and assign grounds at the time
20   of trial, or at the time said deposition is
21   offered in evidence, or prior thereto.
22
23

1           I, Laura H. Nichols, a Certified
2    Realtime Reporter and Registered Professional
3    Reporter of Birmingham, Alabama, and a Notary
4    Public for the State of Alabama at Large,
5    acting as Commissioner, certify that on this
6    date, as provided by the Federal Rules of Civil
7    Procedure of the United States District Court,
8    and the foregoing stipulation of counsel, there
9    came before me at the law offices of Wiggins
10   Childs Pantazis Fisher & Goldfarb, 301 19th
11   Street North, Birmingham, Alabama 35203, on
12   October 19, 2015, commencing at 9:14 a.m.,
13   MIYOSHI BATES, witness in the above cause, for
14   oral examination, whereupon the following
15   proceedings were had:
16
17           MIYOSHI BATES,
18   being first duly sworn, was examined and
19   testified as follows:
20
21   EXAMINATION BY MR. MILLER:
22      Q.   Good morning, Ms. Bates.
23      A.   Good morning.

1       Q.   My name is Matt Miller.  I am a
2    lawyer with Bradley Arant Boult Cummings.  We
3    are here today to take your deposition.
4       A.   Okay.
5       Q.   Have you ever given a deposition
6    before?
7       A.   No.
8       Q.   Okay.  Let me give you some of the
9    ground rules.  First off, you are sworn in
10   under oath, right, just raised your right hand
11   to be sworn?
12      A.   Okay.
13      Q.   So you are under oath just like
14   you would be if we were over in the courthouse
15   in front of the judge and jury.
16      A.   Okay.
17      Q.   Okay.  So the rules of perjury
18   apply.  Do you understand that?
19      A.   Uh-huh.
20      Q.   Okay.  One other rule is, you just
21   said uh-huh.
22      A.   Yes.
23      Q.   It is difficult for the court

1    reporter to take down a nod of the head or an
2    uh-huh.  So a yes or a no or an explanation
3    will read much better on the record, and she
4    won't fuss at us if we do that.
5          A.   Okay.
6          Q.   If I ask you a question and you
7    give me an uh-huh or an huh-uh, I am probably
8    going to ask you, is that a yes or is that a
9    no, okay --
10         A.   Okay.
11         Q.   -- as we go along?  If I ask you a
12   question and you don't understand it, please
13   tell me.
14         A.   Okay.
15         Q.   If I ask you the question and you
16   answer it and you don't tell me hey, I didn't
17   understand that question, I am going to assume
18   you understood it.
19         A.   Okay.
20         Q.   Is that fair?
21         A.   Yes.
22         Q.   Okay.  If you need to take a
23   break, you know, just let us know.  As long as

1    you finish answering the question, you can take
2    a break.  That is the only thing I ask, is that
3    I am right in the middle of a question, that we
4    not jump up unless there's an issue that your
5    lawyer needs to address.  Then we can take that
6    up at that time.
7          A.   Okay.
8          Q.   Are you on any type of medication
9    that would keep you from being able to have a
10   full memory today?
11         A.   No.
12         Q.   Okay.  Are you on any type of
13   medication?
14         A.   No.
15         Q.   Okay.  Are you currently using any
16   type of prescription drugs?
17         A.   No.
18         Q.   Are you currently using any type
19   of illegal drugs?
20         A.   No.
21         Q.   Okay.  When is the last time you
22   took any type of drugs?
23              MR. CAMP:  Objection.

1          Q.   (BY MR. MILLER:)  Okay.  You can
2    answer.
3              MR. CAMP:  Are we talking about
4    prescription drugs?
5              MR. MILLER:  Talking about any
6    kind of drugs.
7              MR. CAMP:  Well, objection to the
8    extent that you are asking her whether she has
9    taken illegal drugs.  It is not relevant to the
10   case, and it is not relevant to the deposition.
11             MR. MILLER:  We are going to be
12   asking that in these depositions.  So we can
13   put it under seal, whatever we need to do, but
14   it is relevant.
15             MR. CAMP:  The client is not going
16   to testify to an illegal activity.
17             MR. MILLER:  So she is going to
18   take the Fifth?
19             MR. CAMP:  Yes.
20             MR. ADAMS:  These are limited to a
21   very specific topic of the employment.
22             MR. MILLER:  Exactly.  And that
23   issue applies to the employment issue if you

1    look at the cases.  And if we have to go to the
2    judge on that, we might as well do it right
3    away.  But it is relevant.  If they are going
4    to take the Fifth, they can take the Fifth.
5    And whatever assumption applies in a civil case
6    based on the Fifth, that's up to them.
7          Q.   (BY MR. MILLER:)  So, ma'am, are
8    you going to take the Fifth Amendment on your
9    lawyer's advice and not answer the question?
10             MR. CAMP:  Hold on.  Go off the
11   record a minute.
12             MR. MILLER:  Okay.
13             (Whereupon, a break was had from
14             9:17 a.m. until 9:18 a.m.)
15             MR. CAMP:  We are not going to
16   instruct her to take the Fifth.  We are going
17   to instruct her not to answer the question.  We
18   don't think it is relevant to the limited issue
19   of this deposition.  And if we need to get the
20   Court, let's go ahead and do it.
21             MR. MILLER:  Okay.  I tell you
22   what we are going to do.  On the record, the
23   plaintiff has refused to answer the question;

Page 13

1   is that correct?
2       MR. CAMP: The plaintiff has been
3   instructed by her counsel not to answer the
4   question. It is outside the scope of this
5   deposition.
6       MR. MILLER: We object to that.
7   As these depositions are concluded, we reserve
8   the right to go to the Court to move to reopen
9   the deposition. In fact, we are going to keep
10  all the depositions open on that issue. And we
11  retain the right to move for appropriate relief
12  from the Court, including having the
13  depositions paid for, whatever other sanctions
14  might be appropriate based on the plaintiff not
15  answering the question that has been asked
16  based on a claim that it is outside the scope,
17  when, in a civil deposition, the only
18  appropriate objection is to the form of the
19  question.
20      So unless she is taking the Fifth,
21  we believe it is inappropriate.
22      MR. CAMP: And, obviously, we
23  disagree that the deposition will be left open,

Page 14

1   and they can move to reopen it if they want to.
2       MR. ADAMS: And we disagree that
3   these depositions have a broad -- the normal
4   broad scope. The Court has said that y'all can
5   take discovery on a very limited issue. We are
6   in an unusual posture in the case because you
7   normally don't get any discovery at this point
8   in time, and the Court has allowed discovery on
9   a very limited issue. And that is all we are
10  going to allow them to answer questions on.
11      MR. MILLER: Just for the record,
12  y'all don't get to decide what we might need to
13  show whether or not these individuals are
14  employees. Okay. Y'all can object to the
15  form. Y'all can move to exclude it, tell the
16  Court it is not relevant. We are trying to
17  keep them short depositions. We are trying to
18  stay focussed on that. But there are some
19  things that we are going to ask them that you
20  may not immediately think oh, that relates
21  directly to whether or not they are employed,
22  but it all does.
23      MR. ADAMS: If you can tell us how

Page 15

1   it does, we will be happy to let them answer
2   it.
3       MR. MILLER: I don't have to go
4   into my legal theories to let you know. But if
5   y'all are going to instruct them to answer or
6   not today, we are going to be going to the
7   Court on it.
8       MR. ADAMS: Then we may need to go
9   ahead and talk to the Court about that issue.
10  We are not going to let them talk --
11      MR. CAMP: Yeah, we are not going
12  to sit here and take depositions and then have
13  you come back and charge us for the next round
14  when the issue could be solved on the front
15  end. Are you following me? We can go to the
16  Court now, have it taken care of, make sure
17  that we are understanding the Court's order and
18  that it is limited to whether they are
19  employees. And then we can come back and take
20  the depositions.
21      But there's no need for us to get
22  in a fight about this and then you want to come
23  back and try to charge us for sanctions when

Page 16

1   you are trying to go outside the scope.
2       MR. MILLER: You just instructed a
3   witness not to answer a question. I will leave
4   that to y'all.
5       MR. CAMP: Fine.
6       MR. MILLER: Fine.
7       Q. (BY MR. MILLER:) Ms. Bates, today
8   we are going to be talking about The Lovelady
9   Center. We may talk about Freedom Rain. Do
10  you know what we are talking about when we talk
11  about those entities?
12      A. I do, yes.
13      Q. Okay. As I said today, if you
14  don't understand one of my questions, let me
15  know.
16      A. I will.
17      Q. I will rephrase it. First, let me
18  show you what I am going to mark as Defendants'
19  Exhibit 1.
20      (Defendants' Exhibit 1 was marked
21      for identification.)
22      Q. (BY MR. MILLER:) I ask you if you
23  have seen this document before. And I will

Page 17

1 represent to you that it is labeled as Miyoshi
2 Bates's Responses to Interrogatories.
3     A.   Yes.
4         THE REPORTER:  You are going to
5 need to speak up some.
6     A.   Yes.
7     Q.   (BY MR. MILLER:)  Will you do me a
8 favor and take a look through that?  Because I
9 don't think I have a signed copy of it.  So
10 what I am going to do is have you under oath
11 tell me that what you have stated in there is
12 accurate and correct.
13     A.   Yes.  To my knowledge at this
14 time, everything is accurate.
15     Q.   Okay.  Well, these are your
16 responses.  This is my only chance.
17     A.   Yes.
18     Q.   So as far as you know, everything
19 is accurate?
20     A.   Yes.
21     Q.   All right.  What is your date of
22 birth?
23     A.   ████.

Page 18

1     Q.   And your Social Security number?
2     A.   ████.
3     Q.   And where do you live?
4     A.   ████
5 ████
6     Q.   And how long have you lived there?
7     A.   On and off, eighteen years.
8     Q.   Okay.  Are you married?
9     A.   Single.
10     Q.   Do you have any children?
11     A.   Two.
12     Q.   Okay.  How old are they?
13     A.   Eighteen and seven.
14     Q.   Your eighteen-year-old, what is
15 the eighteen-year-old's name?
16     A.   ████.
17     Q.   ████?  What is her last name?
18     A.   ████.
19     Q.   ████?  Where does she live?
20     A.   Same address.
21     Q.   Same address.  Okay.  Did either
22 of the children live with you at Lovelady
23 Center?

Page 19

1     A.   No.
2     Q.   Who did they live with while you
3 were at Lovelady Center?
4     A.   Their grandmother.
5     Q.   Is that your mom?
6     A.   No.  My mom is deceased.  Their
7 dad's mother.
8     Q.   Their dad's mother.  Have you ever
9 been in the military?
10     A.   No.
11     Q.   Are you affiliated with any
12 particular religion?
13     A.   Nondenominational.
14     Q.   Do you go to a particular church
15 right now?
16     A.   No.
17     Q.   Have you ever attended a church in
18 the last couple of years?
19     A.   Yes.
20     Q.   Which church?
21     A.   Faith Temple.
22     Q.   Faith Temple.  Where is that
23 located?

Page 20

1     A.   It is in Powderly on Jefferson
2 Avenue.
3     Q.   In where?
4     A.   In Powderly, Alabama.
5     Q.   Powerly?
6     A.   Powderly.
7     Q.   Powderly.  Okay.  All right.  Any
8 other churches?
9     A.   Not that I can think of.
10     Q.   Do you consider yourself to be a
11 person of your word?
12     A.   Yes.
13     Q.   If you say you will do something,
14 you do it?
15     A.   Yes.
16     Q.   All right.
17     A.   If it was -- if it is in my
18 abilities, yes.
19     Q.   Is it ever okay, in your opinion,
20 to lie to help out yourself?
21     A.   To help what?
22     Q.   To help yourself on something?
23     A.   Hold on.  Say that again.

Tyler,Eaton,Morgan,Pritchett                    1-877-373-3660

REDACTED

Page 21

1     Q.   Is there ever a time when it is
2  okay to lie in order to help yourself?
3     A.   No, it is not okay.
4     Q.   What about to help your family, is
5  it ever okay to lie to help your family?
6     A.   No.
7     Q.   Okay.  Have you ever had any
8  issues in the past with lying?
9     A.   Yes.
10    Q.   Okay.  When have you had issues
11 with lying?
12    A.   What do you mean like issues, like
13 where they have gotten me in trouble or issues
14 where it was a little white lie?
15    Q.   Where you lied a lot, like you
16 were lying a lot.
17    A.   No.
18    Q.   Compulsive lying.
19    A.   No.
20    Q.   Have you ever had issues when you
21 feel yourself would be untrustworthy?
22    A.   Have I ever --
23    Q.   Have you ever had issues with

Page 22

1  being trustworthy?
2     A.   I mean how would you say that -- I
3  mean --
4     Q.   How do you define trustworthy?
5     A.   With somebody being able to trust
6  me and trust their care with me with something,
7  yeah.
8     Q.   Have you ever had a time when you
9  weren't trustworthy?
10    A.   Where people -- do you mean where
11 people couldn't trust me or --
12    Q.   Right.  Right.
13    A.   No.
14    Q.   All right.  Have you ever been
15 convicted of a crime?
16    A.   What is "convicted"?  Like if I
17 had to do some time or something?
18    Q.   Yes, ma'am.
19    A.   No.
20    Q.   Or probation.
21    A.   Well, I was -- for a traffic
22 ticket.  I was on probation for a traffic
23 ticket.

Page 23

1     Q.   Just one traffic ticket?
2     A.   No.  It was -- from what I can
3  remember, I think like three, and that was like
4  for speeding.  I think I got one for speeding,
5  is all I can think of right now, and then my
6  license got suspended.  And I got stopped for
7  driving with a suspended license.  And that is
8  what I got put on probation for.
9     Q.   Were you on probation when you
10 went to Lovelady?
11    A.   No.  I had paid all my fines.
12    Q.   Do you currently have any arrests
13 that are pending?
14    A.   No.
15    Q.   Any warrants outstanding?
16    A.   No.
17    Q.   Any other lawsuits you have ever
18 been involved in other than this one?
19    A.   I was in a car accident in 2010,
20 2011.  And I sued the gentleman that hit me
21 from behind.  But that wasn't here in Alabama.
22 That happened in Georgia.
23    Q.   Okay.  What happened in that case?

Page 24

1     A.   Well, I got paid.  I think it was
2  like ten thousand dollars.
3     Q.   Did you have to go to court?
4     A.   No.  I just went to my doctor.  He
5  decided I didn't have to go to court.  My
6  attorneys took care of it.  I did everything by
7  mail.
8     Q.   All right.  Have you ever filed a
9  charge with the Equal Employment Opportunity
10 Commission?
11    A.   No.
12    Q.   Ever talked to anybody with the
13 U.S. Department of Labor?
14    A.   No.
15    Q.   I don't want to know about
16 specifics with your lawyers, but other than
17 talking to your lawyers, what did you do to get
18 ready for the deposition today?
19    A.   Looked for any documentation to
20 prove that what I am saying is correct and
21 truthful.
22    Q.   Did you find any?
23    A.   Yes, I gave it to my attorneys,

Tyler,Eaton,Morgan,Pritchett                    1-877-373-3660

Page 25

1    what I had.
2         Q.   Okay.  Is that something you gave
3    to them today?
4         A.   No.  I have been gave it to them.
5         Q.   In the past?
6         A.   Uh-huh, yes.
7         Q.   Okay.  And what was that
8    documentation?  What was it you think proves
9    your case?
10        A.   Paycheck stubs stating that I was
11   an employee for The Lovelady.  The paycheck
12   stub says The Lovelady Center.  None of them
13   says Blackwell's Way.
14        Q.   Okay.
15        A.   Hours worked were more than forty
16   hours per week at a rate of minimum wage.  All
17   of -- anytime I did any work for them, it was
18   clear to me that I was going to be compensated
19   for it.  I wasn't doing anything just to do it.
20   I was always going to be compensated for it.
21        Q.   Okay.  Well, what document do you
22   have that shows that?
23        A.   The sheets they had me sign

Page 26

1    like that you put your hours on, like the time
2    sheets.
3         Q.   What did it say on the time
4    sheets?
5         A.   Some of them say "opportunity
6    credits."  Some of them say --
7              THE REPORTER:  Some of them say --
8         A.   Opportunity.
9              (Off-the-record discussion.)
10             MR. CAMP:  He is asking what you
11   provided us.
12             MR. ADAMS:  Only what you gave to
13   us.  Not what you looked at that they sent over
14   this morning.
15        A.   Okay.  Receipts showing where the
16   hours that I worked at Blackwell's Way and the
17   money that they would take for my rent.  And
18   what was left, they would give you these sheets
19   to show you your amount, and then they would
20   give me my receipts showing that I paid my rent
21   and other fees that ensued while I was there.
22        Q.   (BY MR. MILLER:)  When you say
23   "they" would take, would Lovelady --

Page 27

1         A.   Lovelady would take, uh-huh.
2         Q.   Anything else?
3         A.   That is all I can think of right
4    now.
5         Q.   Okay.  Now, other than what you
6    just talked about, are there any other
7    documents that you have seen, regardless of
8    where you have seen them, whether you gave them
9    to your lawyers, that you saw them that we
10   produced, that you have seen when you were at
11   Lovelady, any other documents that you think
12   support your position that you were an
13   employee?
14        A.   No, not at this time.
15        Q.   All right.  So the answer is that
16   we have got some paycheck stubs; is that right?
17        A.   Yes.
18        Q.   You have got opportunity credit
19   sheets?
20        A.   Well, I don't have those.
21        Q.   But I am just asking you what you
22   think supports --
23        A.   Yes.

Page 28

1         Q.   Some sheets showing the amounts
2    you were paid?
3         A.   Yes.
4         Q.   Like receipt forms?
5         A.   Yes, receipts.
6         Q.   And a sheet showing the hours you
7    worked?
8         A.   Yes.
9         Q.   Is there anything else?
10        A.   That is all I can think of at this
11   time.
12        Q.   Tell me about where you went to
13   school, what your education is.
14        A.   Starting from where?
15        Q.   Starting from high school.
16        A.   Okay.  I attended Wenonah High
17   School from '93 to '97.  And then in '99 -- I
18   didn't get my high school diploma because -- I
19   don't know -- okay.  I had a baby, and she was
20   sick.  She had to have open heart surgery.  And
21   then my mama passed.  And then -- okay.  Then,
22   so I ended up getting my GED from Virginia
23   College in '99.  I attended Bessemer State Tech

1    in 2001 and got my CNA license to work at a
2    nursing home.  That is -- those are -- that is
3    my educational background.
4         Q.   All right.  Any type of legal
5    training?
6         A.   No.
7         Q.   Do you know what the Fair Labor
8    Standards Act is?
9         A.   I have heard of it.
10        Q.   What is it?
11        A.   Isn't it an act for fair labor,
12   fair work?
13        Q.   And what does it say?
14        A.   I don't know.  I have just heard
15   about just that title.  I have never heard it
16   per se.
17        Q.   Do you know what the law is on
18   overtime, what does the law say about overtime?
19        A.   Yes, that if any employee works
20   overtime, they should be paid overtime,
21   overtime hours.
22        Q.   How --
23        A.   Time and a half.

1         Q.   Okay.  How many hours is overtime?
2         A.   Any hour over forty hours a week.
3         Q.   Okay.  All right.  What else do
4    you know about the wage and hour laws?
5         A.   I know minimum wage is seven
6    dollars and twenty-five cents an hour.
7         Q.   How much of that did you know when
8    you were at Lovelady?
9         A.   I can't recall at this time.
10        Q.   So you don't know whether you knew
11   any of that when you were at Lovelady?
12        A.   No.
13        Q.   But you know it now?
14        A.   Yeah, because of this case.
15        Q.   Any type of medical training other
16   than your CNA, your nursing?
17        A.   Yes.  I worked at UAB hospital as
18   a patient care technician.  And I worked at
19   Caremark as a pharmacy technician.
20        Q.   Okay.  Anything else?
21        A.   No.
22        Q.   Did I read your discovery
23   interrogatory responses correctly that you did

1    not file any tax returns in 2012, 2013 or 2014?
2         A.   Yes.  That is correct.
3         Q.   And you don't know the amount of
4    your income for any of those years?
5         A.   I don't.
6         Q.   Well, how come you didn't file?
7    Why did you not file taxes?
8         A.   Because I was not given anything
9    to file them while I was at The Lovelady
10   Center.
11        Q.   Were you given a 1099?
12        A.   Not while I was there, no.  That
13   was given to me after I have been dismissed.
14        Q.   Okay.  But you got that in 2014?
15        A.   '15.  And I had to call and ask
16   for it.
17        Q.   Oh, you called and asked for a
18   1099?
19        A.   Uh-huh.
20        Q.   Okay.  Who did you call and ask
21   for it?
22        A.   Rosie Mullens.
23        Q.   What made you call and ask for it?

1         A.   Because I know that I was supposed
2    to get something from working in the past, you
3    know.  You are supposed to get something, you
4    know, from working to show that that is filed
5    with the IRS.  So I just called to see if they
6    had one.
7         Q.   Okay.  Did you work in 2013?  Were
8    you at Lovelady in 2013?
9         A.   I was.
10        Q.   Did you get --
11        A.   That's when I first -- I worked at
12   The Lovelady Center, yeah.
13        Q.   Did you get a 1099 for 2013?
14        A.   No.
15        Q.   Did you ask for one?
16        A.   No.
17        Q.   Tell me about where you've worked
18   since high school.
19        A.   Which job?  I've had a bunch of
20   jobs.  I worked temporary agencies.  I worked
21   at Regions Bank.  I worked at Stanberry &
22   Associates.  That is a tax preparation service.
23   I have worked for sitting agencies, home health

Page 33

1   agencies.  Awesome Sitters service.  Then I
2   worked at UAB as a patient care technician.
3   Then the job at Caremark pharmacy and at The
4   Lovelady Center.
5       Q.   Are you working now?
6       A.   No.
7       Q.   What was the last job you had?
8       A.   The Lovelady Center.
9       Q.   So the last time, according to
10   you, that you worked at The Lovelady
11   Center.  That would have been in what, February
12   of 2014?
13      A.   Yes.
14      Q.   Have you applied for any jobs
15   since leaving The Lovelady Center?
16      A.   No.
17      Q.   You haven't applied for any jobs
18   at all?
19      A.   No.
20      Q.   Online or sending out a resume,
21   none of that?
22      A.   No.
23      Q.   Why not?

Page 34

1       A.   When I left The Lovelady Center, I
2   just was -- no reason.
3           THE REPORTER:  I'm sorry.  I can't
4   understand you.
5       A.   It is no reason in particular.  I
6   just haven't.
7       Q.   Why do you --
8       A.   Because when I was at The Lovelady
9   Center, you know, I was working to pay my fees
10   there.  So when I got dismissed from The
11   Lovelady Center, I didn't have the fees anymore
12   so --
13      Q.   What you were doing at The
14   Lovelady Center, if I understand, you were
15   working and you were using that money to pay
16   your fees that you owed to Lovelady Center; is
17   that right?
18      A.   Yes.
19      Q.   What are you doing now for income?
20      A.   I don't have any income.
21      Q.   Are you living with family?
22      A.   Yes, I live with family.
23      Q.   And they are providing you food

Page 35

1   and clothing and all that stuff?
2       A.   That's correct.
3           MR. CAMP:  Objection.
4       Q.   (BY MR. MILLER:)  So the last time
5   you worked or applied for any work was February
6   2014?
7       A.   The last time I worked.
8       Q.   The last time you worked.  And you
9   haven't applied anywhere since?
10      A.   No.
11      Q.   Is that correct?
12      A.   That's correct.
13      Q.   When you worked at the temporary
14   service, tell me about that.  How did that come
15   about?  Did you see an ad in the paper?  Did a
16   friend tell you about it?
17      A.   I think I applied online.
18      Q.   Okay.  So it was --
19      A.   That was so long ago.  That was
20   back in 2000.  I could have walked in the
21   temporary agency and just filled out a paper
22   application.  I can't remember, it is so far
23   back.  One of the two, I either applied online

Page 36

1   or did a walk-in.
2       Q.   Okay.  Either way, you filled out
3   an application?
4       A.   Yes.
5       Q.   An application for a job?
6       A.   Yes.
7       Q.   And then after you filled out the
8   application, did you interview with somebody?
9       A.   Yes.
10      Q.   Okay.  And what kind of things
11   happened in that interview?  What kind of
12   things did they ask you?
13      A.   My work experience, my work ethic.
14   They discussed rate of pay, hours worked, what
15   shift I would work, insurance.
16      Q.   Okay.  At that point, did they
17   tell you we have decided we want to hire you or
18   at some point after --
19      A.   No.
20      Q.   -- the interview did they say,
21   "Ms. Bates, we want to hire you for a job"?
22      A.   Yeah, they initially called and
23   offered me a position.

Page 37

1      Q.   Okay.  And what position did they
2  offer you?
3      A.   Whatever the position was that I
4  applied for.  If it was receptionist, it was a
5  receptionist.
6      Q.   So you applied for a specific
7  position?
8      A.   Yes.
9      Q.   And they interviewed you about
10 that position?
11     A.   Yes.
12     Q.   And you filled out an application?
13     A.   Yes.
14     Q.   And they called you and told you
15 you had been hired for that position?
16     A.   Yes.
17     Q.   And what your rate of pay would
18 be?
19     A.   That's correct.
20     Q.   And what your benefits would be?
21     A.   That's correct.
22     Q.   And you decided yes, I accept the
23 job?

Page 38

1      A.   That's correct.
2      Q.   And who did you report to?  Did
3  you have a supervisor that you reported to?
4      A.   Yes.
5      Q.   And what did the supervisor do?
6      A.   Or a team leader.  Mostly the
7  supervisors just introduced their selves.  Most
8  jobs I have had, I have had a team leader that
9  will tell you the position and what to do.
10     Q.   And what jobs have you had where
11 you have had a team leader?
12     A.   The Lovelady.  You have somebody
13 watching you the whole time.
14     Q.   When you were inside The Lovelady
15 Center?
16     A.   Yes.
17     Q.   Any other jobs where you have had
18 a team leader?
19     A.   Yes, at the bank.
20     Q.   Is that Regions?
21     A.   Regions Bank.
22     Q.   Okay.  And what did you do for
23 Regions Bank?

Page 39

1      A.   I was a -- what do you call those
2  people?  I encoded the checks.
3      Q.   You entered data?
4      A.   Yes.  I ran the checks through the
5  machines.  I forgot what it is called.  But I
6  encoded the checks, like the debits and the
7  credits and ACH.  I have forgotten what they
8  call that.
9      Q.   Okay.  When you worked at Regions,
10 did you fill out an application?
11     A.   I did.
12     Q.   Did you do it online or in person?
13     A.   Online.
14     Q.   You specifically went online to
15 try to get a job with Regions?
16     A.   I did.
17     Q.   And pulled down the application?
18     A.   Yes.
19     Q.   And it said job application on it?
20     A.   Yes.
21     Q.   And you filled it out?
22     A.   That's correct.
23     Q.   And then hit send or whatever you

Page 40

1  do on a computer to send it in?
2      A.   Yes.
3      Q.   And then did somebody contact you
4  from Regions?
5      A.   Yes.
6      Q.   And what did they say, hey, we
7  want to have an interview with you?
8      A.   Well, actually I did a phone
9  interview first.  And if you pass the phone
10 interview, they invited you in for an interview
11 in person.
12     Q.   So there were a couple of
13 different levels of interviews?
14     A.   Yes.
15     Q.   What kind of questions did they
16 ask you on the phone?
17     A.   My job relevancy to the position
18 that I applied for and my availability to be
19 able to work.
20     Q.   Your experience?
21     A.   Yes.
22     Q.   And did you talk about the rate of
23 pay?

10 (Pages 37 to 40)

Page 41

1     A.   Yes.
2     Q.   And did you talk about your job
3  history?
4     A.   That's correct.
5     Q.   Okay.  And did somebody call you
6  in or call you on the phone and say,
7  "Ms. Bates, we want to hire you for this job"?
8     A.   Yes.
9     Q.   And was it a specific job that you
10 applied for?
11    A.   I can't remember, but I think so.
12 I probably applied for several positions, and
13 the one that they called me back for, I
14 accepted it.
15    Q.   When they called you, they told
16 you they were hiring you for a specific
17 position?
18    A.   Yes.
19    Q.   And you accepted?
20    A.   Yes.
21    Q.   And they talked to you about pay
22 and benefits and those types of things?
23    A.   Yes.

Page 42

1     Q.   Is that right?
2     A.   Yes.
3     Q.   What did you do, you coded the
4  checks?
5     A.   Yes.
6     Q.   And did you have somebody you
7  reported to?
8     A.   Yes, my team leader.
9     Q.   Okay.  Who was that?
10    A.   I don't remember her name.  I
11 don't remember her name.
12    Q.   Was she there with you every day?
13    A.   Yes.
14    Q.   Most every day?
15    A.   Yes.
16    Q.   In the same location where you
17 were?
18    A.   Yes.  If she wasn't in the
19 department, yes, she was able to be reached.
20    Q.   But she was with you in the same
21 building?
22    A.   Yes.
23    Q.   And did she give you job

Page 43

1  instructions, here is what you need to do
2  today?
3     A.   Yes.
4     Q.   Let you know what your schedule
5  was going to be?
6     A.   Yes.
7     Q.   Let you know if you had an issue
8  at work?
9     A.   Yes.
10    Q.   And did you go to them if you had
11 a specific question during the day about
12 something?
13    A.   Yes.
14    Q.   Has that been the case at
15 Caremark?  You said you worked at Caremark?
16    A.   Yes.
17    Q.   When you worked at Caremark, did
18 you fill out an application?
19    A.   I did online.
20    Q.   And did somebody interview you?
21    A.   Yes.
22    Q.   And what job were you interviewing
23 for?

Page 44

1     A.   Pharmacy technician.
2     Q.   And did they ask you questions
3  related to being a pharmacy technician?
4     A.   You actually had to pass the test.
5     Q.   Okay.
6     A.   And once I scored what they felt
7  was acceptable, they called you in for an
8  interview.
9     Q.   Then you had to apply for a
10 license, send the money in for a license?
11    A.   I did that after I gained like
12 ninety days of training and I was tested again.
13 And then I do have my license, yes.
14    Q.   And as a pharmacy tech, you always
15 had to have a pharmacist there with you
16 on-site, correct?
17    A.   Yes.  The pharmacist actually
18 stood over you all the time.
19    Q.   That was your supervisor?
20    A.   No.
21    Q.   Who was your supervisor?
22    A.   I don't remember her name.
23    Q.   Somebody other than a pharmacist?

11 (Pages 41 to 44)

Page 45

1    A.   Yes.
2    Q.   Was that supervisor there also?
3    A.   Yes.
4    Q.   During the day, on-site?
5    A.   In the building.
6    Q.   Were you ever terminated from any
7  of those jobs?
8    A.   Yes.
9    Q.   Which ones were you terminated
10 from?
11   A.   Caremark for not being on time.
12   Q.   Were you ever disciplined in any
13 of your jobs, get written discipline?
14   A.   No.
15   Q.   And the only time you have ever
16 been terminated was at Caremark?
17   A.   At Caremark.
18   Q.   Did any of the jobs that you have
19 ever held that we just talked about, at
20 Regions, Caremark, the job placement, the --
21 what was the name of that place, the temporary
22 agency, right?
23   A.   (Nodding.)

Page 46

1    Q.   At any of those, did you have to
2  pay any of them fees?
3    A.   Yes.
4    Q.   Okay.  Who did you pay fees to?
5    A.   At UAB, well, actually, they were
6  taken out my check.
7    Q.   For what?
8    A.   Parking, some courses that we had
9  to take like what they called continuing
10 educating units.
11   Q.   Uh-huh.
12   A.   That is it.
13   Q.   Parking and continuing education
14 and maybe for benefits?
15   A.   Yes.
16   Q.   Any of them, did you have to pay
17 to live there?  Did you live on-site with any
18 of those employers?
19   A.   No.
20   Q.   Did any of those employers provide
21 you with all your meals?
22   A.   Not all my meals.  But they did
23 feed us sometime at some of my jobs.

Page 47

1    Q.   Did you pay for it, when they fed
2  you?
3    A.   No.
4    Q.   Did you go through counseling in
5  any of those jobs, like psychological
6  counseling or spiritual counseling?
7    A.   No.
8    Q.   Did they make you go through any
9  of that on any of those jobs?
10   A.   No.
11   Q.   Were any of those jobs providing
12 you any type of treatment or rehab for
13 dependency?
14   A.   No.
15   Q.   Tell me, what is The Lovelady
16 Center?
17   A.   It is a treatment center for women
18 who are addicted to substances.
19   Q.   What is its purpose?
20   A.   I guess its purpose is to help the
21 women that are addicted to substances to better
22 themselves.
23   Q.   When did you first hear about it?

Page 48

1    A.   I Googled -- what did I Google?  I
2  think I Googled treatment centers in
3  Birmingham, Alabama, and they were one of the
4  three that I looked up and decided to go check
5  out.
6    Q.   Do you remember what the other
7  ones were?
8    A.   Aletheia House and Olivia's House,
9  I think.  Olivia's House.
10   Q.   Why were you looking for a
11 treatment center?
12   A.   I had lost my way a little, just
13 needed to get back on track with some things.
14   Q.   Were you employed at the time?
15   A.   No.
16   Q.   Okay.  Had you recently lost a
17 job?
18   A.   No.
19   Q.   Were you looking for employment at
20 the time you applied at Lovelady?
21   A.   I can't -- I don't remember.
22   Q.   Okay.  What was your condition at
23 the time?

Tyler,Eaton,Morgan,Pritchett                    1-877-373-3660

Page 49

1    A.   What do you mean my condition?
2    Q.   Were you suffering from drug
3  dependency?
4    A.   Yes.  That is why I went.
5    Q.   Okay.  Were there other things
6  going on in your life as a result of that drug
7  dependency that caused you to feel like you
8  needed to reach out for help?
9    A.   Yes.  My kids weren't staying with
10 me at the time.
11   Q.   Had DHR taken your children?
12   A.   Yes.  Well, they were with their
13 father.
14   Q.   Were you allowed to have your
15 children at that time legally or had they been
16 taken from you?
17   A.   No, they had been taken from me.
18   Q.   And did you think that going
19 through The Lovelady Center, if you made it
20 through their rehabilitation, that might enable
21 you to be able to get your children back?
22   A.   That wasn't, no, the reason I
23 went -- I went for myself.

Page 50

1    Q.   Tell me about that.
2    A.   What do you mean?
3    Q.   You went for yourself.  What were
4  you trying to achieve?
5    A.   It was for depending on
6  medication.
7    Q.   Okay.  To get off the substances
8  that you were on?
9    A.   That's right.
10   Q.   To get clean?
11   A.   That's correct.
12   Q.   Any other reason that you went?
13   A.   No.
14   Q.   Did you feel like you were
15 physically and emotionally capable of holding
16 down a job at the time that you were at
17 Lovelady?
18   A.   Yes.
19   Q.   You could hold down a job?
20   A.   Yes.
21   Q.   Even though you were suffering
22 from dependency issues, you could still go to
23 work?

Page 51

1    A.   I was still functional.
2    Q.   Functional?  Okay.  Had you ever
3  lost any jobs in the past due to dependency
4  issues or related to that?
5    A.   No.
6    Q.   No.  From looking at the
7  documents, it looks like you enrolled in
8  January of 2012?
9    A.   That's correct.
10   Q.   Can you tell me about that?  You
11 looked online and came across Lovelady Center
12 and a couple of other options for treatment?
13   A.   Yes.
14   Q.   And what was it about The Lovelady
15 Center that made you decide to pursue that,
16 that one instead of the others?
17   A.   All the other ones, I felt like
18 they just weren't quick to call me back.  One
19 wanted to put me on a waiting list.  I guess
20 because a lot of times when I went, I didn't
21 have anything in my system.  Because I wasn't
22 just out there, you know, and -- because when I
23 went to Lovelady, I was self.  I wasn't

Page 52

1  court-ordered.  Nobody made me to go.  I went
2  on my own cognizance, you know.
3    Q.   And when you went in, did you test
4  positive at that time when you went into
5  Lovelady?
6    A.   I did.
7    Q.   Do you have to test positive to
8  enroll?
9    A.   I am not sure.
10   Q.   Tell me about that.  You called or
11 did you fill out something online or did you
12 just look them up online?
13   A.   I just looked them up online.  And
14 I called and called.  And nobody called me
15 back, actually.  So I just went over there.
16 And when I went over there, The Lovelady turned
17 me around too.
18   Q.   Who did you talk to at Lovelady?
19   A.   I can't think of her name.  I
20 can't think of her name right now.
21   Q.   Is there somebody that you
22 initially --
23   A.   She was in the intake department.

13 (Pages 49 to 52)

Page 53

1    Q.   Okay.
2    A.   Somebody in intake.
3    Q.   You met somebody at intake?
4    A.   Uh-huh.
5    Q.   And you talked to them?
6    A.   Yes.
7    Q.   Did you fill out an intake form?
8    A.   Not at that time.
9    Q.   Okay.  Why not?
10   A.   They said that they didn't have
11   any beds.
12   Q.   Okay.  So they had to have --
13   A.   And that I didn't have the intake
14   fee either.  She told me to come back with the
15   intake fee or either half of the intake fee and
16   they will see about getting me in the program
17   then.
18   Q.   How much was the intake fee?
19   A.   Five hundred dollars.
20   Q.   So you looked online, found some
21   places, ended up going down to The Lovelady
22   Center; is that correct?
23   A.   Yes.

Page 54

1    Q.   Walked in.
2    A.   Yes.
3    Q.   Went and talked to somebody in the
4    intake department.
5    A.   Yes.
6    Q.   And at that time you were turned
7    away because they didn't have enough beds --
8    A.   Yes.
9    Q.   -- and because you didn't have the
10   intake fee.
11   A.   Yes.  I forgot what they called
12   the beds -- they have beds available, I guess,
13   if you were to come in and don't have any
14   money.  I forgot what she referred to them as.
15   But they didn't have any at that time.  But had
16   I had the five hundred dollar intake fee, I
17   could have been enrolled in the program that
18   day.
19   Q.   They didn't have any beds
20   available for people who didn't have the
21   ability to pay for it?
22   A.   That's correct.
23   Q.   And did somebody call you back

Page 55

1    later or did you go back later?
2    A.   No.  I went back the next day.
3    Q.   The next day?
4    A.   Yes.
5    Q.   Okay.
6    A.   And this time I had my aunt with
7    me, and my aunt did most of the talking.  And
8    they went ahead and accepted me in the program.
9    Q.   Okay.  So your aunt went to -- I
10   say aunt.  You say aunt.
11   A.   Yeah.
12   Q.   -- went down to Lovelady with you.
13   Did y'all go back to intake again?
14   A.   Yes.
15   Q.   Do you remember who y'all talked
16   to?
17   A.   I said I cannot think of her name.
18   But she was the one -- the main one that ran
19   intake.
20   Q.   Okay.  All right.  And they
21   accepted you into the program?
22   A.   Yes.
23   Q.   Okay.  When you went in, did you

Page 56

1    have to fill out a job application?
2    A.   Not that I can remember.
3    Q.   Did you interview for a job at
4    Lovelady when you first went there?
5    A.   No, not that I can remember.
6    Q.   You didn't go there looking to be
7    hired for a job; you went there for treatment,
8    correct?
9    A.   Yes and no.  I went there for
10   treatment, but in order to get the treatment, I
11   had to work.
12   Q.   To pay for the beds --
13   A.   Yes.
14   Q.   -- and to pay for the treatment?
15   A.   Yes.  Because I didn't have any
16   money to -- and I didn't have anybody to give
17   me any money.  So it was brought to my
18   attention in order to be in this program, you
19   had to have some kind of income or some kind of
20   money to pay your way through the program.
21   Q.   Okay.  All right.  Does Lovelady
22   have people who work there full-time who are
23   not enrolled in the program?

Page 57

1  A.  Yes.
2  Q.  Okay.  Like do you know Melinda?
3  A.  Yes.
4  Q.  She is sitting here today.  Is she
5  enrolled in the program?
6  A.  No.
7  Q.  Was she when you went in?
8  A.  No.
9  Q.  Does she work with Lovelady?
10  A.  Yes.
11  Q.  Okay.  So they have a group of
12  people who work at Lovelady helping with their
13  treatment program, their rehabilitation
14  program --
15  A.  Yes.
16  Q.  -- who are not enrolled in the
17  program?
18  A.  That's correct.
19  Q.  Okay.  Have you ever been out to
20  Lovelady to apply for a job where you would not
21  be enrolled in the program, in the treatment
22  program?
23  A.  While I was at The Lovelady?

Page 58

1  Q.  Has there ever been a point when
2  you have been at Lovelady when you haven't been
3  enrolled in the program, in the treatment
4  program?
5  A.  No.
6  Q.  Anytime you have been at Lovelady,
7  you were enrolled?
8  A.  Yes.
9  Q.  And were having to pay fees?
10  A.  Yes.
11  Q.  Did you ever submit a resume to
12  Lovelady?
13  A.  Yes.
14  Q.  You did?
15  A.  You had to.  That was actually one
16  of the ways to gain a signature to be moved up.
17  You had -- and you had to go online and you had
18  to set up an account with the Alabama
19  Department website.  You had to submit your
20  resume and -- so, yes.
21  Q.  Okay.  Who were you submitting
22  that resume to?
23  A.  Nobody in particular.  It is a

Page 59

1  website that you go on like a jobs department
2  website.  And it would just be out there for
3  anybody, almost like a monster.com.
4  Q.  Uh-huh.
5  A.  You had to do that.
6  Q.  You weren't submitting that to
7  Lovelady for a job; you were creating one to
8  submit out to the general public, the
9  workforce?
10  A.  Yes.  But it was required of The
11  Lovelady.  You had to get a signature stating
12  that you did that.
13  Q.  Okay.  Lovelady required you to
14  complete a resume to put out on this website
15  with other employers?
16  A.  Yes.
17  Q.  Is that correct?
18  A.  Yes.
19  Q.  And did you do that?
20  A.  I did.
21  Q.  When you first went into Lovelady
22  and you enrolled, did you have to pay any fees?
23  Did you have to pay your intake fee?

Page 60

1  A.  No.  I didn't have any money.
2  Q.  They enrolled you in the program
3  without you paying the intake fee?
4  A.  Yes.
5  Q.  What was your understanding about
6  how you were going to pay for the intake fee?
7  A.  That I was going to have to work
8  in order to get the fees paid down.
9  Q.  Did you talk when you were at
10  Lovelady about a specific job that you were
11  going to perform when you first enrolled?
12  A.  No.  I was told which jobs that I
13  could do.
14  Q.  Okay.  When you first enrolled?
15  A.  Yes.
16  Q.  Wasn't it the first thirty days
17  that you didn't do any work?
18  A.  I didn't.
19  Q.  Is that correct?
20  A.  That's correct.
21  Q.  What did you do the first thirty
22  days?
23  A.  Worked the program, just attended

Page 61

1   some classes.
2       Q.   Did you go through some
3   rehabilitation?
4       A.   I attended some classes.
5       Q.   What kind of classes?
6       A.   A lot of my classes are like
7   spiritual classes.
8       Q.   Was that something you did
9   throughout the time you were at Lovelady?
10      A.   Yes.
11      Q.   Was that a requirement?
12      A.   Yes.
13           MR. CAMP:  I need a bathroom break
14  whenever you get a chance.
15           MR. MILLER:  Okay.  This is a good
16  time.
17           (Whereupon, a break was had from
18           10:05 a.m. until 10:13 a.m.)
19      Q.   (BY MR. MILLER:)  Ms. Bates, we
20  are back on the record.
21      A.   Okay.
22      Q.   Let me show you what I am going to
23  mark as Defendants' Exhibit 2.

Page 62

1           (Defendants' Exhibit 2 was marked
2           for identification.)
3       Q.   (BY MR. MILLER:)  And I ask you if
4   that is your signature on that document.
5       A.   Yes.
6       Q.   And what is that document called?
7       A.   Financial Obligation Agreement
8   Between Resident and Lovelady Center/TLC,
9   Residential Rehabilitation.
10      Q.   Okay.  It is a financial
11  obligation?
12      A.   Yes.
13      Q.   All right.  It has a date on
14  there.  It says January 23rd, 2012.  I want to
15  make sure that I am correct.  Did you start
16  there in January of 2012 or January of 2013?
17      A.   It was 2012.
18      Q.   It was 2012?
19      A.   Yes.
20      Q.   Okay.  And you were there until --
21      A.   February of 2014.
22      Q.   Okay.  All right.  So you went in
23  in January 2012.  And when you met with the

Page 63

1   folks there at intake, this would have been one
2   of the documents you would have filled out?
3       A.   Yes.
4       Q.   And it says Ms. Lott, L. Lott.  Is
5   that who you would have met with at intake?
6       A.   Yes.
7       Q.   Cindy Ledkins, was she also there,
8   client representative?
9       A.   I don't remember her being there.
10      Q.   Okay.  Did you have somebody
11  called a client representative?
12      A.   Not when I was filling out these
13  papers.
14      Q.   Okay.  Did you later?
15      A.   Yes.
16      Q.   Okay.  And what did the client
17  representative do?
18      A.   What do you mean do?  Like what?
19      Q.   What was their job?  That was
20  somebody who worked at Lovelady, the client
21  representative?
22      A.   Yes.
23      Q.   Who was not enrolled in the

Page 64

1   program?
2       A.   Well, she had been through the
3   program, but she was not enrolled in the
4   program.
5       Q.   Had graduated from it?
6       A.   Yes.
7       Q.   Okay.  And was now working for
8   Lovelady; is that correct?
9       A.   Yes.
10      Q.   What was their role?  What was
11  their job?  What did they do, client reps?
12      A.   They -- from my recollection, they
13  would do like a tour of The Lovelady Center,
14  showed you your room and gave you a set of
15  guidelines of what were expected of you and
16  what we expected of them.
17      Q.   Was that somebody you could go to
18  if you had questions while you were enrolled?
19      A.   Yes.
20      Q.   The client representative was like
21  your person that you could go to with issues or
22  questions?
23      A.   One of the persons, yes.

16 (Pages 61 to 64)

1    Q.   Was there somebody else you could
2  also go to?
3    A.   Yes.
4    Q.   Who was that?
5    A.   It was the counselors, the head of
6  Lovelady, like Ms. Melinda.
7    Q.   Ms. Melinda who is sitting here?
8    A.   Yes.
9    Q.   Did you ever go talk to Melinda?
10   A.   Yes.
11   Q.   Did you know her while you were at
12 Lovelady?
13   A.   Only when I needed to go talk to
14 her.
15   Q.   Okay.  How often did you go talk
16 to her?
17   A.   I think I met with her maybe from
18 my recollection, maybe three times.
19   Q.   Was she nice to you?
20   A.   Yes.
21   Q.   Was she helpful?
22   A.   Yes.
23   Q.   Did you feel like she was trying

1  to help you?
2    A.   I can't -- I can't recall.
3    Q.   Was she a nice person?
4    A.   Yes.
5    Q.   Was there anything about her that
6  you didn't like, that you had problems with?
7    A.   No.
8    Q.   Did you feel like she was in any
9  way unfair to you?
10   A.   I can't recall at this time.
11   Q.   Not that you can remember?
12   A.   Not that I can remember.
13   Q.   Do you have any reason to believe
14 Ms. Melinda is not an honest person?
15   A.   Yes.
16   Q.   And what is that?
17   A.   Simply because the basis of this,
18 I don't feel like I was treated fair as regards
19 to my work and my rate of pay, you know, while
20 I was there.  And we, you know, we used to say
21 something all the time, but it didn't make any
22 difference.
23   Q.   Who did you say something to?

1    A.   The client reps or somebody in job
2  placement.
3    Q.   What did you say?
4    A.   Well, all the hours worked, I
5  mean, my rent was -- sometimes, you know, it
6  would be caught up, but I always incurred some
7  kind of fee on there that I felt like I was
8  working, it should have been taken care of.
9  Because I was rarely in the Center.  I was
10 always somewhere working.  I was rarely in my
11 room is what I am saying.
12         I was always somewhere working,
13 whether it be chores, cleaning up the building,
14 working at The Lovelady Center, and there was
15 times that I couldn't buy myself something to
16 eat, you know.
17   Q.   That is what you said to them?
18   A.   Uh-huh.
19   Q.   Anything else?
20   A.   That is all I can remember at this
21 time.
22   Q.   Okay.  So you felt like you should
23 have been getting more money in?

1    A.   I want to say more money than I
2  was actually being paid, simply because of the
3  time that I worked, not something just given to
4  me, what I had worked for.
5    Q.   Were you doing a lot of general
6  maintenance and housekeeping stuff?
7    A.   Yes.  From what I can remember.
8    Q.   Is that a pretty accurate general
9  description of what you would have done inside
10 The Lovelady Center?
11   A.   Inside the Center?  No, I did
12 security.
13   Q.   Did you do any housekeeping type
14 things?
15   A.   Yes.
16   Q.   And maintenance type things?
17   A.   Not maintenance.  I didn't fix
18 anything.
19   Q.   Just housekeeping?
20   A.   Yeah.  And I did security --
21   Q.   Okay.
22   A.   -- in there, like --
23   Q.   Well, that would be part of

Page 69

1  maintaining the Center, wouldn't it, having
2  some security?
3      A.   When I am thinking of maintenance,
4  I am thinking of like fixing something.
5      Q.   Okay.
6      A.   So do you mean maintenance like
7  repairing something?  No, I never repaired
8  anything.
9      Q.   You helped maintain the Center by
10  picking up, making sure that it was clean,
11  making sure that general chores were done, that
12  type of thing?
13      A.   Yes, that was part of my work.
14      Q.   That was part of what you are
15  considering to be your work for Lovelady?
16      A.   That was my work.
17      Q.   That was your work?
18      A.   Yes.
19      Q.   Okay.  If you look at what I have
20  marked as Defendants' Exhibit 2, there's a line
21  on there that says that The Lovelady would
22  receive your food stamps.  Do you see that?
23      A.   I do.

Page 70

1      Q.   Did you receive food stamps?
2      A.   They did for me.
3      Q.   You filled out a form asking for
4  food stamps, correct?
5      A.   Yes.
6      Q.   And you got approved for food
7  stamps?
8      A.   I did.
9      Q.   And did you turn those over to
10  Lovelady?
11      A.   I did.
12      Q.   Was that to help pay for your food
13  while you were there?
14      A.   As far as I can recall.
15      Q.   Okay.  This document, Exhibit 2,
16  also says you were paid zero dollars and five
17  hundred dollars balance would be billed to you;
18  is that correct?
19      A.   Let me see.  Okay.  At the bottom?
20  That's correct.
21      Q.   And so you were having to pay a
22  fee each week to be a part of the program?
23      A.   Yes.

Page 71

1      Q.   In addition to your initial intake
2  fee, that covered you living there and food and
3  a variety of other things that would go along
4  day-to-day, counseling, all the things that
5  would be into the program, right?
6      A.   I'm not sure.
7      Q.   You didn't know --
8      A.   I don't know if I was made aware
9  of that at the time.
10      Q.   Let's look at the first line on
11  there.  Do you see that?  "I am responsible for
12  paying an intake fee of five hundred, and I
13  also must pay four hundred and fifty, which
14  covers the first three weeks."  Do you see
15  that?
16      A.   Yes.
17      Q.   Are those your initials, MB, right
18  next to that?
19      A.   Yes.
20      Q.   And your signature on the bottom
21  where it says "resident's signature"?
22      A.   Yes.
23      Q.   So you were aware of that, right?

Page 72

1      A.   Yes, I was aware of that.
2      Q.   And then it says, "I am
3  responsible to pay a hundred fifty dollars or
4  forty percent of my gross pay for participating
5  in the program."  That is on the second line.
6  Do you see that?
7      A.   Now, that, I wasn't made aware of
8  that.
9      Q.   Okay.  Well, you --
10      A.   I didn't understand what -- what
11  they were talking about.
12      Q.   Let's just read this, okay, with
13  me?
14      A.   Okay.
15      Q.   "I understand I am responsible to
16  pay a hundred fifty dollars or forty percent of
17  my gross pay, depending on my specific program,
18  weekly for participating in the program."  Am I
19  reading that correctly?
20      A.   Yes.
21      Q.   And right next to that there's a
22  little line that has got two initials.  What
23  are those initials?

Page 73

1     A.   MB.
2     Q.   Are those your initials?
3     A.   Those are my initials, yes.
4     Q.   And then it has got your signature
5  on the bottom of this document, correct?
6     A.   Yes.
7     Q.   So you were, in fact, aware of
8  that, right?  Because it says here, "I
9  understand it," and you initialed and signed
10  it.
11     A.   I initialed this and I signed
12  this, but I wasn't like -- I didn't know my
13  rights at this time.  I didn't understand all
14  what went into it.
15     Q.   Okay.
16     A.   Because really, honestly, it
17  was -- the financial -- the financial part of
18  it was really way above my head because it was
19  times I was thousands of dollars behind on
20  rent, so --
21     Q.   All I am asking is, those are your
22  initials and your signature on that?
23     A.   They are.

Page 74

1     Q.   The one that says "I understand"?
2     A.   Yes.
3          (Defendants' Exhibit 3 was marked
4          for identification.)
5     Q.   (BY MR. MILLER:)  I will show you
6  what I'm going to mark as Defendants'
7  Exhibit 3.  Is that your signature on that
8  document?
9     A.   It is.
10     Q.   And it says you were voluntary or
11  court-ordered admission to The Lovelady Center.
12  Do you see that on the top?
13     A.   I do.
14     Q.   You were voluntary; is what you
15  told me?
16     A.   Voluntary, self.
17     Q.   And it says that you were eligible
18  for residential rehabilitation, right?
19     A.   Yes.
20     Q.   There's a line on there, Number 5,
21  that says, "I waive my rights to claim suit
22  against The Lovelady Center."  Do you see that?
23     A.   I do.

Page 75

1     Q.   Okay.  Are you suing The Lovelady
2  Center?
3     A.   But I wasn't made aware of my
4  rights at the time when I signed this.
5     Q.   I am just asking you, are you
6  suing The Lovelady Center?
7     A.   I am involved in a case where I
8  was working overtime and I was not getting paid
9  to work overtime.  So I am not -- I can't say
10  exactly if it is The Lovelady Center, is it
11  their fault?  So I don't know.
12     Q.   You don't know if it was The
13  Lovelady Center's fault or not?
14     A.   I mean I know it is their fault
15  because I was there at The Lovelady Center and
16  I worked for The Lovelady Center.  But I am
17  here simply to get money that was owed to me.
18     Q.   Do you know who you are suing?
19     A.   My -- who I worked for.
20     Q.   Okay.  Who was that?
21     A.   The Lovelady Center.
22     Q.   Okay.  So you are suing The
23  Lovelady Center?

Page 76

1     A.   Yes.
2     Q.   Okay.  Does your church give any
3  money to The Lovelady Center?
4     A.   My church?
5     Q.   Uh-huh.
6     A.   I don't belong to a church.
7     Q.   Or the one you went to before,
8  Temple.
9     A.   No.
10     Q.   Do you know if any churches give
11  money?
12     A.   I don't know.
13     Q.   I know my church does.  Did you
14  ever see anybody there from Vestavia Baptist
15  Church at The Lovelady Center?
16     A.   Not Vestavia.
17     Q.   Any of the other Baptist churches?
18     A.   No.
19     Q.   You know churches, they had people
20  that would show up and volunteer, right?
21     A.   Yeah.
22     Q.   And they would give some money, to
23  your knowledge?

Page 77

1      A.   I don't know.
2      Q.   You didn't know --
3      A.   I haven't seen any exchange of
4   monies.
5      Q.   Okay.  You don't know where they
6   get their money?
7      A.   No.
8      Q.   Do you want to sue the --
9      A.   Well, from us, you know, the
10  clients.
11     Q.   Yeah, do you think that is enough,
12  what you were paying, would that be enough to
13  pay for all the services they provided to you,
14  a hundred fifty dollars a week?
15     A.   Services like what?
16     Q.   Well, living there, food,
17  counseling, all the staff that was there.
18     A.   I think it was too much.
19     Q.   A hundred fifty dollars a week was
20  too much?
21     A.   Yeah.
22     Q.   Do you know what Bradford costs,
23  if you were to go to rehabilitation there?

Page 78

1          MR. CAMP:  Objection.  Get back on
2   track, please.  This has nothing to do with her
3   employment.
4          MR. MILLER:  Just object to the
5   form.
6      A.   I object.
7      Q.   (BY MR. MILLER:)  No, you can't.
8   Overruled.
9          MR. CAMP:  No, you can't --
10     Q.   (BY MR. MILLER:)  Do you know how
11  much it would cost to go to Bradford?
12         MR. CAMP:  Same objection.
13     Q.   (BY MR. MILLER:)  You can answer.
14     A.   I don't.
15     Q.   Did you think Lovelady was taking
16  any risk bringing in people who were addicted
17  to drugs, having them all there together?  Was
18  there any risk involved with that?
19     A.   Risk like what?
20     Q.   Like that they could get hurt or
21  that they might do something that they
22  shouldn't do that would cause The Lovelady to
23  have some liability?

Page 79

1      A.   No.
2      Q.   You understood when you signed
3   these documents that this was required of you
4   in order to enter the program?
5      A.   No, not at the time.
6      Q.   Oh, you didn't?
7      A.   No.
8      Q.   You thought they were just having
9   you sign them?  Why did you think they had you
10  sign them?
11     A.   I mean like when you go anywhere,
12  do anything with a company, they have you sign
13  papers.  Like I guess like as far as like to --
14  to verify that you were there and that this was
15  that person and in a lot of cases, such as
16  these, to cover their end, you know.
17     Q.   Okay.  You told me you did live
18  on-site.
19     A.   I did.
20     Q.   But you didn't have any children
21  who lived there with you.
22     A.   No.
23     Q.   Did they ever come and visit you?

Page 80

1      A.   Yes, on the weekends.
2      Q.   Could they stay overnight?
3      A.   Yes.
4      Q.   So they did come and stay
5   overnight with you there?
6      A.   Yes.
7      Q.   Did you have to pay extra for them
8   when they came?
9      A.   No.
10     Q.   Was there some child care for them
11  if you needed it?
12     A.   Child care?
13     Q.   Through the Center.
14     A.   Yes, there was some provided
15  through the Center, but my children didn't --
16  they couldn't use those services.
17     Q.   They couldn't?
18     A.   No.
19     Q.   Why not?
20     A.   Because the -- the hours that I
21  would have needed them, the KidZone was not
22  open.  Because I primarily -- I worked
23  overnight.  But most of the time if I knew my

Page 81

```
 1    kids were coming for the weekend, I did not
 2    work. I scheduled off.  And if I could not
 3    schedule off, I would have my roommate watch my
 4    kids.
 5         Q.   And your roommate would do that
 6    for you?
 7         A.   Yes.
 8         Q.   Would you ever watch anybody
 9    else's children when they needed help?
10         A.   Yes.
11         Q.   As a favor or --
12         A.   Yes.
13         Q.   Is that something y'all did for
14    each other?  Y'all were all kind of in the same
15    boat, people who were enrolled in the program,
16    right?
17         A.   Yes.
18         Q.   Did y'all sort of help each other
19    out or try to?
20         A.   Yes.  Try.
21         Q.   Was it that kind of environment, I
22    mean, that you wanted to help each other out,
23    everybody wanted each other to succeed, to get
```

Page 82

```
 1    through it?
 2         A.   I can't speak for anybody else,
 3    just for myself.
 4         Q.   Were you encouraged to help each
 5    other out?
 6         A.   No, we weren't encouraged.  It was
 7    just more so of if you were asked and you could
 8    do it, you did it.  And if you couldn't do it,
 9    you didn't do it.
10         Q.   Who fed your children when they
11    came and visited you?
12         A.   My kids are so picky they brought
13    their own food.  And I would buy outside food.
14    Their dad would send money with them, and I
15    bought food from restaurants.
16         Q.   So could you do that, you were
17    allowed to buy food and bring it in?
18         A.   Yes, that is what I did most of
19    the time because I didn't like their food.
20         Q.   You didn't like Lovelady food?
21         A.   No.
22         Q.   Is that a no?
23         A.   No.
```

Page 83

```
 1         Q.   Let's talk about when you were
 2    there, the services that were involved.  You
 3    had rehabilitation; is that right?
 4         A.   Yes.
 5         Q.   Trying to get clean, get sober?
 6         A.   Yes.
 7         Q.   That was something that was
 8    worthwhile to you, to try to get clean?
 9         A.   Yes.
10         Q.   You had counseling?
11         A.   That was required.
12         Q.   That was required as part of the
13    program?
14         A.   Part of the program.
15         Q.   How often did you go to
16    counseling?
17         A.   We had to schedule a counseling
18    appointment -- I can't put it in for how often
19    you had to, but you just had to have so many
20    signatures on the piece of paper.
21         Q.   And then you had job services that
22    was part of --
23         A.   Yes, job placement.
```

Page 84

```
 1         Q.   Was there some training and a
 2    program called job readiness?
 3         A.   I don't remember that.
 4         Q.   You don't remember job readiness?
 5         A.   No.
 6         Q.   Or something similar to that that
 7    helped you get ready to go out and get a job?
 8         A.   No.
 9         Q.   Wasn't that part of the reason you
10    submitted that resume online?
11         A.   Yes.  But I didn't need to get
12    ready.  I already knew how to apply for a job.
13    I just did that to get a signature on a piece
14    of paper.
15         Q.   You didn't need to get ready to go
16    out in the workforce?
17         A.   No.
18         Q.   But you didn't have a job when you
19    showed up?
20         A.   No.
21         Q.   And had you created a resume
22    before?
23         A.   Yes.
```

21 (Pages 81 to 84)

Page 85

1    Q.   You did?
2    A.   I already had my resume.
3    Q.   Do you have a resume right now?
4    A.   Not with me.  I have one.
5    Q.   A current, up-to-date resume?
6    A.   It is not up to date.
7    Q.   When did you last update it?
8    A.   2011.
9    Q.   So you enrolled in Lovelady in
10   2012 and the last time you had updated your
11   resume was 2011?
12   A.   (Nodding.)
13   Q.   Is that correct?
14   A.   Yes.
15   Q.   And other than the one you did at
16   Lovelady that was submitted online to the State
17   of Alabama agency, you haven't ever done
18   another resume?
19   A.   No.
20   Q.   Is that correct?
21   A.   That's correct.
22   Q.   What about money management, did
23   you have some classes on managing your money,

Page 86

1    managing your finances?
2    A.   No, I didn't.
3    Q.   You didn't do any of that?
4    A.   No.
5    Q.   What about interviewing skills,
6    did you have any classes on that?
7    A.   No.
8    Q.   No?  What about how to dress,
9    professional dress, any kind of training or
10   classes on that while you were at Lovelady?
11   A.   No.
12   Q.   No?  Okay.  Other educational
13   courses, did you take any type of educational
14   training when you were there?
15   A.   No.
16   Q.   Religious services, did you go to
17   religious --
18   A.   Yes.
19   Q.   -- services and --
20   A.   You had to.
21   Q.   You had to?
22   A.   (Nodding.)
23   Q.   Was that helpful to you?

Page 87

1    A.   I can't tell you one way or
2    another.
3    Q.   Okay.  Transportation, is that
4    something that was provided or that you paid
5    for when you were there?
6    A.   Yes.
7    Q.   Well, they deducted it from your
8    fees.  So if you were going to be transported
9    somewhere, you paid for it?
10   A.   Yes.
11   Q.   Just like you would if you weren't
12   living there, if you wanted to take a bus
13   somewhere or a cab somewhere, you would pay for
14   it, right?
15   A.   Yes.
16   Q.   Okay.  As I understand it, when
17   you first come in, there's something called
18   Phase I; is that correct?
19   A.   That's correct.
20   Q.   Is that the first thirty days?
21   A.   Yes.
22   Q.   Or I guess it could go longer if
23   you didn't progress past Phase I?

Page 88

1    A.   That's correct.
2    Q.   And what you do there is you
3    basically get clean, get sober?
4    A.   I guess.  I mean I was already
5    sober.
6    Q.   Well, you tested positive when you
7    came in.
8    A.   I know.  But they tested me like
9    three days later and I didn't have anything in
10   my urine.
11   Q.   So it was just left over, residual
12   things that were in your system?
13   A.   Yes.
14   Q.   And it was gone three days later?
15   A.   Yes.
16   Q.   Okay.  Did you later test positive
17   while you were at the Center?
18   A.   Yes.  It was some months later,
19   like I think about a year, almost.
20   Q.   When you went to the hospital to
21   visit a family member, when you came back, you
22   tested positive, right?
23   A.   Yes.

Page 89

```
 1        Q.   They didn't kick you out of the
 2   program, did they?
 3        A.   No, not at that time.
 4        Q.   It was after you tested positive
 5   again --
 6        A.   (Nodding.)
 7        Q.   -- that you were kicked out of the
 8   program, right?
 9        A.   That's correct.
10        Q.   Have you gone to any other
11   programs since Lovelady for rehabilitation?
12        A.   No.
13        Q.   When you were in Phase I, were you
14   doing any type of work inside The Lovelady or
15   outside?
16        A.   Inside The Lovelady.
17        Q.   Okay.  What were you doing?
18        A.   Just chores.
19        Q.   What kind of chores?
20        A.   Like cleaning up, taking out the
21   trash, that is pretty much what I did.  I kept
22   my client rep's office clean.
23        Q.   Did you get some type of credit
```

Page 90

```
 1   for that?
 2        A.   You got a signature.
 3        Q.   For however many hours you worked?
 4        A.   Yes.
 5        Q.   Did sometimes when you did a job,
 6   say, take out the trash, did they give you more
 7   credit than the time you actually spent?
 8        A.   No.
 9        Q.   That never happened to you?
10        A.   No.
11        Q.   Say if you will take out the
12   trash, we will give you two hours of credit,
13   anything like that?
14        A.   No.
15        Q.   It was always the actual time that
16   you spent?
17        A.   Yes.  That is why my fees and
18   stuff got behind when I did start working.
19   Like I said, I was never caught up.  I was
20   always behind.  They started adding up.
21        Q.   When you left, were you caught up
22   or were you behind?
23        A.   When I left, I was caught up.
```

Page 91

```
 1        Q.   Didn't owe anything?
 2        A.   No, because they kept my last
 3   check.
 4        Q.   Did you have some money in your
 5   pocket when you left?
 6        A.   No.
 7        Q.   In your bank account?
 8        A.   No.
 9        Q.   Do you have a bank account?
10        A.   No.
11        Q.   Have you ever had a bank account?
12        A.   Yes.
13        Q.   When did you last have one?
14        A.   2011.
15        Q.   So Phase I, you were basically
16   getting clean, getting acclimated in the
17   program; is that right?
18        A.   Yes.
19        Q.   Doing some chores internally?
20        A.   Yes.
21        Q.   And when you did those chores, you
22   were writing your time down?
23        A.   No.  I wasn't writing the time
```

Page 92

```
 1   down.  I was getting signatures from my client
 2   rep.  She would just sign a piece of paper
 3   saying I did that.
 4        Q.   You did your chores.
 5        A.   Yes.
 6        Q.   How many hours were you spending
 7   doing chores at that first phase?
 8        A.   Hours totaling the whole month or
 9   daily?
10        Q.   That thirty days.
11        A.   I don't remember.
12        Q.   Was it mostly spent going through
13   counseling and rehab?
14        A.   Yeah, and doing the classes that
15   they required you to do.
16        Q.   After that thirty days, did you
17   get to the next phase?
18        A.   Yes.
19        Q.   Phase II?
20        A.   Yes.
21        Q.   What does Phase II involve?
22        A.   I was able to apply for a job at
23   The Lovelady Center to work to where I can --
```

Page 93

1    because my client rep, she kept getting on me,
2    on my fees, and my fees was getting high. So I
3    had to apply for, you know, work. So that is
4    when I did The Lovelady security.
5        Q.   Who did you go talk to about
6    working in security?
7        A.   Shanae. I can't think of her last
8    name. I just remember Shanae.
9        Q.   What department or area was she
10   in?
11       A.   She was over security.
12       Q.   So you just went and you said I am
13   going to work in security and you went and
14   talked directly to Shanae?
15       A.   Yes.
16       Q.   You didn't go through Lovelady's
17   human resources department?
18       A.   Not that I can remember. I mean
19   she had to. She had to make sure I was cleared
20   to do it.
21       Q.   Was she an employee of Lovelady?
22       A.   No. She was actually in the
23   program.

Page 94

1        Q.   She was? Shanae was in the
2    program?
3        A.   Yes.
4        Q.   Okay. Did you fill out an
5    application for security?
6        A.   No.
7        Q.   Do you have any security
8    background? Had you ever been a security guard
9    before?
10       A.   No.
11       Q.   Any experience at all being
12   security?
13       A.   For what they needed, yeah.
14       Q.   What was it that they needed?
15       A.   I mean just basically when the
16   clients came in or anybody came in to the
17   Center, I just had to check their purses and
18   their bags to make sure they weren't bringing
19   in anything that wasn't allowed in the Center.
20   And I had to do room checks.
21       Q.   So you weren't carrying a weapon
22   or anything like that?
23       A.   No.

Page 95

1        Q.   Billy club?
2        A.   Huh-uh.
3        Q.   You never had to throw anybody on
4    the ground and frisk them?
5        A.   No. We didn't have to throw them
6    on the ground, but we did have to search them.
7        Q.   When people came into the Center,
8    you checked to make sure they weren't bringing
9    drugs or guns or anything like that?
10       A.   Yes.
11       Q.   And you checked their rooms to
12   make sure people didn't have drugs or anything
13   that they weren't supposed to have?
14       A.   That's correct.
15       Q.   At that time when you were in
16   Phase II, were you still going through your
17   counseling and religious services?
18       A.   Yes. You had to do everything
19   else.
20       Q.   When you were at Lovelady, did you
21   ever get any type of written employment
22   agreement, saying you are an employee, here is
23   what your job consists of?

Page 96

1        A.   Yes. There was a piece of paper I
2    had to sign.
3        Q.   What did that piece of paper say?
4        A.   Stating the duties of what I had
5    to do and that I completed them. I had to sign
6    like every night of what I did, like what rooms
7    I checked and what area of the building that I
8    checked. And that was given to like the head
9    lady that was over --
10       Q.   You were signing a task sheet and
11   said here is what I did today?
12       A.   Yes.
13       Q.   But that is not what I am asking
14   about. I appreciate it. Thank you for telling
15   me that. But what I am asking about, did you
16   ever have any type of agreement that said you
17   were going to be an employee of Lovelady and
18   here is what your job is going to be, here is
19   what you are going to be paid, that type of
20   detail and you signed it and they signed it,
21   where you had an agreement like a contract to
22   be an employee?
23       A.   Well, I was made aware that how

Page 97

1    they calculated up the hours and how they
2    decided what was the rate of pay and what was
3    on -- how my rent and my fees were going to be
4    handled, yes.
5        Q.   Okay.  Was that done verbally, you
6    talked about it?
7        A.   From what I can remember, I
8    remember signing something with my client rep.
9        Q.   You do?
10       A.   Yes.
11       Q.   Okay.  Do you remember what that
12   piece of paper was?
13       A.   No.  I don't.  They should have
14   it.  They have all these other papers.
15       Q.   I'm asking you if you have it.
16       A.   I don't have it.
17       Q.   Do you remember what it said?
18       A.   Just describing my work, what I
19   would be doing at that time.  I guess they had
20   to have an account for every client, you know,
21   stating what I would be doing and how I would
22   be compensated for what I would be doing.
23       Q.   How would that work?  Tell me how

Page 98

1    you were going to be compensated.
2        A.   My fees were going to be taken
3    care of, this five hundred dollar intake fee
4    and that nine hundred and fifty dollars that
5    was put upon me while I wasn't working.
6        Q.   You say put upon you?
7        A.   Yeah, I mean, you know, that I had
8    incurred while I was not working.
9        Q.   That you agreed to?
10       A.   Yeah, I agreed to it.  But had I
11   had it that day, it would not have been behind.
12       Q.   Okay.
13       A.   And the hundred and fifty dollars
14   or forty percent of my gross pay.
15           (Defendants' Exhibit 4 was marked
16           for identification.)
17       Q.   (BY MR. MILLER:)  Let me show you.
18   Did you ever see or sign a piece of paper that
19   looked like this that described the Success
20   program?
21       A.   No.  I never worked the Success
22   program.
23       Q.   You what?

Page 99

1        A.   I never worked the Success
2    program, no.
3        Q.   You never worked the Success
4    program?
5        A.   No.
6        Q.   What was the Success program?
7        A.   I don't know.  I am reading it
8    now.
9            (Pause.)
10       A.   Yeah, I didn't do the Success
11   program.
12       Q.   (BY MR. MILLER:)  Are you sure?
13       A.   I am positive.
14       Q.   Okay.  Are you sure the Success
15   program wasn't part of Phase II and that your
16   working security maybe was not part of that?
17       A.   No, not to my knowledge, no.  I
18   never did a two-page summary -- first, I have
19   never seen this.
20       Q.   Okay.  As far as you know, you
21   weren't even in the Success program?
22       A.   No.  I was not in the Success
23   program.

Page 100

1        Q.   Did you understand that your
2    general chores like housekeeping and the
3    maintenance stuff that you testified about,
4    that you were going to do that without having
5    to be compensated?
6        A.   No.
7        Q.   You didn't?
8        A.   I thought anything that I did, I
9    was going to be compensated for.
10       Q.   You did?
11       A.   (Nodding.)
12       Q.   Okay.
13           (Defendants' Exhibit 5 was marked
14           for identification.)
15       Q.   (BY MR. MILLER:)  Is that your
16   signature on this document that I have just
17   given you as Defendants' Exhibit 5?
18       A.   It is.
19       Q.   Okay.  That is your signature down
20   on the bottom?
21       A.   Yes.
22       Q.   Okay.  It is dated January 23rd,
23   2012?

25 (Pages 97 to 100)

1    A.   Yes.
2    Q.   That would have been when you
3  first came in?
4    A.   Yes.
5    Q.   There's a witness on there, right?
6    A.   Yes.
7    Q.   Do you remember signing this
8  document?
9    A.   I don't remember signing it.
10    Q.   But it is your signature?
11    A.   It is.
12    Q.   Okay.  And it says on here that
13  each resident has the right to know that the
14  performance of all assigned housekeeping and
15  general maintenance duties may be performed
16  without compensation.  Do you see that?
17    A.   I wasn't aware of that at the
18  time.
19    Q.   Well, you did sign this document.
20    A.   Yes, I signed a stack of papers
21  that was just thrown in front of me.
22    Q.   They were thrown in front of
23  you --

1    A.   You had to sign them.  That is why
2  my signature looked like that.
3    Q.   Do you typically sign stuff
4  without reading it?
5    A.   If I trust somebody.
6    Q.   You just sign it?
7    A.   If I feel like I am not getting
8  taken advantage of.  And I didn't see any
9  reason I -- not to sign it.
10    Q.   So you worked security there.  How
11  long did you work security?
12    A.   Up until I started working at
13  Blackwell's Way.
14    Q.   Okay.  When did you start working
15  at Blackwell's Way?
16    A.   I think in April of 2013.
17    Q.   April of 2013?
18    A.   Yes.
19    Q.   How did that come about?
20    MR. CAMP:  Hold on a second.
21    (Off-the-record discussion.)
22    (Whereupon, a break was had from
23    10:50 a.m. until 10:58 a.m.)

1    Q.   (BY MR. MILLER:)  Okay.  We are
2  going back on the record if you are ready.
3    A.   Yes.
4    Q.   Ms. Knox will be back in a second.
5  When we went off the record, I think we were
6  talking a little bit about the Success program.
7  You said you didn't remember being in the
8  Success program.
9    A.   No.
10    Q.   As I understand it, the work that
11  you did, you received money that allowed you to
12  pay for your expenses, the money that you owed
13  the Center.
14    A.   Yes.
15    Q.   Is that right?
16    A.   Yes.
17    Q.   Did you ever get to a point where
18  you were making more than what you owed the
19  Center?
20    A.   Yes.
21    Q.   Okay.
22    A.   When I started working at
23  Blackwell's.

1    Q.   Okay.  You started working at
2  Blackwell's.  Did you have to be in Phase III
3  or was that part of Phase II?
4    A.   Honestly, I don't know what phase
5  I was in when I started at Blackwell's.
6  Because I was working so much trying to get my
7  fees down, a lot of the times I didn't get my
8  signatures to phase up.  So I couldn't tell you
9  how -- if I was in Phase II or Phase III.
10    Q.   Okay.  Now, as part of the
11  program, you had to work some voluntary hours,
12  right?
13    A.   Yes.
14    Q.   That was part of the arrangement?
15    A.   That was part of it, but I thought
16  anytime that I worked that I was going to be
17  compensated for it.
18    Q.   I'm not asking you what you want
19  to tell me you thought now.  I am asking you,
20  when you came in, you understood that you had
21  to do volunteer hours?
22    A.   Yes.
23    Q.   And that was a requirement of the

Page 105

1  program in order to graduate, right?
2      A.  I guess to phase up, yeah.
3      Q.  Well, to graduate?
4      A.  To graduate, yes.
5      Q.  And those volunteer hours could be
6  at The Lovelady Center or they could be out in
7  the community, correct?
8      A.  I'm not sure.
9      Q.  Well, did you ever do any
10 volunteer work out in the community?
11     A.  No.
12     Q.  None at all?
13     A.  No.
14     Q.  Have you ever done any voluntary
15 work out in the community since you have been
16 at Lovelady Center?
17     A.  No.
18     Q.  Did you ever do any voluntary work
19 out in the community before?
20     A.  No.
21     Q.  So tell me about Blackwell's.  How
22 did that come about?
23     A.  Because my fees were never getting

Page 106

1  caught up, my client rep suggested that I apply
2  for an outside job at Blackwell's.
3      Q.  And how did you apply for that?
4      A.  I went to job placement and told
5  them that I wanted to work at Blackwell's.  And
6  that is it.
7      Q.  And then what happened?
8      A.  I started working at Blackwell's.
9      Q.  Okay.  Where was Blackwell's
10 located?
11     A.  In Pinson, Trussville.
12     Q.  Okay.  And did you take a bus that
13 took you there or a car or how did you get
14 there?
15     A.  Transportation, The Lovelady
16 transportation.
17     Q.  Did they provide it, Lovelady
18 provided you transportation there and back?
19     A.  Yes.
20     Q.  Was that part of your fee, your
21 weekly fee, that transportation?
22     A.  It was included.
23     Q.  It was included?

Page 107

1      A.  Yes.
2      Q.  And so you would get in the
3  transportation.  You would take the
4  transportation, go to Blackwell's, right?
5      A.  Yes.
6      Q.  And what would you do when you got
7  there?
8      A.  I would do my job.  I worked.
9      Q.  What was your job?
10     A.  To feed -- well, prepare, cook the
11 food for the client, give them their
12 medication, bathe them or change their clothes
13 if they needed -- some of the clients, they
14 could do for themselves; some couldn't.  Some
15 of them you just had to watch to, you know,
16 keep them safe.  Some of them would try to run
17 out in the middle of the street.
18     Q.  When you say clients, what was
19 Blackwell's?  What service did they provide?
20     A.  They were in like a group home,
21 what was considered a group home for the
22 mentally impaired.
23     Q.  Okay.  And did you have some

Page 108

1  training out at Blackwell's when you got there
2  about what you were supposed to do?
3      A.  Yes.
4      Q.  Okay.  Who gave you that training?
5      A.  I don't remember their name.  They
6  were at Haymon Homes, H-A-Y-M-O-N-S.
7      Q.  Did you ever work at Haymon Homes?
8      A.  I did my training at Haymon Homes.
9      Q.  Okay.
10     A.  But I didn't actually go out to
11 the house at Haymon Homes.  I came right back
12 to go to Blackwell's.
13     Q.  Was it a person who was at
14 Lovelady who trained you for Blackwell's or was
15 it somebody who worked at Blackwell's or
16 Haymon?
17     A.  Somebody that worked at
18 Blackwell's or Haymon.
19     Q.  They told you what jobs you needed
20 to do, how you needed to do it, that type of
21 thing?
22     A.  And they certified us for -- to
23 give medication.  You had to take a test in

27 (Pages 105 to 108)

Page 109

1    order to be able to give medication to one of
2    the residents.
3        Q.    And you had some nursing training
4    already, right?
5        A.    Yes.
6        Q.    So that was helpful, you were
7    able --
8        A.    Yes.
9        Q.    Did that give you a leg up on
10   knowing what to do, do you feel like?
11       A.    Not really, no.
12       Q.    So you went through the training.
13       A.    (Nodding.)
14       Q.    Is that a yes?
15       A.    Yes.
16       Q.    And then once you completed the
17   training, you actually went and worked at
18   Blackwell's?
19       A.    I did.
20       Q.    And that is not on the same
21   location as Lovelady, right, not the same --
22       A.    No.  Haymon Homes is in -- it is
23   in another part of Alabama.  I can't think of

Page 110

1    where.  But --
2        Q.    Okay.
3        A.    It was like about an hour drive.
4        Q.    Okay.  When you got there each day
5    at Blackwell's, did you go see somebody and
6    find out where you were assigned for that day
7    or what you were supposed to do or how did that
8    work?
9        A.    No.  That was already given to us.
10   We already knew the house that we were going to
11   work at, unless something changed at the last
12   minute.
13       Q.    Who told you what house you were
14   going to work at?
15       A.    The supervisor.
16       Q.    Okay.  Who was your supervisor?
17       A.    LaDedra Colvin.
18       Q.    And who did she work for?
19       A.    Blackwell's Way.
20       Q.    And had she been there a long
21   time?
22       A.    I'm not sure.  I don't remember.
23       Q.    So she told you what house you

Page 111

1    were going to go to each day?  She would give
2    you your assignment?
3        A.    Well, she told -- I can't remember
4    who it was at job placement at that time.
5    Somebody at job placement in The Lovelady put
6    this person at this house.
7        Q.    Okay.
8        A.    She communicated to that person.
9    And the person in job placement, there was so
10   many of them -- it first started out Holly, and
11   then two more girls ended up being in there
12   because some of them got dismissed or whatever.
13   And they would give us our schedule and tell us
14   where to work.
15       Q.    That came from Blackwell's, they
16   communicated it to --
17       A.    To somebody at The Lovelady.
18       Q.    So they could organize it so
19   everybody would know where they were supposed
20   to go?
21       A.    Yes.
22       Q.    So you would get right there each
23   day?

Page 112

1        A.    Yes.
2        Q.    So you wouldn't have to come in
3    and figure out where you were going and all
4    that?
5        A.    Yes.
6        Q.    When you went, was there somebody
7    who you reported to on a day-to-day basis at
8    Blackwell's who was your supervisor?
9        A.    Not that I reported to.  But if
10   you needed something, there was somebody, a
11   nurse you can call.
12       Q.    Was the nurse your supervisor?
13       A.    No, she wasn't my supervisor.
14       Q.    Who looked over you while you were
15   at Blackwell's?
16       A.    Well, while we were in the homes,
17   it was just us and the clients.
18       Q.    But if you had an issue, who did
19   you go to?
20       A.    While we were at work?
21       Q.    Yes.
22       A.    I would go to -- I would call the
23   nurse.

28 (Pages 109 to 112)

1      Q.   And what kind of things would you
2   call the nurse for?
3      A.   If it was a medication error, if
4   one of the clients acted out and needed medical
5   attention or something.
6      Q.   All right.  If you had a question
7   about something, what am I supposed to do in
8   this situation, who would you call?
9      A.   The nurse.
10     Q.   Did Lovelady have anybody that
11  they sent up who was in the home with you every
12  day?
13     A.   No.
14     Q.   You didn't have a supervisor
15  on-site at Blackwell's who worked at Lovelady?
16     A.   Not that I can remember.  But if I
17  had an issue with anything at any time, I could
18  call my client rep.
19     Q.   About anything, right?
20     A.   Yes.
21     Q.   Okay.  How much were you paid at
22  Blackwell's?
23     A.   What do you mean like pay?

1      Q.   Were you paid by the hour?
2      A.   An hour?  Yes, we were paid
3   hourly.
4      Q.   Who decided what your hourly rate
5   was going to be?
6      A.   The Lovelady.
7      Q.   How do you know that?
8      A.   Because they just told us that is
9   what it would, you know, be.  Minimum wage, I
10  guess.
11     Q.   Okay.  So you were paid minimum
12  wage?
13     A.   Yes.
14     Q.   Do you know how you got paid, how
15  that money came through?  Did Blackwell's send
16  it to Lovelady and they then cut a check to
17  you?
18     A.   I guess that is how they did it.
19  I'm not sure.
20     Q.   You don't even know?
21     A.   No.
22     Q.   Did you ever ask?
23     A.   No.

1      Q.   Do you know if Lovelady owned the
2   building where Blackwell's Way was?
3      A.   I don't know.
4      Q.   Do you know if they owned or
5   leased any of it?
6      A.   I don't know.
7      Q.   You don't know?  Did you
8   understand that the nurse, if you did something
9   you weren't supposed to do, that the nurse at
10  Blackwell's could fire you?
11     A.   No.
12     Q.   No?
13     A.   (Shaking head.)  I thought my
14  client rep, you know, told me if I could or
15  couldn't go back to work.
16     Q.   Okay.  You thought your client
17  rep, who was not with you on a day-to-day
18  basis, right?  Is that correct?
19     A.   Yes.
20     Q.   Didn't observe what you were doing
21  on a day-to-day basis, did she?
22     A.   Yes.  They could still decide
23  whether or not I could go back to work.

1      Q.   I am asking you, your client rep
2   didn't observe you on a day-to-day basis?
3      A.   But they still decided --
4      Q.   Did your client rep observe you on
5   a day-to-day basis?
6      A.   Yes, inside the Center.
7      Q.   No, at Blackwell's.
8      A.   Oh, no.
9      Q.   So they wouldn't know if you were
10  doing a good job or not unless somebody at
11  Blackwell's specifically told them, right?
12     A.   Yes.
13     Q.   Somebody at Blackwell's would have
14  to call and say don't send her back?
15     A.   Yes.
16     Q.   Is that correct?
17     A.   That's correct.
18     Q.   Okay.  Let's go back a little bit
19  on your chores.  Tell me what kind of type of
20  internal chores you did when you were at
21  Lovelady.
22     A.   Well, sweep the steps, sweep and
23  mop the entranceway of the Center when you

Page 117

1    first come in.  They had these common areas
2    where you could heat up food.  You just have to
3    take the trash out there, clean and wipe down
4    the counters there.  Take out trash.  Vacuum
5    carpet.  What else did I do?  That was pretty
6    much it.
7        Q.   Would you pick what you did?
8        A.   No, you was told.
9        Q.   Who told you, hey, do this chore?
10       A.   The person that was over the
11   chores.
12       Q.   Who was over the chores?
13       A.   Whoever assigned -- whoever was
14   assigned to give out chores.  It wasn't the
15   same person at all times.
16       Q.   Have you ever had a job in the
17   outside world, outside Lovelady, where you
18   would have done chores like you did at
19   Lovelady?
20       A.   Not -- what do you mean like
21   outside world?
22       Q.   Well, in another job, outside for
23   the bank or for Caremark or any of these other

Page 118

1    jobs you have done --
2        A.   If I was getting paid for it and
3    it was in my job description.
4        Q.   If you what?
5        A.   If I was getting paid for it and
6    it was in my job description.
7        Q.   But have you ever had a job where
8    your job was to do chores?
9        A.   Yes.
10       Q.   Okay.  What job was that?
11       A.   When I worked in the home health
12   agency, we had to clean the client's house, you
13   know, clean up behind them because they
14   couldn't.  They were old.  Wash their clothes,
15   cook for them.
16       Q.   That is where you were doing
17   everything for that particular client?
18       A.   Yes.
19       Q.   Okay.  And when was that?
20       A.   When I worked for Awesome Sitter
21   service.
22       Q.   Awesome Sitter service?
23       A.   Uh-huh.

Page 119

1        Q.   So when you were a sitter you did
2    chores?
3        A.   Yes.
4        Q.   In addition to watching that
5    person?
6        A.   Yes.
7        Q.   That is a job that you applied
8    for, interviewed for and all that, the Awesome
9    Sitter service?
10       A.   Yes.
11       Q.   And you didn't live on-site with
12   the person that you were doing the chores for?
13       A.   No, I didn't live with them, no.
14       Q.   Did some of your chores at
15   Lovelady include picking up after yourself,
16   keeping your room clean, that type of thing?
17       A.   Yes, that was required of us.
18       Q.   Cleaning common areas that you and
19   others would use?
20       A.   Yes.
21       Q.   When you did a chore, did you
22   write down your time, keep track of it?
23       A.   No, I didn't, but the person that

Page 120

1    was giving out the chores, they would have a
2    piece of paper from the client rep that had all
3    that client rep's clients listed on it.  And
4    they would write what chore they did.  And they
5    went behind and checked to make sure that that
6    chore was completed.  And that was handed over
7    to my client rep.
8        Q.   What was that called?  Was that an
9    opportunity credit?
10       A.   The chore?
11       Q.   (Nodding.)
12       A.   No, that was called work.
13       Q.   How did you get an opportunity
14   credit?  Didn't you have a sheet called
15   opportunity credits?
16       A.   Yes.
17       Q.   And what did you use that for?
18       A.   That was when I first started
19   working for Carraway, doing the security at
20   Carraway.
21       Q.   At Carraway?
22       A.   Yes.
23       Q.   When you were at Lovelady?

Page 121

1       A.   Yes.
2       Q.   When you say Carraway, was that
3   the location?
4       A.   That was their other location.  We
5   went over there and were supposed to keep folks
6   off the property.
7       Q.   So when you were doing the
8   security work at Carraway, you filled out a
9   sheet that was called opportunity credits?
10      A.   Yes.
11      Q.   Let me show you one.
12          (Defendants' Exhibit 6 was marked
13           for identification.)
14      Q.   (BY MR. MILLER:)  We are on 6?
15      A.   Yes.
16      Q.   Is that the type of sheet that you
17  would have for an opportunity credit?
18      A.   Yes.
19      Q.   What does this show?  Go through
20  this with me and tell me what it shows.
21      A.   It is showing -- what do you mean?
22      Q.   Well, when you were working
23  security, you were writing down the time that

Page 122

1   you started and the time you stopped?
2       A.   Yeah, the time I started and the
3   time I break for lunch and then the time I go
4   back in.
5       Q.   And this shows ten of those hours
6   were considered to be voluntary hours?
7       A.   I don't know because when I signed
8   this, only twenty-five was there.  That minus
9   ten wasn't there.  This was added after.
10      Q.   The twenty-five was there?
11      A.   Yes.
12      Q.   Okay.  How do you remember what
13  was on there when you signed it?
14      A.   Because I would have asked her why
15  she is taking ten off.
16      Q.   Do you remember signing this on
17  March 18th, 2013?
18      A.   Mine says April the 2nd, 2013.
19      Q.   Oh, you have got the April.  Okay.
20  April 2nd, 2013?
21      A.   Yes.  I didn't date it.  It was
22  dated by Shanae.
23          THE REPORTER:  I'm sorry?

Page 123

1       A.   I'm sorry.  I didn't date it, but
2   it's dated by Shanae.
3       Q.   (BY MR. MILLER:)  You understood
4   that some of your work that you did internally
5   was going to get credited toward your volunteer
6   hours?
7       A.   No, I didn't.
8       Q.   You didn't?  Where did you think
9   you were going to get those volunteer hours if
10  you weren't going outside to do any --
11      A.   I didn't think I was volunteering
12  to do anything.
13      Q.   Oh, you didn't?
14      A.   No.
15      Q.   You didn't think you had to do any
16  volunteer hours; is that your testimony?
17      A.   Not while I was working, no.
18      Q.   When were you going to do them if
19  it wasn't when you were working?  How were you
20  going to get those volunteer hours?
21      A.   I don't know.
22      Q.   They were just going to magically
23  appear?

Page 124

1       A.   I didn't think they were going to
2   magically appear.  I just wasn't thinking about
3   them at that time.
4       Q.   But you knew that you had to have
5   them to graduate?
6       A.   Yes.
7       Q.   And that that was part of the
8   program?
9       A.   But I was always working to get my
10  fees down to even maintain at the Center.  If I
11  didn't work to get the fees down, I was going
12  to be dismissed for nonpayment.
13      Q.   And you understood that that was
14  part of the program, though, was to do
15  volunteer work, have a certain number of
16  volunteer hours?
17      A.   Yes, but I don't remember when the
18  volunteer hours were due.  Just I knew I had to
19  have them.  But at this time, I was working to
20  pay my rent.  I wasn't volunteering for
21  anything.
22      Q.   You weren't?
23      A.   No.

Page 125

1      Q.    And you have never volunteered for
2  anything, as I understand it today; is that
3  right?
4      A.    No.
5      Q.    Is that correct?
6      A.    I was working.
7      Q.    Is that correct?
8      A.    Yes.
9      Q.    You have never done any volunteer
10 work?
11     A.    No.
12     Q.    Do you know anything about how the
13 pay arrangement worked when you were working
14 out at Blackwell's?
15     A.    What do you mean?
16     Q.    How did you get paid?
17     A.    The Lovelady cut a check and gave
18 it to us. Went to accounting on I think the
19 15th of every month and gave us a check.
20     Q.    Okay. Did you check that, look at
21 how much you were paid as against the hours
22 that you worked?
23     A.    Yes.

Page 126

1      Q.    Did you ever complain about hey, I
2  don't think I am getting enough?
3      A.    Yes.
4      Q.    Who did you complain to?
5      A.    I don't remember her name but
6  somebody in job placement.
7      Q.    Do you remember when it was that
8  you complained?
9      A.    Almost every pay period.
10     Q.    Do you remember any specific ones?
11     A.    My hours were not right.
12     Q.    Do you remember any specific dates
13 that you complained to the person who you can't
14 remember in job placement?
15     A.    Not right now, no.
16     Q.    Just I want to make sure I am
17 clear. So you don't know who you complained to
18 or specifically when you complained?
19     A.    Somebody in job placement who was
20 over at that time during anytime that I was
21 working.
22     Q.    You complained every single time,
23 every single week?

Page 127

1      A.    No.
2      Q.    You can't tell me any specific
3  week that you complained?
4      A.    No.
5      Q.    Is that correct?
6      A.    That's correct.
7      Q.    All right. Do you know who
8  actually worked for Lovelady's, who was on the
9  staff? Can you name some of them?
10     A.    Yes.
11     Q.    All right. Who can you name?
12     A.    Just like anywhere?
13     Q.    Uh-huh.
14     A.    The client reps, want me to name
15 all my client reps?
16     Q.    I just wanted to ask you, your
17 client reps, they weren't enrolled in the
18 program at the time they were your client reps?
19     A.    No, they were staff.
20     Q.    So there was a difference between
21 staff and people who were enrolled? You knew
22 some people were staff and some people were
23 enrolled, correct?

Page 128

1      A.    I mean I knew some people that
2  were in the program but were still working but
3  at a different level.
4      Q.    They weren't staff of Lovelady
5  Center?
6      A.    What do you mean they weren't
7  staff?
8      Q.    Well, there were some people who
9  weren't enrolled in the program who worked for
10 Lovelady?
11     A.    Yes.
12     Q.    Like Melinda, people like that.
13 That is what I consider to be staff.
14     A.    Yes.
15     Q.    You understand what I mean by
16 staff, right?
17     A.    Yes. Well, I didn't consider her
18 staff. She owned the place. So no, I don't
19 consider her staff. She owned it.
20     Q.    You don't consider her staff? Oh,
21 she owned it?
22     A.    Yeah, she ran it, you know, ran
23 it.

1    Q.   Do you know she owned it?
2    A.   Yeah.
3    Q.   You do?
4    A.   I mean anytime -- I feel like
5  anytime somebody is the head, they have the big
6  office, then yeah --
7    Q.   Then they own it?
8    A.   Yeah.  And they tell everybody
9  what to do, (nodding).
10   Q.   Okay.  Any other staff members you
11 can think of who weren't enrolled in the
12 program but who worked there?
13   A.   No.
14   Q.   You can't think of any others?
15   A.   (Shaking head.)
16   Q.   Did you think that being at The
17 Lovelady was worthwhile, The Lovelady Center?
18   A.   It didn't impact me negatively nor
19 positively.  It didn't do one way or another.
20   Q.   But you just stayed there?
21   A.   (Nodding.)
22   Q.   Why did you stay?
23   A.   For one, I was working, you know.

1  And it did -- I take that back.  It did kind of
2  help me as far as my kids but --
3    Q.   As far as your kids?
4    A.   Yes, being able to visit with
5  them.
6    Q.   You couldn't have visited with
7  your kids if you weren't in the program?
8    A.   I could have.  I could have.
9    Q.   How did it help you?
10   A.   But they were able to come -- to
11 come, you know, there and it just be us and not
12 somebody else around.
13   Q.   You didn't have to have somebody
14 else there for visitation?
15   A.   Yes.
16   Q.   And that is something you couldn't
17 have done if you weren't enrolled in the
18 program?
19   A.   I could have.
20   Q.   Well, then --
21   A.   It just would have been a
22 different environment is what I am saying.
23   Q.   What kind of environment would it

1  have been?
2    A.   At their father's house.
3    Q.   Do you know who determined what
4  your wage rate was going to be at Blackwell's?
5    A.   I guess The Lovelady.
6    Q.   Do you know?
7    A.   No.
8    Q.   Okay.  And you don't know whether
9  or not Blackwell's was owned or leased by
10 Lovelady?
11   A.   No.
12   Q.   When you went to Blackwell's, did
13 they provide everything that you needed to do
14 the job there?
15   A.   Yes.
16   Q.   Okay.  Did Lovelady send you with
17 the type of equipment or stuff that you needed
18 to do the job or was that all there at
19 Blackwell's?
20   A.   That was all there.
21   Q.   At Blackwell's?
22   A.   Yes.
23   Q.   Did you ever work at Haymon Homes

1  or just train there?
2    A.   No.  I just trained.
3    Q.   Can you tell me how many people
4  you think have been not paid what they should
5  be paid?
6    A.   No.  I don't know how many.
7    Q.   You don't have any idea?
8    A.   No.
9    Q.   Do you remember signing a
10 declaration in this case, something called a
11 declaration?
12        (Defendants' Exhibit 7 was marked
13        for identification.)
14   Q.   (BY MR. MILLER:)  I will show you
15 what I am going to mark as Defendants'
16 Exhibit 7.
17   A.   Yes.
18   Q.   Do you remember this?
19   A.   Yes.
20   Q.   Did you type that up?
21   A.   This is not mine.
22   Q.   What?
23   A.   This is not mine.

Page 133

1     Q.   Oh, I gave you the wrong one.
2  That wouldn't be yours.  Let me give you the
3  right one.  Do you remember doing one?
4     A.   Yes.
5     Q.   Did you type it up?
6     A.   Those are my answers, yes.
7     Q.   Did you type it up?
8     A.   No, I didn't type it up.
9     Q.   You told your lawyers what to put
10 on it?
11     A.   I answered the questions that I
12 was asked, yes.
13     Q.   Did you read it before you signed
14 it?
15     A.   I did.
16     Q.   Did you understand that it was
17 submitted as a declaration and it is submitted
18 under penalty of perjury?
19     A.   Yes.
20     Q.   Okay.  Let me show you.  Is that
21 your declaration there?
22     A.   It is.
23     Q.   Is that your signature on the end?

Page 134

1     A.   Yes.
2     Q.   Do you want to revoke your
3  declaration here now that you are under oath or
4  do you want to stand by it?
5     A.   Stand by it.
6     Q.   Okay.  Do you have any type of
7  audio recordings of anything that happened at
8  Lovelady or Blackwell's --
9     A.   No, I don't.
10     Q.   -- to support your claim?  Do you
11 have any documents other than what you have
12 given your lawyers that you would believe
13 supports your case?
14     A.   Not that I can think of at this
15 time.
16     Q.   Well, do you?  You don't know of
17 any others?
18     A.   No.  No.  Not at this time.
19     Q.   Did you have any communication
20 with the U.S. Department of Labor?
21     A.   No.
22     Q.   Involved in an audit with them?
23     A.   No.

Page 135

1     Q.   Talk to an investigator?
2     A.   No.
3     Q.   So am I right that you think
4  Melinda owns Lovelady?
5     A.   Yes.
6     Q.   Okay.
7     A.   That is what I said.  That is what
8  I believe, yes.
9     Q.   And you are suing Lovelady?
10     A.   Yes.
11     Q.   So you are suing Melinda?
12        MR. CAMP:  Objection.
13     A.   No.
14     Q.   (BY MR. MILLER:)  No?  You don't
15 think you are suing her?
16     A.   I am not suing Melinda McGahee.  I
17 am not suing her, no.
18     Q.   Do you think she did anything
19 wrong?
20        MR. CAMP:  Asked and answered.
21     A.   If she knew of --
22     Q.   (BY MR. MILLER:)  If she knew
23 what?

Page 136

1     A.   Yes, I believe she -- yes.
2     Q.   What did she do wrong?
3     A.   Working us and not paying us, not
4  compensating us.
5     Q.   You worked and you didn't get paid
6  for it?
7     A.   Not the correct compensation, no.
8     Q.   What was --
9     A.   I worked overtime and didn't get
10 paid overtime, time and a half.  No, I didn't.
11     Q.   And that is something you have
12 learned about since being in this case?
13     A.   No.
14     Q.   About the requirement for
15 overtime?
16     A.   No, I have always known about
17 overtime with all my jobs because I have always
18 been compensated time and a half.  Sometimes
19 double time.
20     Q.   Oh, you have, double time?
21     A.   Yes.
22        MR. MILLER:  All right.  Let's
23 take a break for just a minute.

1          (Whereupon, a break was had from
2     11:31 a.m. until 11:41 a.m.)
3          Q.   (BY MR. MILLER:)  Are you ready to
4     go back on the record?
5          A.   Yes.
6          Q.   You understand you are still under
7     oath?
8          A.   Yes.
9          Q.   What evidence do you have that
10    Blackwell's withheld money from your pay?
11         A.   What?
12         Q.   Do you have any evidence that
13    Blackwell's withheld money from your pay?
14         A.   That Blackwell's withheld money
15    from my pay?
16         Q.   Uh-huh.
17         A.   No.
18         Q.   What about do you have any
19    evidence that Lovelady withheld money from your
20    pay?
21         A.   Not that I can think of.  No, I
22    have like paycheck stubs.
23         Q.   Okay.  And they show that money

1     was withheld?
2          A.   Yes.
3          Q.   Where did that money go to?
4          A.   To The Lovelady Center.
5          Q.   To pay for what?
6          A.   My rent and my fees.
7          Q.   Other than that, was there any
8     money withheld from you that you are aware of?
9          A.   Not that I am aware of.
10         Q.   What evidence do you have that
11    your client rep could fire you from your job at
12    Blackwell's?
13         A.   I was told that if I didn't adhere
14    to the rules and guidelines --
15         Q.   If you didn't adhere to Lovelady's
16    rules and guidelines, Lovelady could take you
17    out of that part of the program, correct?
18         A.   Yes.
19         Q.   And you couldn't go and do outside
20    work, correct?
21         A.   No.
22         Q.   Isn't that correct?
23         A.   That's correct.

1          Q.   Okay.  But that is taking you out
2     of the program.  Do you have any evidence that
3     your client rep could fire you from Blackwell's
4     because of your performance there?
5          A.   No.
6          Q.   You understood when you came into
7     the program at Lovelady that it was
8     rehabilitation, correct?
9          A.   That's correct.
10         Q.   And that part of that
11    rehabilitation was a work therapy piece?
12         A.   No.
13         Q.   You never --
14         A.   I never heard of work therapy.
15         Q.   You never heard of work therapy?
16         A.   No.
17         Q.   Did you understand that part of
18    what you were going to be doing was getting
19    engaged in work when you signed up?
20         A.   No.
21         Q.   You didn't know that you were
22    going to do internal stuff and there was a
23    requirement that you were going to help out and

1     do security or wash dishes or child care?
2          A.   Not at that time.
3          Q.   At what point did you become aware
4     of that?
5          A.   During my first thirty days that I
6     was there.
7          Q.   How did you think you were going
8     to pay for Lovelady services if you weren't
9     doing some type of work?
10         A.   I knew that I was going to
11    eventually have to get a job to work to be able
12    to pay my fees.
13         Q.   And you could go and apply outside
14    and work at McDonalds or wherever you wanted to
15    once you got into Phase II or III, right?
16         A.   Yes.  I just decided to work for
17    The Lovelady Center.
18         Q.   You decided to go work at
19    Blackwell's, right?
20         A.   Well, I was told that if I didn't
21    apply outside, that I would have work at
22    Blackwell's.
23         Q.   You could either go apply

Page 141

1   somewhere else on your own or they could help
2   you get on with Blackwell's; is that correct?
3        A.   No.
4        Q.   No?
5        A.   No.  I was told.
6        Q.   Told what?
7        A.   To work at Blackwell's.
8        Q.   Didn't you tell me earlier that
9   you went to somebody and said I want to work at
10  Blackwell's?
11       A.   Yes, to pay my fees.  After my
12  client rep told me that I could do Blackwell's
13  or Haymon's Homes, yes, that is when I agreed
14  to it.
15       Q.   Or you could have gone outside and
16  done an outside job if you wanted to?
17       A.   Yes.
18       Q.   But you wanted to do Blackwell's?
19       A.   Yes.
20       Q.   That was your choice?
21       A.   I decided, yes.
22       Q.   Is there any evidence that you
23  have, any documents or stuff people said to you

Page 142

1   or any information that you have that we
2   haven't talked about today that you believe
3   supports your position that you were an
4   employee of Lovelady?
5        A.   I can't think of any right now.
6        Q.   All right.
7             MR. MILLER:  I think that is all I
8   have.
9             MR. CAMP:  I have got a few
10  questions for you, Ms. Bates.
11
12  EXAMINATION BY MR. CAMP:
13       Q.   When you received your 1099 I
14  believe you said in 2015, who was that 1099
15  from?
16       A.   It was from The Lovelady Center.
17       Q.   Did you ever receive a 1099 from
18  Blackwell's Way?
19       A.   No.
20       Q.   Or from Haymon Homes?
21       A.   No.
22       Q.   When you went to job placement and
23  said you were interested in working at

Page 143

1   Blackwell's Way, did you put in a written
2   application for Blackwell's Way's employment?
3        A.   No.
4        Q.   And were you interviewed by
5   anybody from Blackwell's Way?
6        A.   No.
7        Q.   So you were told by Lovelady
8   Center to go to Haymon Homes for orientation?
9             MR. MILLER:  Object to the form.
10       A.   That's correct.
11       Q.   (BY MR. CAMP:)  I'm sorry.  Did
12  Lovelady Center tell you where to report for
13  orientation for the work at Blackwell's Way?
14            MR. MILLER:  Object to the form.
15       A.   Yes.
16       Q.   (BY MR. CAMP:)  And where did they
17  tell you to go?
18       A.   To Blackwell's Way.
19       Q.   Where was your orientation, your
20  training?
21            MR. MILLER:  Object to the form.
22       A.   Oh, my training was at Haymon
23  Homes.

Page 144

1        Q.   But you never worked at Haymon
2   Homes?
3        A.   No.
4        Q.   So you never had any orientation
5   at Blackwell's Way; is that correct?
6             MR. MILLER:  Object to the form.
7        A.   That's correct.
8        Q.   (BY MR. CAMP:)  And when you were
9   at Haymon Homes, where did you live?
10       A.   In a trailer.  There was a trailer
11  for all of the clients who had to stay there
12  with a housemother.  The trailer --
13            (Off-the-record discussion.)
14       A.   That was basically it, what I
15  said.
16       Q.   (BY MR. CAMP:)  And the
17  housemother, who did the housemother work for?
18       A.   For The Lovelady Center.
19       Q.   And what was the housemother's
20  responsibilities?
21       A.   To oversee all of the clients
22  that were sent up, to make sure that we reported to
23  our duties and we did our chores.

36 (Pages 141 to 144)

1       Q.   Now, you had mentioned that if you
2   wanted to see your kids over a weekend, you
3   would have to schedule off.  If you wanted to
4   schedule off while you were at Blackwell's Way,
5   who would you contact?
6       A.   The job placement, the lady in job
7   placement.
8       Q.   At The Lovelady Center?
9       A.   At The Lovelady Center.
10      Q.   And then Lovelady would decide
11  whether you could take the time off; is that
12  correct?
13      A.   That's correct.
14           MR. MILLER:  Object to the form.
15           MR. CAMP:  Did you get that?
16           THE REPORTER:  (Nodding.)
17      Q.   (BY MR. CAMP:)  Now, did you ever
18  work alongside individuals who were graduates
19  of The Lovelady Center?
20      A.   Yes.
21      Q.   So they were no longer in the
22  program, correct?
23      A.   That's correct.

1       Q.   And were they doing any work that
2   was different than you?
3       A.   No.
4            MR. MILLER:  Object to the form.
5       A.   We were doing the exact same work.
6            (Off-the-record discussion.)
7       Q.   (BY MR. CAMP:)  Just so I am
8   clear, we talked about the fact that at
9   Blackwell's Way, you thought that you had had
10  money improperly withheld by you by Lovelady
11  Center, correct?
12      A.   Yes.
13           MR. MILLER:  Object to the form.
14      Q.   (BY MR. CAMP:)  Did Lovelady
15  Center pay you overtime while you were assigned
16  to Blackwell's Way?
17      A.   No.
18      Q.   Now, you talked about working
19  security at I believe it was Carraway; is that
20  correct?
21      A.   Yes.
22      Q.   And does Lovelady Center have any
23  clients at Carraway?

1       A.   No.  It is just an empty lot.
2       Q.   It is just an empty building?
3       A.   Well, empty building, yes.
4       Q.   So you weren't securing Lovelady
5   Center employees; you were securing property.
6   Is that correct?
7       A.   That's correct.
8            MR. MILLER:  Object to the form.
9       Q.   (BY MR. CAMP:)  Now, while you
10  were working security, it was your
11  understanding that you were working off the
12  fees you had accrued to date; is that correct?
13           MR. MILLER:  Object to the form.
14      A.   That's correct.
15           MR. MILLER:  Have you got my
16  objection?
17           THE REPORTER:  (Nodding.)
18      Q.   (BY MR. CAMP:)  And you said that
19  you filled out the opportunity credit forms
20  while you were assigned to that Center; is that
21  accurate?
22      A.   That's correct.
23           (Plaintiffs' Exhibit 1 was marked

1            for identification.)
2            (Off-the-record discussion.)
3            MR. CAMP:  I am going to mark this
4   as Plaintiffs' Exhibit 1.
5       Q.   (BY MR. CAMP:)  I am going to show
6   you some of these opportunity credit sheets.
7   On these opportunity credit sheets --
8            MR. MILLER:  Before you show them
9   to her, could I see a copy of them?
10           MR. CAMP:  Yes.  Sure.  Sorry.  I
11  wasn't anticipating using them with her.
12           MR. MILLER:  Okay.
13      Q.   (BY MR. CAMP:)  Take a look at
14  these sheets.
15      A.   Uh-huh.
16      Q.   The time that you recorded, do
17  these sheets reflect that you worked security
18  at Carraway in excess of forty hours in each of
19  those weeks?
20      A.   Yes.
21           MR. MILLER:  Object to the form.
22      Q.   (BY MR. CAMP:)  And we talked
23  about this minus ten.  Do you know what that is

Page 149

1  for?
2      A.   No, I don't.  That was put on
3  there after I signed.  When I signed the sheet,
4  it said sixty.
5      Q.   Did you authorize anybody at The
6  Lovelady Center to deduct ten hours from your
7  sixty hours of reported time?
8          MR. MILLER:  Object to the form.
9  Lacks foundation.  Leading question.
10     A.   No.
11     Q.   (BY MR. CAMP:)  Now, look through
12 all of them.  All of them have ten hours
13 deducted from them in which it puts you under
14 forty hours --
15     A.   Yes.
16     Q.   -- except for the first one.
17         MR. MILLER:  Object to the form.
18         MR. CAMP:  I'm not done with the
19 question.
20         MR. MILLER:  Well, it is so
21 leading that I figured I would object.
22     Q.   (BY MR. CAMP:)  Can you tell me if
23 on any of those weeks you gave Lovelady Center

Page 150

1  authorization to subtract ten hours?
2      A.   No.
3          MR. MILLER:  Now I object.
4      Q.   (BY MR. CAMP:)  Now, if you will
5  look up here in the right top hand corner of
6  these sheets, they have a number.
7      A.   Yes.
8      Q.   Do you know what that number is?
9      A.   Where they calculated it, the rate
10 of pay times the hours that I worked.
11     Q.   What was your rate of pay while
12 you were working security?
13     A.   Seven dollars and twenty-five
14 cents an hour.
15     Q.   Have you ever worked at the thrift
16 store?
17     A.   Yes.
18     Q.   Were you paid for the time you
19 were employed at the thrift store?
20     A.   No.  It went towards my rent.
21     Q.   You are saying you got credit for
22 those hours towards your rent while you were at
23 the thrift store?

Page 151

1      A.   That's correct.
2      Q.   And while you were at the thrift
3  store, did you work along any other employees
4  or workers there that were graduates of the
5  program?
6      A.   Yes.
7      Q.   And did they do any work that was
8  different from what you were doing?
9          MR. MILLER:  Object to the form.
10     A.   No.
11     Q.   (BY MR. CAMP:)  While you were at
12 The Lovelady Center or Blackwell's Way, at any
13 point in time did you tell Lovelady to
14 designate certain hours that you were working
15 as voluntary?
16     A.   No.
17         MR. MILLER:  Object to the form.
18     Q.   (BY MR. CAMP:)  Did you ever
19 graduate from the program?
20     A.   No, I did not.
21     Q.   Why not?
22     A.   Because I was always working to
23 make sure that I made enough money to get my

Page 152

1  fees down.  And I didn't go to enough of the
2  classes so that I could graduate the program
3  because I was always working.
4      Q.   And how long was your program
5  supposed to be?
6      A.   From nine to twelve months.
7      Q.   And you were actually there a
8  little over two years; is that correct?
9      A.   Yes.
10     Q.   Do you know if your client reps
11 were graduates of the program?
12     A.   Yes.
13     Q.   All of them?
14     A.   All of my client reps, yes.
15     Q.   So if you went through the
16 program, there was the possibility that you
17 could work as a client rep?
18         MR. MILLER:  Object to the form.
19     A.   That's correct.
20     Q.   (BY MR. CAMP:)  I wanted to clear
21 up one thing.  When you were talking about
22 sometimes you would babysit a co-client's
23 children --

38 (Pages 149 to 152)

Page 153

1          A.   Uh-huh.
2          Q.   -- I think you said when you were
3   asked to do something, you would try to do it;
4   if you couldn't, you didn't.
5               When you were referring to someone
6   asking you to do something, were you talking
7   about a co-client or The Lovelady Center?
8          A.   A co-client.
9          Q.   Did you have any option not to do
10  what The Lovelady Center told you?
11              MR. MILLER:  Object to the form.
12         A.   No.
13              MR. CAMP:  That is all I have.
14
15  REEXAMINATION BY MR. MILLER:
16         Q.   Ms. Bates, your testimony a minute
17  ago about why you left the Center was not true,
18  was it?
19         A.   I wasn't asked why I left the
20  Center.
21              MR. CAMP:  She was asked why she
22  didn't graduate the program.
23         A.   Why I didn't graduate.

Page 154

1          Q.   (BY MR. MILLER:)  The reason you
2   didn't graduate from the program was because
3   you tested positive for drugs, right?
4          A.   Yes.  I realize that, yes.
5          Q.   I just want to make it clear
6   because you made it sound like a minute ago it
7   was because you didn't get something checked
8   off from a form, but it was because you were
9   doing drugs.
10         A.   No.  I made it clear that I didn't
11  graduate the program.  Because I could have
12  graduated the program and stayed at the Center
13  and --
14         Q.   But you left the program because
15  you tested positive for drugs not once, but
16  twice while you were in there?
17         A.   Yes.
18         Q.   When they would give you a pass to
19  go out on your own and do something with your
20  family or somebody else is when you did that,
21  that you couldn't handle it and you relapsed --
22         A.   No.
23         Q.   -- correct?

Page 155

1          A.   No.
2          Q.   That is when you tested positive,
3   was when you went off-site.
4          A.   That was one time.
5          Q.   When did you work at the thrift
6   store?
7          A.   When I first got to the Center.
8          Q.   When was that?  Do you remember
9   dates?
10         A.   Sometime in January or February of
11  2012.
12         Q.   Okay.  Did you ever ask to be a
13  client rep?
14         A.   No.
15         Q.   Ever apply for a job?
16         A.   Not for client rep.
17         Q.   Is that something you aspired to
18  do one day, was to be a client rep?
19         A.   Not that I can think of, no.
20              MR. MILLER:  That is all I have
21  got.  Thank you.
22         A.   Okay.
23              MR. CAMP:  I have just got one

Page 156

1   more follow-up.
2
3   REEXAMINATION BY MR. CAMP:
4          Q.   Let's make it clear.  You didn't
5   graduate within nine to twelve months of
6   starting your program because you were working
7   all the time.
8               MR. MILLER:  Object to the form.
9          A.   That's correct.
10         Q.   (BY MR. CAMP:)  Is that your
11  testimony?
12         A.   Yes.
13         Q.   You were ultimately dismissed from
14  the program two years after you started it
15  because of a drug violation, correct?
16         A.   That's correct.
17         Q.   But that was two years after you
18  had started?
19         A.   Yes.
20              MR. CAMP:  That is all I have.
21              MR. MILLER:  Okay.  That is all.
22         FURTHER THE DEPONENT SAITH NOT
23  (Deposition concluded at 12:00 p.m.)

Page 157

```
 1              C E R T I F I C A T E
 2
 3
 4     STATE OF ALABAMA
 5     JEFFERSON COUNTY
 6
 7          I hereby certify that the above
 8     and foregoing deposition was taken down by me
 9     in stenotypy, and the questions and answers
10     thereto were reduced to typewriting under my
11     supervision, and that the foregoing represents
12     a true and correct transcript of the deposition
13     given by said witness upon said hearing.
14          I further certify that I am
15     neither of counsel nor of kin to the parties to
16     the action, nor am I in anywise interested in
17     the result of said cause.
18
19
20     /s/ LAURA H. NICHOLS
21     Commissioner-Notary Public, State of AL
       ACCR License No. 3, Exp. 9/30/2016
22     GA CCR No. 2714, Exp. 4/1/2016
       TN LCR No. 679, Exp. 6/30/16
23     Transcript Certified on 10/26/2015
```

Tyler,Eaton,Morgan,Pritchett                    1-877-373-3660