FILED
2016 Apr-08  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT  3

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF ALABAMA

3           SOUTHERN DIVISION

4

5   CIVIL ACTION NO. 2:15-cv-274-MHH

6

7   BRIANA WALKER, individually and on behalf

8   of herself and all others similarly

9   situated,

10         Plaintiffs,

11  vs.

12  FREEDOM RAIN, INC., d/b/a The Lovelady

13  Center,

14         Defendant.

15

16         DEPOSITION

17            OF

18         RHONDA GADDIS

19       October 21, 2015

20

21  REPORTED BY:  Lisa Roussell

22         Certified Shorthand Reporter

23         and Notary Public

---

Page 2

1      S T I P U L A T I O N

2         IT IS STIPULATED AND AGREED,

3   by and between the parties, through their

4   respective counsel, that the deposition of

5   RHONDA GADDIS may be taken before Lisa

6   Roussell, Commissioner, Certified

7   Shorthand Reporter and Notary Public;

8         That the signature to and

9   reading of the deposition by the witness

10  is waived, the deposition to have the same

11  force and effect as if full compliance had

12  been had with all laws and rules of Court

13  relating to the taking of depositions;

14         That it shall not be necessary

15  for any objections to be made by counsel

16  to any questions, except as to form or

17  leading questions, and that counsel for

18  the parties may make objections and assign

19  grounds at the time of trial, or at the

20  time said deposition is offered in

21  evidence, or prior thereto.

22

23

---

Page 3

1      A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4      Mr. Robert J. Camp

5      Attorney at Law

6      Wiggins, Childs, Pantazis, Fisher &

7         Goldfarb, LLC

8      The Kress Building

9      301 19th Street North

10     Birmingham, AL 35203

11

12  FOR THE DEFENDANT:

13     Ms. Mary Ann Couch

14     Ms. Anne Knox Averitt

15     Attorney at Law

16     Bradley Arant Boult Cummings LLP

17     1819 Fifth Avenue North

18     Birmingham, AL 35203

19

20

21

22

23

---

Page 4

1   OTHERS PRESENT:

2      Ms. Melinda Magahey

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Rhonda Gaddis**

---

Page 5

1    INDEX OF EXAMINATION
2              Page:
3  Ms. Couch          6
4  Mr. Camp          146
5
6       INDEX OF EXHIBITS
7              Page:
8  Defendant's 1        7
9  Defendant's 2        10
10 Defendant's 3        12
11 Defendant's 4        26
12 Defendant's 5        69
13 Defendant's 6        71
14 Defendant's 7        76
15 Defendant's 8        77
16 Defendant's 9        90
17 Defendant's 10       98
18 Defendant's 11       137
19 Plaintiff's 1        153
20 Plaintiff's 2        154
21 Plaintiff's 3        156
22
23

Page 6

1        I, Lisa Roussell, a Certified
2   Shorthand Reporter of Birmingham, Alabama,
3   and a Notary Public for the State of
4   Alabama at Large, acting as Commissioner,
5   certify that on this date, as provided by
6   the Federal Rules of Civil Procedure and
7   the United States District Court, and the
8   foregoing stipulation of counsel, there
9   came before me at Wiggins, Childs,
10  Pantazis, Fisher & Goldfarb, 301 19th
11  Street North, Birmingham, Alabama 35203,
12  on October 21, 2015, commencing at 10:12
13  a.m., RHONDA GADDIS, witness in the above
14  cause, for oral examination, whereupon the
15  following proceedings were had:
16
17        RHONDA GADDIS,
18  being first duly sworn, was examined and
19  testified as follows:
20
21  EXAMINATION BY MS. COUCH:
22     Q.   Good morning.  I'm Mary Ann
23  Couch.  I represent the defendant in this

Page 7

1   case, The Lovelady Center.  And we're
2   going to be talking about Lovelady also
3   known as Freedom Rain.  I'm going to show
4   you what we're going to mark as
5   Defendant's Exhibit 1.
6        (Whereupon, Defendant's
7         Exhibit 1 was marked for
8         identification and attached
9         to the deposition.)
10     Q.   Did you sign this document
11  which states that it's consent to join
12  suit as party plaintiff?
13     A.   Yes.
14     Q.   And we're just going to kind
15  of go over some ground rules here for the
16  deposition.  You understand that the court
17  reporter swore you in, that you swore to
18  tell the truth, and you're under oath?
19     A.   Yes, ma'am.
20     Q.   Do you understand that the
21  laws of perjury apply?
22     A.   Yes, ma'am.
23     Q.   Do you know what that means,

Page 8

1   that it's a crime to lie under oath?
2     A.   Yes, ma'am.
3     Q.   Are you on any medications
4   today?
5     A.   Yes, ma'am.
6     Q.   What medications are you on?
7     A.   Phenergan, 12.5 milligrams;
8   Hydrocodone, 7.5 milligrams; and
9   Amoxicillin, 500 milligrams.
10     Q.   Can you please identify if
11  those are prescription drugs, and if they
12  are, why they were prescribed to you?
13     A.   They're all prescriptions.
14  The Phenergan was prescribed for a
15  condition called Hyperemesis Gravidarum,
16  and it's a pregnancy condition that causes
17  severe morning sickness and weight loss.
18  The Amoxicillin and Hydrocodone were
19  prescribed by my dentist on Saturday for
20  oral surgery and infected teeth.
21     Q.   Did you have oral surgery?
22     A.   I did, Saturday.
23     Q.   What was the procedure?

**Rhonda Gaddis** 3

Page 9

1    A.   They did four extractions.
2  Three were simple and one they thought was
3  going to be simple turned out to be
4  complicated.  There are six sutures in my
5  mouth right now.
6    Q.   So you were in a lot of pain?
7    A.   Yes.  I'm still is some pain.
8    Q.   I think you described two of
9  the drugs you were on.  Is there a third?
10    A.   Amoxicillin is just an
11 antibiotic because I have other teeth that
12 are still abscessed.
13    Q.   Are any of those drugs making
14 you feel today that you can't think
15 clearly?
16    A.   That I cannot?  No, they're
17 not affecting my ability to think.
18    Q.   Do you otherwise feel okay to
19 give your testimony under sworn oath?
20    A.   Yes.
21    Q.   A couple of other ground
22 rules, make sure you speak up as clearly
23 as possible for the court reporter to make

Page 10

1  her job easier.  I will try not to talk
2  over you.  If you can, try not to talk
3  over me to make our statements clear for
4  the court reporter.  Make sure that you
5  give verbal responses or a yes or a no
6  answer if it's applicable instead of
7  nodding your head or waving your arms or
8  something like that.  Just to make her job
9  easier.  It will go quicker and more
10 smoothly for everybody.  Let me know if at
11 any time you don't understand any one of
12 my questions, and I'll restate it for you.
13 If we need to take breaks, we'll do that
14 as well.  We'll go ahead and get started
15 on sort of some background information.
16    MS. COUCH:  I'm going to mark
17 as Exhibit 2, your responses to the
18 Lovelady Center's interrogatories.
19    (Whereupon, Defendant's
20    Exhibit 2 was marked for
21    identification and attached
22    to the deposition.)
23    Q.   Take a minute to look over the

Page 11

1  document.
2    A.   (Witness reviewing document.)
3  Okay.
4    Q.   Did you help and prepare the
5  answers to these interrogatories?
6    A.   Yes.
7    Q.   Do you know whether or not
8  they are complete, if the answers are
9  correct and accurate?
10    A.   To the best of my knowledge,
11 they're accurate and correct at this time.
12 Also, that I can remember here.
13    (Witness conferring with
14    counsel.)
15    A.   Oh, I'm sorry.  So the
16 criminal history, there are misdemeanor
17 convictions that I don't recall how many
18 counts the misdemeanor convictions, but I
19 know that there were four possession of
20 drug paraphernalia, trespassing, and
21 shoplifting.
22    Q.   Are there any other answers
23 that are incomplete at this time?

Page 12

1    A.   I don't believe so.
2    Q.   Okay.  I'm going to show you
3  what we've marked as Defendant's Exhibit
4  3.
5    (Whereupon, Defendant's
6    Exhibit 3 was marked for
7    identification and attached
8    to the deposition.)
9    Q.   These are responses to the
10 Lovelady Center's request for production
11 of documents.
12    A.   Okay.
13    Q.   Are these responses correct as
14 you read them here today?
15    A.   Yes.
16    Q.   Is there anything that you
17 would add or change?
18    A.   Not at this time.
19    MR. CAMP:  Like I said earlier,
20 we have a response of documents that will
21 be produced as soon as they're brought
22 downstairs.
23    Q.   Ms. Gaddis, could you please

**Rhonda Gaddis**                                                                 **4**



Page 13

1  state your date of birth for the record?
2      A.    ▮ 1982.
3      Q.    Social Security number?
4      A.    ▮-8343.
5      Q.    And what's your current
6  address?
7      A.    ▮,
8  Birmingham, Alabama ▮.
9      Q.    How long have you lived at
10 that address?
11     A.    Two months.
12     Q.    Where did you live before your
13 current address?
14     A.    In Odenville.  It's ▮
15 ▮, Odenville, Alabama, and I
16 don't remember the zip code.  Sorry.
17     Q.    How long did you live in
18 Odenville?
19     A.    About a year.
20     Q.    At your current address, does
21 anyone live there with you?
22     A.    The landlord.  It's his house.
23 I rent the upstairs but he lives

Page 14

1  downstairs.
2      Q.    Who's the landlord?  What's
3  his name?
4      A.    Nicholas Hunt.
5      Q.    Does anyone live with you in
6  the -- did you say you live in the
7  downstairs or the upstairs?
8      A.    I live upstairs.
9      Q.    Does anyone live with you
10 upstairs?
11     A.    No.
12     Q.    No husband or boyfriend?
13     A.    No.
14     Q.    Do you have a husband or
15 boyfriend?
16     A.    Not at this time.
17     Q.    Okay.  Have you recently had a
18 husband or boyfriend?
19     A.    Yes.
20     Q.    Was this a husband?
21     A.    No.  Boyfriend.  Actually,
22 okay.  This is a little complicated.  I do
23 have a husband.  We've been separated for

Page 15

1  seven years.  He's in the state of
2  Florida.
3      Q.    Where does he live in Florida?
4      A.    I don't know.
5      Q.    Do you know where he last
6  lived?
7      A.    In Niceville, Florida.
8      Q.    But you are still legally
9  married to your husband?
10     A.    Yes.
11     Q.    And what's his name?
12     A.    Brandon Gaddis.
13     Q.    Do you and your husband have
14 any children together?
15     A.    Yes.
16     Q.    Could you please state their
17 names?
18     A.    ▮.
19     Q.    Is that it?
20     A.    Uh-huh.
21     Q.    How old is he?
22     A.    Seven.
23     Q.    Where does he live?

Page 16

1      A.    With his father in Florida,
2  with Brandon Gaddis.
3      Q.    And you don't know where
4  either of them are in Florida at this
5  time?
6      A.    I don't.
7      Q.    When's the last time you had
8  contact with your husband or your son?
9      A.    Eight months ago.
10     Q.    Okay.  Do you have any other
11 children?
12     A.    Yes.
13     Q.    What are their names?
14     A.    My oldest child, his name is
15 ▮, and my middle child, her
16 name is ▮.
17     Q.    Your oldest child ▮, how
18 old is he?
19     A.    Fourteen.
20     Q.    And your middle name,
21 ▮ how old is she?
22     A.    Nine.
23     Q.    Where does ▮ live?

**Rhonda Gaddis**                                                                    **5**

Page 17

1    A.   I don't know.
2    Q.   When did you last talk to
3 █████?
4    A.   When he was nine months old.
5 He was placed for adoption.
6    Q.   Okay.  And do you know where,
7 what family he was adopted by?
8    A.   Mitchell and Annette █████
9 adopted him.
10    Q.   Was that in Alabama or
11 Florida?
12    A.   At the time they lived in
13 Alabama.  They lived in Pelham, Alabama,
14 but they moved to Mississippi years ago,
15 and I didn't have an address or any
16 contact information from them.
17    Q.   Where does █████ live?
18    A.   With my aunt, Janis Jacobs in
19 Huntsville, Alabama.
20    Q.   How long has she lived there?
21    A.   Since 2012.
22    Q.   Okay.  And when's the last
23 time you saw █████?

Page 18

1    A.   Last Christmas.
2    Q.   Does your aunt have legal
3 custody of █████?
4    A.   Yes.
5    Q.   And how long has she had legal
6 custody of █████?
7    A.   Since March of 2013.
8    Q.   What was the reason that your
9 aunt was given legal custody of your
10 daughter, █████?
11    A.   I left her in the care of my
12 aunt because I was addicted to drugs, and
13 I could not care for her.
14    Q.   Did any of your children live
15 at the Lovelady Center when you were
16 there?
17    A.   No.
18    Q.   Have you ever been in the
19 military?
20    A.   No.
21    Q.   Are you affiliated with any
22 specific religion?
23    A.   I consider myself Christian.

Page 19

1 I was raised as a Baptist, but I've kind
2 of strayed from the Baptist faith, but I
3 still consider myself a Christian.
4    Q.   Do you go to any church?
5    A.   Not at this time.
6    Q.   Is Lovelady religious?
7       MR. CAMP:  Object to the form.
8 You're asking her if a legal entity is
9 religious?
10    Q.   Is it affiliated with any
11 religious entity?
12    A.   They have spiritual classes.
13 I don't know how to answer that question,
14 to be honest with you.
15    Q.   Was Lovelady involved in your
16 religion or your spiritual growth?
17    A.   No.
18    Q.   Did Lovelady provide any
19 spiritual or religious services to you
20 while you lived there?
21    A.   Yes.  They were required, not
22 optional.
23    Q.   Did you participate in any of

Page 20

1 those types of services?
2    A.   I did.  I had to.  It's part
3 of the program.
4    Q.   Are you a person who sticks by
5 their word?
6    A.   Yes.
7    Q.   If you say something, will you
8 follow through with it?
9    A.   To the best of my ability,
10 yes.
11    Q.   Is it ever okay to lie or to
12 tell a half truth?  Is it ever okay to lie
13 or tell a half true even to protect your
14 family or yourself?
15    A.   No.
16    Q.   Okay.  I know earlier you
17 mentioned some additional misdemeanor
18 charges that were not on your
19 interrogatory responses, but could you
20 please state all the instances when you've
21 been arrested or in jail, including those
22 misdemeanors and including the felonies
23 that were listed on your interrogatory

**Tyler Eaton Morgan Nichols & Pritchett**                          **877-373-3660**

REDACTED

Page 21

1  responses?
2      A.   To be honest, I cannot at this
3  time recall every time that I've been
4  arrested.  There are numerous occasions
5  where I've been arrested, while I was
6  addicted to drugs.  What I can tell you is
7  I have a total of five felony arrest
8  convictions and multiple accounts of
9  misdemeanors, and some of them were
10  together.  Some of the felonies and
11  misdemeanors came together like there was
12  a possession, which was also a misdemeanor
13  for paraphernalia, and then the
14  trespassing and the shoplifting
15  misdemeanors were separate incidents.
16      Q.   Do you know what the felonies
17  were for; do you remember?
18      A.   Possession of cocaine,
19  possession of methamphetamines, and grand
20  theft auto.
21      Q.   And did you do any jail time
22  for any of those offenses?
23      A.   Yes.

Page 22

1      Q.   How much jail time, and was it
2  at different points in your life or all at
3  once?
4      A.   No.  They were at different
5  points.  I did a year for the possession
6  of cocaine, and the grand theft auto was
7  the first two felony charges that I was
8  arrested for, and the subsequent
9  possession of cocaine, I don't remember
10  how much time I received for that.  But
11  the possession of methamphetamines, I
12  served over a year in jail.
13      Q.   Where were you at jail for
14  each of those instances?
15      A.   The possession of cocaine and
16  grand theft auto, it was Escambia County,
17  Florida, and possession of
18  methamphetamines and the shop lifting and
19  trespassing was Madison County, Alabama.
20      Q.   Have you been involved in any
21  other lawsuits or investigations by the
22  police or other authorities?
23      A.   Lawsuits, no.  Actually, yes,

Page 23

1  I have.  I'm sorry.  There was a lawsuit
2  that I was involved in when I was part of
3  a wreck.  I was pregnant with my youngest
4  child.  Other than that, I cannot recall
5  any other lawsuits at this time.  Legal
6  proceedings, just the criminal stuff that
7  I've described to you.
8      Q.   And so that lawsuit, did you
9  get in an accident?
10      A.   My sister was driving, but I
11  was in the car with her.
12      Q.   Were you hurt?
13      A.   Yes.
14      Q.   And so did you sue the other
15  driver?
16      A.   I did.
17      Q.   Did your sister also sue?
18      A.   She did.
19      Q.   Did you recover any money from
20  that lawsuit?
21      A.   Yes, ma'am.
22      Q.   Do you recall the amount of
23  money you recovered?

Page 24

1      A.   I think it was a little over
2  seven thousand dollars.
3      Q.   Do you know where that lawsuit
4  was filed?
5      A.   The wreck occurred in
6  Jefferson County, Alabama but we lived in
7  Shelby County, Alabama at the time, so...
8      Q.   Do you recall the name of your
9  attorney?
10      A.   I don't.  It was seven years
11  ago.
12      Q.   And you mentioned you were
13  pregnant at the time with your --
14      A.   My youngest child.
15      Q.   And back to something you
16  mentioned at the very beginning of this
17  deposition.  You mentioned you were on a
18  drug because of morning sickness.  Are you
19  pregnant currently?
20      A.   Yes.
21      Q.   So you said that you've been
22  involved in that one lawsuit, but no other
23  investigations except for the arrests and

**Rhonda Gaddis**

Page 25

1  jail time that we've already talked about?
2      A.   Yes, ma'am.
3      Q.   No other civil actions like
4  the one we're involved in now versus
5  criminal?
6      A.   Not that I can recall at this
7  time.
8      Q.   Have you been involved in any
9  what we call EEOC complaints or charges
10  that those are complaints with the Equal
11  Employment Opportunity Commission?
12      A.   Oh, yes.
13      Q.   When have you ever filed a
14  complaint or been involved in an EEOC
15  charge?
16      A.   I filed a complaint with the
17  labor department in 2014.
18      Q.   What was that for?
19      A.   For the unpaid wages working
20  at Lovelady.  But it was only like I made
21  the complaint to the labor department, and
22  what I was compensated for was only the
23  time after I graduated their program.

Page 26

1  So...
2      Q.   Okay.  So do you agree that
3  you received money from the Lovelady
4  Center as a result of the department's
5  labor investigation?
6      A.   Not for the time that I was in
7  the program.  Only the time after I
8  graduated the program.  I was no longer in
9  the center for that time period.
10      Q.   Do you recall the amount of
11  money that you got from Lovelady for wages
12  due to you for your time spent working
13  after your involvement in the Lovelady
14  program, after you graduated the program?
15      A.   The amount of the check was
16  one thousand two hundred and fifty
17  dollars, I think.
18      Q.   Okay.  I'm going to mark as
19  Defendant's Exhibit 4, documents that we
20  produced to your attorney earlier this
21  morning that represent your settlement
22  with the department of labor.
23      (Whereupon, Defendant's

Page 27

1      Exhibit 4 was marked for
2      identification and attached
3      to the deposition.)
4      Q.   I'd like you to take a look at
5  those documents.
6      A.   (Witness reviewing documents.)
7      Q.   Did you sign these documents?
8      A.   I did.
9      Q.   And did you accept the check
10  that's reflected on the fourth page of the
11  documents?
12      A.   I signed them because I was
13  told to sign them in order to get the
14  check, and yes, I did get the check, but I
15  didn't read what I signed.  And I wasn't
16  aware of my rights at the time I signed
17  this, so...
18      Q.   What did you think this money
19  was for?  At the time you signed this
20  settlement, what did you think the money
21  was for?
22      A.   I was told, before I signed
23  this, a representative from the department

Page 28

1  of labor called me and told me that there
2  would be compensation for the time after I
3  graduated the Lovelady's program, and that
4  this is what this was for.  That does not
5  include at the time that I was in the
6  center that I was also paid less than
7  minimum wage.
8      Q.   You just stated that at the
9  time you signed this agreement, someone
10  from the department of labor told you that
11  this settlement check for over one
12  thousand two hundred and fifty dollars was
13  for time that you worked after you
14  graduated?
15      A.   Yes, ma'am.
16      MR. CAMP:  Object to the form.
17  Mischaracterizes her testimony.  You can
18  answer.
19      MS. AVERITT:  I think she did
20  answer.
21      Q.   Have you ever been involved in
22  any other EEOC charges apart from the
23  department of labor investigation we've

**Rhonda Gaddis**                                                                                    **8**

Page 29

¹ talked about?
²     A.   No, not that I can recall.
³     Q.   Have you ever had your
⁴ deposition taken before?
⁵     A.   No.
⁶     Q.   Was your deposition taken in
⁷ the car wreck case we talked about a
⁸ minute ago?
⁹     A.   No.
¹⁰     Q.   Have you ever testified in
¹¹ court?
¹²     A.   No.
¹³     Q.   Or taken any other sworn
¹⁴ testimony?
¹⁵     A.   What do you mean by sworn
¹⁶ testimony?
¹⁷     Q.   Testimony that's under oath
¹⁸ where you swear to tell the truth.
¹⁹     A.   No.
²⁰     Q.   What did you do to prepare for
²¹ your deposition today?
²²     A.   I met with Robert Camp and
²³ Rusty Adams.

Page 30

¹     Q.   Did you talk to anyone else
² besides your lawyers, Robert and Rusty?
³     A.   No.
⁴     Q.   Did you look at any documents?
⁵     A.   Yes.
⁶     Q.   What documents were those?
⁷     A.   This one the "2." And I also
⁸ made sure I had copies with me of the tax
⁹ information that I had given them.
¹⁰     Q.   And what tax information
¹¹ specifically?
¹²     A.   It's the 1099 from the
¹³ Lovelady Center and the W4's or the W2's
¹⁴ for Burger King, GRG Ventures, and Subway.
¹⁵ GRG Ventures. It's the corporation for
¹⁶ Burger King.
¹⁷     Q.   I'm not sure we have the
¹⁸ Subway one, but maybe that's in the
¹⁹ documents you're giving us.
²⁰     A.   I think it says Extension P
²¹ Group.
²²     Q.   A little more background, and
²³ then we'll move into your time at

Page 31

¹ Lovelady. I'd like to ask you a little
² bit about your education. Did you
³ complete high school?
⁴     A.   No.
⁵     Q.   What grade did you complete?
⁶     A.   The highest grade that I
⁷ completed was eleventh. I dropped out my
⁸ senior year.
⁹     Q.   Where did you go to high
¹⁰ school?
¹¹     A.   Well, there were multiple high
¹² schools. I went back and forth between
¹³ family members as a child. So I was at
¹⁴ Hewitt-Trussville High School for a brief
¹⁵ period as well as a school that's also a
¹⁶ vocational school called Renaissance High
¹⁷ in Pelham, Alabama and Hewitt-Trussville.
¹⁸     Q.   So was your last year at
¹⁹ eleventh grade at Hewitt-Trussville?
²⁰     A.   No. My last year was at
²¹ Renaissance High.
²²     Q.   Did you ever complete your
²³ GED?

Page 32

¹     A.   Yes.
²     Q.   Where did you complete that?
³     A.   In Tallahassee, Florida in
⁴ 2003.
⁵     Q.   You were living in Tallahassee
⁶ at the time?
⁷     A.   Well, I was living in
⁸ Pensacola, but the GED was issued from
⁹ Tallahassee department. That's where the
¹⁰ department of education for Florida is
¹¹ located, so...
¹²     Q.   What were you doing in
¹³ Pensacola?
¹⁴     A.   I lived with my aunt.
¹⁵     Q.   Have you ever taken any
¹⁶ classes for college credit?
¹⁷     A.   Yes.
¹⁸     Q.   What types of classes?
¹⁹     A.   Just the Tennessee Temple
²⁰ courses that were required at the Lovelady
²¹ Center.
²²     Q.   Do you know about how many
²³ classes that was?

Page 33

1    A.   I don't recall at this time,
2  to be honest.
3    Q.   Have you received any other
4  certificates for training or for any sort
5  of education experience beyond the GED?
6    A.   I'm service aide certified.
7    Q.   What does that mean?
8    A.   It's a restaurant
9  certification.  If you're a management in
10 a food establishment, you have to have a
11 restaurant certification.
12   Q.   So did you do training to
13 receive that certificate?
14   A.   Yes.
15   Q.   What type of training?
16   A.   On-the-job training as well as
17 a book that you have to read and go over.
18 It covers food safety issues and...
19   Q.   Okay.  Have you had any legal
20 training?
21   A.   No.
22   Q.   Have you ever had any medical
23 training?

Page 34

1    A.   No.
2    Q.   Since high school, since
3  eleventh grade, when you dropped out at
4  that point, have you had any jobs?
5    A.   Yes.
6    Q.   Can we go through those jobs
7  since eleventh grade in high school, what
8  jobs did you have?
9    A.   There are a lot of different
10 jobs, and to be honest with you, I'm not
11 going to be able to recall every employer
12 that I've had since I've graduated or
13 since I left high school.
14   Q.   Let's just start at the
15 beginning and remember as many as you can.
16 So when you left in the eleventh grade did
17 you have a job at that point?
18   A.   I worked as a private
19 contractor then.
20   Q.   For what entity?
21   A.   A construction company called
22 Premiere, Incorporated, I think, was the
23 name.

Page 35

1    Q.   Did you apply for that job?
2    A.   No, I didn't.
3    Q.   How did you get the job?
4    A.   My friend owned the company.
5    Q.   So did you interview for it?
6    A.   No.
7    Q.   Did you have any training for
8  it?
9    A.   Yes.
10   Q.   What type of training did you
11 have for that job?
12   A.   Well, he trained me as well,
13 the owner of company.
14   Q.   So what did he do?  What were
15 your job duties?
16   A.   He just showed me how to do
17 the different things that needed to be
18 done, painting, how to tape off, how to
19 cut lines, how to take care of the tools.
20   Q.   So were you building?
21   A.   It was a remodeling company,
22 so we did a lot of different aspects of
23 construction.  Sometimes it was tile.

Page 36

1  Sometimes it was painting.  Sometimes it
2  was carpet.  Sometimes it was sheetrock.
3  Just whatever job was required.
4    Q.   About what year was that?
5    A.   From 1998 until 2001.
6    Q.   Okay.  And did you leave that
7  job and go to a different job?
8    A.   I did not.
9    Q.   Did you have any other jobs at
10 the same time?
11   A.   No.
12   Q.   Did you quit that job?
13   A.   Yes.
14   Q.   Why did you quit that job?
15   A.   Because I was addicted to
16 drugs and alcohol and so was the owner of
17 the company.  Yeah, so he went to jail, so
18 the company fell apart.
19   Q.   So what did you do after that?
20 Did you find a new job?
21   A.   I went to live with my aunt
22 for a while, and I went to --
23   Q.   Where was that?  In Pensacola?

Page 37

1     A.   Yes, ma'am.  Well, actually
2  she lived in Gulf Breeze, or she did live
3  in Gulf Breeze at the time.
4     Q.   Did you work when you were
5  living with your aunt in Gulf Breeze?
6     A.   I did after the first six
7  months.
8     Q.   And what's your aunt's name?
9     A.   Janis Jacobs.
10    Q.   So after the first six months
11 you got a job?
12    A.   Yes, ma'am.
13    Q.   Where did you work?
14    A.   Burger King.
15    Q.   And was this in about 2001,
16 2002?
17    A.   2002 at that time.
18    Q.   Did you apply for a job at
19 Burger King?
20    A.   I did.
21    Q.   Did you get interviewed?
22    A.   I did.
23    Q.   Were you trained after you

Page 38

1  were given a job offer?
2     A.   Yes.
3     Q.   Okay.  Did you fill out
4  paperwork for that job?
5     A.   Yes.
6     Q.   What type of grade paperwork
7  did you fill out as an employee?
8     A.   A W4, which is where you
9  itemize your tax deductions so that they
10 know how much you're claiming.
11    Q.   So did you report taxes for
12 your work at Burger King?
13    A.   Yes.
14    Q.   How long did you work at
15 Burger King?
16    A.   Three months.
17    Q.   Was that the Burger King in
18 Gulf Breeze?
19    A.   Yes.
20    Q.   So you worked there about
21 three months at the Burger King in Gulf
22 Breeze when you were living with your
23 aunt.  Did you voluntarily leave that job?

Page 39

1     A.   Yes.
2     Q.   You quit?
3     A.   I quit.
4     Q.   Why did you quit?
5     A.   I found a different job at a
6  nursing home that paid more.
7     Q.   Did you apply for the job at
8  the nursing home?
9     A.   I did.
10    Q.   What was the nursing home
11 called?
12    A.   I can't remember at this time.
13    Q.   Do you remember where it was
14 located?
15    A.   It's in Gulf Breeze.
16 Actually, it's not a nursing home.  It's
17 not a state nursing home.  It's a
18 retirement home.
19    Q.   So was this still in 2002 when
20 you worked with the retirement home in
21 Gulf Breeze?
22    A.   Yes.
23    Q.   How did you get that job?

Page 40

1     A.   I applied, and I interviewed,
2  and they hired me.
3     Q.   Did you submit a resume when
4  you applied for the job at the nursing
5  home -- or excuse me -- the retirement
6  home?
7     A.   An application.  Not a resume.
8     Q.   What were your job duties when
9  you worked at the retirement home in Gulf
10 Breeze?
11    A.   Took care of patients, washed
12 dishes, cleaned, changed colostomy bags
13 and catheters, just whatever needed to be
14 done to take care of the patient.
15    Q.   Did you receive training for
16 those duties?
17    A.   I did.  Yes.
18    Q.   Did you like your job at the
19 retirement home?
20    A.   No.
21    Q.   Why not?
22    A.   It was physically strenuous,
23 and they were understaffed, so it was

**Rhonda Gaddis**                                                    **11**

Page 41

¹ difficult at times to move the patients.
² Some of the patients were bedridden, and I
³ mean they teach you how to move people,
⁴ but it's still very strenuous, exhausting.
⁵     Q.   How long did you work at the
⁶ retirement home in Gulf Breeze?
⁷     A.   Six months, I think.
⁸     Q.   And what happened after those
⁹ six months?
¹⁰     A.   I left.  I quit.
¹¹     Q.   Let's back up.  When you were
¹² at the retirement home, you said you were
¹³ going to be making more than when you were
¹⁴ at Burger King.  How much did you make at
¹⁵ the retirement home?
¹⁶     A.   I don't remember at this time,
¹⁷ to be honest.  I know it was more than
¹⁸ minimum wage.  I made minimum wage at
¹⁹ Burger King, and I think it was a dollar
²⁰ an hour more to work at the nursing home
²¹ as a patient care assistant so...
²²     Q.   And what was your job title
²³ when you were at Burger King?

Page 42

¹     A.   Cashier.
²     Q.   And at the retirement home you
³ were a patient care assistant?
⁴     A.   Yes, ma'am.
⁵     Q.   So you quit your job as a
⁶ patient care assistant at the retirement
⁷ home in Gulf Breeze?
⁸     A.   Yes, ma'am.
⁹     Q.   What did you do after that?
¹⁰     A.   I started using drugs again,
¹¹ so I was homeless for a while.
¹²     Q.   Did you ever get another job?
¹³     A.   In 2006, I did.
¹⁴     Q.   So you went four years or so
¹⁵ without a job?
¹⁶     A.   Yes, ma'am.
¹⁷     Q.   What was your job in 2006?
¹⁸     A.   I went back to Burger King.
¹⁹     Q.   As a cashier?
²⁰     A.   Yes, ma'am.
²¹     Q.   Where was the Burger King
²² located?
²³     A.   In Fort Walton Beach, Florida.

Page 43

¹     Q.   Did you apply for in job
² again?
³     A.   I did.
⁴     Q.   Did you go have an interview?
⁵     A.   I did.
⁶     Q.   Did you receive training?
⁷     A.   Initially, no.  I already knew
⁸ how to work as a cashier, so there was no
⁹ training necessary at that point.
¹⁰     Q.   And how long did you work at
¹¹ the Burger King in Fort Walton Beach?
¹²     A.   That location, I was there
¹³ until I delivered my daughter in ▮▮▮ of
¹⁴ 2006.
¹⁵     Q.   So about how many months?
¹⁶     A.   Four months.
¹⁷     Q.   Okay.  And did you go back to
¹⁸ work after you delivered your daughter in
¹⁹ ▮▮ of 2006?
²⁰     A.   I did.
²¹     Q.   You went back to that same
²² Burger King?
²³     A.   No.  I went to a different

Page 44

¹ location because I moved to Destin.  So
² same corporation, different store.
³     Q.   Did you have to reapply?
⁴     A.   No.  They -- the general
⁵ manager referred me to the other store.
⁶     Q.   And how long did you work at
⁷ Burger King in Destin?
⁸     A.   From June of 2006 until
⁹ January of 2010, I think.
¹⁰     Q.   Did you have supervisors while
¹¹ you were working at Burger King this time
¹² and your previous employment with Burger
¹³ King?
¹⁴     A.   Yes.
¹⁵     Q.   Were you ever disciplined by
¹⁶ your supervisors or any other employees at
¹⁷ Burger King?
¹⁸     A.   No.
¹⁹     Q.   You said you worked at the
²⁰ Burger King in Destin until about 2010.
²¹ Were you a cashier that entire time?
²²     A.   No.  In 2008 I was promoted to
²³ what they called breakfast coordinator,

Page 45

1  which is an opening manager, and then from
2  there to an hourly manager.
3       Q.   So did your wages increase?
4       A.   Yes.
5       Q.   Do you know what you were paid
6  as an opening manager?
7       A.   For the breakfast coordinator
8  position, I made nine seventy-five an
9  hour.
10      Q.   And you were promoted again?
11      A.   Yes, ma'am.
12      Q.   Did your salary increase?
13      A.   Yes, ma'am.
14      Q.   Did you have to receive
15  additional training for your promotions at
16  Burger King?
17      A.   Yes.
18      Q.   What type of training?
19      A.   You have to take complete,
20  what they call, shift foundations, which
21  is management training.  Teaches you how
22  to manage your employees, run the shift.
23      Q.   Was that for the breakfast

Page 46

1  coordinator position?
2       A.   Yes.  But it goes over into
3  the hourly management position as well,
4  but for you to run shifts in a restaurant,
5  you have to have these certifications.  So
6  I was trained at new shift foundations,
7  guest service expert, food service expert,
8  and service aide certification.
9       Q.   So did you go somewhere else
10  and receive training or was it on the job?
11      A.   It was on the job.
12      Q.   And did you receive
13  certificates after the completion of that
14  training?
15      A.   Yes.
16      Q.   And was it all the same type?
17  You distinguished two different positions.
18  You had the breakfast coordinator, and
19  then you were later promoted to the hourly
20  manager position, correct?
21      A.   Yes.
22      Q.   Did you have additional
23  different training for the hourly

Page 47

1  management position?
2       A.   Yes.
3       Q.   What was that training?
4       A.   Just the closing duties at
5  that point.  I had to learn the closing
6  duties and closing procedures because I
7  had never done those before, and handling
8  the deposits at night.  When you open, you
9  just verify your safe.  You don't have to
10  break down cash drawers or anything of
11  that.
12      Q.   So you had a lot more
13  responsibility?
14      A.   I did.
15      Q.   And then you received
16  additional certificates from Burger King
17  for the additional training for the hourly
18  manager position?
19      A.   There were no additional
20  certificates for the closing duties.  Just
21  the only thing that I had to get certified
22  in was the certification shift foundation,
23  which I already had those.

Page 48

1       Q.   When you had these different
2  positions at Burger King, did you have to
3  fill out new paperwork for these new
4  positions that you were promoted to?
5       A.   I signed performance reviews
6  that covered different duties.  But I
7  didn't really fill out anything else.
8       Q.   Okay.  Did Burger King have
9  monthly or yearly or quarterly performance
10  reviews?
11      A.   Yes.
12      Q.   And what were your performance
13  reviews like?
14      A.   To be honest, I don't know.
15  I've only seen a couple of them.  That
16  wasn't part of my job to review these.  I
17  just signed them.
18      Q.   Did you ever have meetings
19  with supervisors to go over your
20  performance at Burger King?
21      A.   On a couple of occasions, yes.
22      Q.   Were you ever disciplined for
23  any --

**Rhonda Gaddis**

Page 49

1    A.    No.

2    Q.    -- errors or anything else?

3    A.    No.

4    Q.    So why did you leave Burger

5  King in Destin in 2010?

6    A.    I separated from my husband.

7  And I had my daughter in my custody at

8  that point, and I couldn't afford to

9  support her by myself, so I moved in with

10  my aunt in Alabama.

11    Q.    And your aunt was?  What's her

12  name?

13    A.    Janis Jacobs.

14    Q.    So she was the one that was

15  living in Florida previously, correct?

16    A.    Yes.

17    Q.    And she moved to Alabama, and

18  you moved in with her again?

19    A.    Yes, ma'am.

20    Q.    For all of the jobs we've been

21  talking about, you indicated, you stated

22  that you quit the various jobs at specific

23  times we've talked about.  Were you ever

Page 50

1  terminated?

2    A.    No.

3    Q.    For any of those jobs?

4    A.    No.

5    Q.    Have you ever been terminated

6  in a job?

7    A.    No.

8    Q.    After the 2010 when you moved

9  to Alabama, did you get a new job when you

10  moved in with your aunt, Janis and had

11  your daughter with you?  Is this daughter

12  Victoria?

13    A.    Yes.  Victoria Satterfield.

14  No, I did not.  Sorry.  Yes, I did.  I

15  went back to Burger King for a very brief

16  period when I first moved in with her.

17    Q.    What was your position at

18  Burger King?

19    A.    Cashier.

20    Q.    What Burger King?  Where was

21  it located?

22    A.    In New Market, Alabama on

23  Winchester Road.

Page 51

1    Q.    Was that in 2010?

2    A.    I believe so.

3    Q.    And do you know how long you

4  worked there?

5    A.    Maybe three months.  Not sure

6  if that's accurate, though.  That's an

7  approximation.

8    Q.    Why did you leave after

9  approximately three months?

10    A.    I relapsed.

11    Q.    And by relapse?

12    A.    I started using drugs again.

13    Q.    And about how long was it

14  until you got another job or did you get

15  another job after that point?

16    A.    I did not get another job

17  until I went to work for Burger King again

18  after I had been at the Lovelady program.

19    MR. CAMP:  Can we take a break?

20  Just a short one?

21    MS. COUCH:  Sure.

22    (Recess taken.)

23    Q.    We'll turn our attention now

Page 52

1  to your involvement at the Lovelady

2  Center.  But first, can you tell me what

3  the Lovelady Center is?

4    A.    Well, from what I was told,

5  it's a transitional housing facility while

6  it's a rehabilitation program.

7    Q.    When did you first hear about

8  the Lovelady Center?

9    A.    In 2012.

10    Q.    How did you hear about it?

11    A.    In Madison County Jail.  There

12  were other inmates that had been court

13  ordered to complete treatment, and they

14  went to the Lovelady Center.

15    Q.    Were you court ordered?

16    A.    I was.

17    Q.    What was the charge that you

18  were in the Madison County Jail for at

19  that time?

20    A.    Possession of methamphetamines

21  and possession of paraphernalia.

22    Q.    So did you have any jail time

23  associated with that charge?

**Rhonda Gaddis**                                                              **14**

Page 53

1      A.   Yes, ma'am.  I was in jail for
2   a little over eleven months.
3      Q.   And at the conclusion of the
4   eleven months term, did the court mandate
5   that you participate in a rehabilitation
6   program?
7      A.   Yes, ma'am.  As part of my
8   probation.
9      Q.   Was there a requirement for a
10  certain amount of time that you had to
11  participate in the rehabilitation program?
12     A.   They didn't give me a specific
13  time frame.  They just said it had to be
14  intensive, inpatient.
15     Q.   Was part of the requirement
16  from the court that you complete or
17  graduate from the rehabilitation program?
18     A.   Yes, ma'am.
19     Q.   And do you know what the
20  repercussions were or would have been had
21  you not completed the rehabilitation
22  program?
23     A.   Yes, ma'am.  Not completing

Page 54

1   the program would have been a violation of
2   my probation, and I would have been
3   required to serve five years on a
4   fifteen-year sentence.
5      Q.   So did you choose to enroll at
6   the Lovelady so that you would avoid
7   serving an additional five years in jail?
8      A.   I actually chose Lovelady
9   because I needed housing and
10  rehabilitation, so...
11     Q.   Did you --
12     A.   And it was recommended.
13     Q.   Was part of your decision
14  based on the fact that you would not have
15  to serve five years in jail?
16     A.   It was a factor, yes.
17     Q.   At the time you enrolled at
18  Lovelady you said you had been charged
19  with possession of methamphetamines.  Were
20  you addicted to methamphetamines at that
21  time or any other drugs?
22     A.   When I entered the center?
23     Q.   Correct.

Page 55

1      A.   No.
2      Q.   Prior to entering the center
3   at the time of your charge for possession
4   of methamphetamines, were you addicted to
5   methamphetamines or any other drug?
6      A.   I was addicted to
7   methamphetamines for a period of eight
8   months.  My sobriety date was May 16th,
9   2013.
10     Q.   And when did you enter
11  Lovelady?
12     A.   Mid April in 2013.  I'm not
13  sure of the exact date.  I think it was
14  April the 21st, but I'm not certain.
15     Q.   Prior to your enrollment at
16  Lovelady, have you ever enrolled in any
17  other rehabilitative programs or
18  counseling programs?
19     A.   Yes.
20     Q.   What programs were those?
21     A.   At age twenty-one I completed
22  a twenty-eight day, inpatient treatment
23  program at The Friary in Gulf Breeze,

Page 56

1   Florida.  And I also was part of an
2   outpatient treatment program after that
3   called Pathways in Pensacola, Florida.
4      Q.   Okay.  At the Friary in Gulf
5   Breeze, Florida was that a voluntary
6   rehabilitation?
7      A.   Yes.
8      Q.   Did you pay for that
9   rehabilitation?
10     A.   No.
11     Q.   Did anyone in your family pay
12  for that rehabilitation?
13     A.   No.
14     Q.   How was that program funded so
15  that you could attend when you were
16  approximately twenty-one years old at the
17  Friary in Gulf Breeze?
18     A.   DHR paid for it.
19     Q.   Was it mandated by DHR?
20     A.   Actually, it was paid for --
21  there was a program called the Wise
22  program, which works with DHR, and it
23  stands for Women Intervention Services and

Page 57

1 Education, and they give parenting classes
2 and help you with rehabilitation services
3 and counseling.  I qualified for that
4 program, so they helped me pay for it, the
5 inpatient treatment.  The outpatient
6 treatment, I paid for, which was following
7 the inpatient treatment.
8    Q.   Let's stay on the inpatient
9 treatment at the Friary.
10    A.   Okay.
11    Q.   DHR paid for that, correct?
12    A.   The Wise program, I think,
13 technically paid for it.
14    Q.   The Wise program associated
15 with?
16    A.   DHR.
17    Q.   Florida's DHR?
18    A.   Yes.
19    Q.   Do you know approximately how
20 much that cost?
21    A.   A little over twenty thousand
22 dollars, I think.
23    Q.   For twenty-eight days?

Page 58

1    A.   It's one of the nation's
2 top-ranked rehabs.
3    Q.   Did you have children at that
4 time?
5    A.   I did.
6    Q.   How many children did you
7 have?
8    A.   Just one.
9    Q.   And where was your child?
10    A.   He was already with the
11 adoptive family.
12    Q.   After that inpatient treatment
13 when you were approximately twenty-one
14 years old, you said you also participated
15 in an outpatient treatment at Pathways in
16 Pensacola?
17    A.   Yes, ma'am.
18    Q.   Did you pay for that yourself?
19    A.   I did.
20    Q.   How long were you at Pathways?
21    A.   I think it was twelve weeks.
22    Q.   How much did that cost?
23    A.   I don't recall at this time,

Page 59

1 to be honest.  It was based on a sliding
2 scale, so...
3    Q.   What do you mean by a sliding
4 scale?
5    A.   Like if you didn't have income
6 or you were low income, then you only paid
7 a minimal fee.  And you paid for your drug
8 test fees as well, so...
9    Q.   Do you have any idea the
10 estimate that it may have cost for twelve
11 weeks of an outpatient program?
12    A.   I don't recall at this time.
13 I'm sorry.
14    Q.   Did you participate in any
15 other rehabilitative programs or
16 counseling programs after your time spent
17 at the Friary and Pathways in Florida?
18    A.   I did.  I was part of an
19 outpatient treatment program in Bradford
20 for a brief period in 2012, I think.
21    Q.   How long were you at Bradford
22 in 2012?
23    A.   I'm not certain, but I think

Page 60

1 it was about six weeks.
2    Q.   Did you pay for that
3 treatment?
4    A.   I did not.
5    Q.   Did anyone in your family pay
6 for that treatment?
7    A.   No.
8    Q.   Who paid for that treatment?
9    A.   DHR.
10    Q.   Do you know how much that
11 treatment cost?
12    A.   I don't.
13    Q.   Did DHR mandate that
14 treatment?
15    A.   Yes.
16    Q.   Why?
17    A.   Because I was addicted to
18 drugs, and I was still trying to get
19 custody of my middle child.
20    Q.   Did you have custody of any of
21 your children at that time?
22    A.   No.
23    Q.   Did you complete the Bradford

**Rhonda Gaddis**                                                                16

Page 61

1  program?
2      A.   No.
3      Q.   Why not?
4      A.   I couldn't maintain sobriety.
5      Q.   Did you ever get custody of
6  your child or children back after that
7  time?
8      A.   No.
9      Q.   Did you complete the Friary
10 Program in Gulf Breeze, Florida for the
11 twenty-eight days?
12     A.   I did, yes.
13     Q.   And did you complete the
14 Pathways program in Pensacola, Florida
15 that was a couple of weeks long?
16     A.   Twelve weeks.
17     Q.   Twelve weeks long.
18     A.   Yes, I did.
19     Q.   After your treatment at
20 Bradford that you did not complete, did
21 you enter any other rehab facility?
22     A.   No.
23     Q.   Prior to entering Lovelady,

Page 62

1  have you had any counselors prior to
2  entering Lovelady?
3      A.   Like psychiatrist,
4  psychologist?
5      Q.   Any type of counselor outside
6  of the rehab facilities that you were in
7  that we talked about; the Friary,
8  Pathways, and Bradford.
9      A.   Yes.
10     Q.   Okay.  What types of
11 counselors did you have?
12     A.   Well, all the counselors,
13 substance abuse counselors were under
14 employment from the counseling centers
15 that we've already listed, but there were
16 also psychologists and psychiatrists that
17 I saw from the age of seventeen until I
18 was twenty-four at various times.
19     Q.   Did you pay for any of those
20 psychologists or psychiatrists?
21     A.   No.
22     Q.   Did anyone in your family pay
23 for those psychologists or psychiatrists?

Page 63

1      A.   No.  My health insurance paid
2  for it.
3      Q.   Did you have copays?
4      A.   No.  I had Medicaid.
5      Q.   Okay.  When you enrolled at
6  Lovelady, after being court ordered by
7  Madison County to enter a rehab facility,
8  were you looking for a job?
9      A.   Yes.  After I got to the
10 center.  Yes.
11     Q.   At the time you entered the
12 center when you had been in jail for
13 eleven months, at that time were you
14 looking for a job?
15     A.   The goal was employment.
16 After the first two weeks of the program,
17 yes.  You have to find a job.  When I got
18 there, the rules were different for the
19 center.  The first two weeks you had to go
20 to classes and you didn't work, but after
21 that two weeks was up, you found a job and
22 went to work.
23     Q.   When you arrived at Lovelady

Page 64

1  to enroll, were you physically and
2  emotionally able to handle a job at that
3  time?
4      A.   Yes.
5      Q.   If you were physically and
6  emotionally able to handle a job at that
7  time, why didn't you have one?
8      A.   I came straight from jail to
9  the Lovelady.  Like I left jail, and three
10 days later I came to the Lovelady Center,
11 so...
12     Q.   And when had you last worked
13 prior to enrolling at Lovelady?
14     A.   Whatever is listed for Burger
15 King.  Before my last relapse.
16     Q.   Burger King in Alabama?
17     A.   Yes.  The one on Winchester
18 Road.
19     Q.   So had it been a few years
20 before you had worked?
21     A.   Yes.  Yes.
22     Q.   At the time you entered
23 Lovelady you hadn't worked for a few

Rhonda Gaddis

Page 65

1 years?
2    A.   Correct.
3    Q.   Okay.  And you said when you
4 entered Lovelady, there was a period of
5 time where you were not going to have a
6 job, and did you know that?
7    A.   After I signed the intake
8 paperwork, we talked about it and went
9 over the -- yeah.
10   Q.   Who did you meet with when you
11 showed up at Lovelady?
12   A.   I don't know her last name.
13 Her first name was Elle.  She works in
14 intake.
15   Q.   Did you have an application?
16   A.   To enter the center?
17   Q.   Correct.
18   A.   No.
19   Q.   Did you have an interview?
20   A.   No.  To enter the center?  No.
21   Q.   Correct.  So did you interview
22 for any job at Lovelady when you arrived
23 to enroll?

Page 66

1    A.   To enter the center?  No.  To
2 start working at the thrift store, yes.
3    Q.   Okay.  That's a separate
4 question that we'll get to.  Talking about
5 your enrollment at the center.
6    A.   Okay.
7    Q.   Do you know if Lovelady has
8 employees that work there full time?
9    A.   Yes.
10   Q.   And do you know if there's
11 someone, another employee at Lovelady that
12 hires those people that work full time and
13 manages them?
14   A.   Who are you referring to right
15 now?  You're talking about the thrift
16 store employees or?
17   Q.   The Lovelady Center that
18 handles your intake.
19   A.   They have full-time employees.
20 Do I know who hires them?  No.  I'm sure
21 someone does.
22   Q.   Okay.  So who did you meet
23 with when you enrolled?  You said her name

Page 67

1 was Elle?
2    A.   Elle.  She works intake.
3    Q.   Do you know what her position
4 was?
5    A.   I don't.  I just know that she
6 works in the intake office.
7    Q.   And when you say she works in
8 the intake office, do you know that she
9 maybe is responsible for getting paperwork
10 from the clients who are entering the
11 program's rehab facility?
12   A.   That's one of her
13 responsibilities, yes.
14   Q.   Did you submit any resumes to
15 Lovelady Center?
16   A.   To enroll in rehab?
17   Q.   Correct.
18   A.   No.
19   Q.   Did you ever in your previous
20 jobs submit resumes?
21   A.   Yes.
22   Q.   But you did not submit a
23 resume to Lovelady Center?

Page 68

1    A.   No.
2    Q.   Did you talk about what you
3 might get paid or any job benefits when
4 you enrolled at Lovelady?
5    A.   To enroll in the
6 rehabilitation program, no.
7    Q.   When you enrolled do you
8 remember signing some documents?
9    A.   I signed a stack of papers.
10 And did I read them?  No.  Do I know what
11 they said?  No, I don't.
12   Q.   Were you under the influence
13 of any medications or drugs when you
14 enrolled at Lovelady?
15   A.   No.
16   Q.   Were you under the influence
17 of any drugs or medication when you signed
18 papers at Lovelady?
19   A.   No.
20      MS. COUCH:  I'm going to show
21 you what we're going to mark as
22 Defendant's Exhibit 5.
23      (Whereupon, Defendant's

**Rhonda Gaddis**                                                           **18**

Page 69

1       Exhibit 5 was marked for
2       identification and attached
3       to the deposition.)
4    Q.   This is a document that it
5 appears that you signed.  Can you verify
6 if that's your signature at the bottom?
7    A.   Yes.
8    Q.   Okay.  And this document was
9 given to you as part of the paperwork for
10 your enrollment at Lovelady, correct?
11    A.   I don't remember.  This is the
12 first time I ever remember reading this,
13 but I signed it, so...
14    Q.   And you signed it on the date
15 it's dated, April 22nd, 2013.  Is that on
16 or about the time you entered the Lovelady
17 program?
18    A.   Yes.
19    Q.   And do you see in paragraph
20 five, could you read that paragraph for
21 me?
22    A.   "Each resident has the right
23 to know that the performance of all

Page 70

1 assigned housekeeping and general
2 maintenance duties may be performed
3 without compensation."
4    Q.   Did you understand that
5 paragraph to mean that you might have
6 responsibilities and duties at Lovelady
7 and that you may not be paid for them?
8    A.   I didn't read any of this.
9 They gave me an entire stack of papers,
10 and I needed housing, and I needed
11 employment, and I needed drug
12 rehabilitation.  I didn't read this.  I
13 just signed it.  I had to be there.
14    Q.   Do you understand reading it
15 today that it indicates that you may have
16 duties and responsibilities but may not be
17 compensated for those duties and
18 responsibilities?
19    A.   Not for time that I actually
20 worked.
21    Q.   But you don't dispute that you
22 signed this statement, correct?
23    A.   I signed it, yes.

Page 71

1       MS. COUCH:  I'm going to show
2 you what we're going to mark as
3 Defendant's Exhibit 6.
4       (Whereupon, Defendant's
5       Exhibit 6 was marked for
6       identification and attached
7       to the deposition.)
8    Q.   This is another document that
9 it appears you signed upon your enrollment
10 at Lovelady.  It's titled statement of
11 understanding and agreement.  Is this your
12 signature on the bottom of this document?
13    A.   Yes.
14    Q.   And is it dated April 22nd,
15 2013 on or about your time of enrollment
16 at Lovelady?
17    A.   Yes.
18    Q.   Do you see in paragraph five
19 -- could you read that paragraph five for
20 me?
21    A.   "I do hereby waive all rights
22 to claim suit against the Lovelady Center
23 and board of directors of the Lovelady

Page 72

1 Center."
2    Q.   Do you understand what that
3 paragraph means?
4       MR. CAMP:  Objection.  Calls
5 for a legal conclusion.
6    Q.   I'm asking whether or not you
7 understand without any legal understanding
8 of any terms or anything of the sort,
9 whether or not that you know what it means
10 to waive your rights to a lawsuit.
11    A.   I didn't read any of this.  I
12 just signed the papers they told me to
13 sign.  So when I signed it, did I
14 understand what my rights were?  No.
15    Q.   Were you under the influence
16 of any drugs or medication when you signed
17 this agreement?
18       MR. CAMP:  Objection.  Asked
19 and answered.
20       MS. COUCH:  That's a different
21 document.
22    Q.   Okay.  Do you understand that
23 Lovelady takes a risk when bringing in a

Rhonda Gaddis                                                                    19

Page 73

1 person who needs rehabilitation and
2 counseling?
3     A.   I don't really see where
4 that's relevant to ask me.  Like what do
5 -- I don't know what it means to run a
6 drug rehabilitation center, no, I don't.
7     Q.   Okay.  Do you understand that
8 the forms that I showed you that you were
9 required to signed those upon your
10 entrance to the program?
11    A.   I understand that I was
12 required to sign them, yes.
13    Q.   Do you understand that had you
14 not signed them you may not have been
15 accepted into the program?
16    A.   Yes.  I was under the
17 impression that I was required to sign
18 them.
19    Q.   Okay.  Did you intend to
20 follow through with the waiver provision
21 on this Defendant's Exhibit 6?
22    A.   The one you just gave me?
23        MR. CAMP:  Objection to form.

Page 74

1 I don't understand the question.  Could
2 you repeat it for me or read it back?
3     Q.   Sure.  Did you intend to
4 comply with the waiver provision on the
5 document entitled statement of
6 understanding and agreement in paragraph
7 five of this agreement?
8        MR. CAMP:  At what time?
9     A.   I did not read any of this, so
10 to be honest with you, I intended to
11 comply with any rules that they gave me
12 when I was there so I could complete the
13 program, but I did not read the documents
14 before I signed them.
15    Q.   Why are you suing here today?
16    A.   Because I was paid less than
17 minimum wage for the entire time that I
18 worked at the thrift store, and because I
19 was not paid for overtime hours that I
20 worked.  I was not legally allowed to even
21 record the overtime hours that I worked.
22 And I don't feel that it was fair.
23    Q.   But you don't dispute that you

Page 75

1 signed what we had labeled as Defendant's
2 Exhibit 5, correct?
3     A.   I signed it.
4     Q.   Which states in paragraph five
5 that certain duties, housekeeping and
6 general maintenance may be performed
7 without compensation?
8     A.   I've read it today, and I
9 understand what it says now, but I didn't
10 read it then so...
11    Q.   And so what do you understand
12 that to mean now today?  I understand that
13 you may not have read it previously.
14    A.   That the chores that I did
15 within the center weren't to be paid for
16 but the work that I did in the thrift
17 store was not -- it was not something that
18 was a chore.  It was employment.
19    Q.   Okay.  Did you live onsite at
20 Lovelady when you were enrolled in the
21 program?
22    A.   I did.
23    Q.   And I think we've already

Page 76

1 established that you didn't have any
2 children with you at the time?
3     A.   Correct.
4     Q.   So none of them lived with
5 you?
6     A.   No, ma'am.
7        MS. COUCH:  Another document to
8 show you that you signed upon enrollment,
9 we'll mark as Defendant's Exhibit 7.
10       (Whereupon, Defendant's
11       Exhibit 7 was marked for
12       identification and attached
13       to the deposition.)
14    Q.   Do you recognize this document
15 and your signature at the bottom of the
16 document?
17    A.   I recognize my signature, but
18 I didn't read this the day I signed it.
19    Q.   Okay.  And do you understand
20 that it's an agreement regarding finance
21 between you and Lovelady?
22    A.   Yes.
23    Q.   Okay.  And in the first

**Rhonda Gaddis**

Page 77

1 paragraph it states that nine hundred and
2 fifty dollars is due upon intake?
3     A.   (Nodding head.)
4     Q.   Do you know if you paid that
5 nine hundred and fifty dollars?
6     A.   Not all at once on intake.
7          MS. COUCH:  I'm going to show
8 you another document, Defendant's Exhibit
9 Number 8.
10         (Whereupon, Defendant's
11         Exhibit 8 was marked for
12         identification and attached
13         to the deposition.)
14    Q.   This shows payment of fees
15 upon intake.  And it looks like you paid
16 five hundred dollars; is that correct?
17    A.   Yes, ma'am.
18    Q.   On the financial obligation
19 agreement, which we've marked as
20 Defendant's Exhibit 6.  Sorry.
21 Defendant's Exhibit 7.  It also states
22 that you, Ms. Gaddis, are responsible to
23 pay a hundred and fifty dollars weekly for

Page 78

1 the services that you were given, staying
2 and living and eating and being provided
3 for at Lovelady; is that correct?
4     A.   Yes, ma'am.
5     Q.   So did you understand, and do
6 you today understand that there was a
7 weekly fee of a hundred and fifty dollars
8 to Lovelady to provide you housing and
9 services?
10    A.   Yes.
11    Q.   Do you know what the actual
12 cost of the program was?
13    A.   No.  I mean, I know the
14 initial fee is nine fifty, but I don't
15 recall how much I paid.  I would have to
16 go back and calculate the weeks I was
17 there.
18    Q.   And I'm asking a little bit
19 different question.  I'm asking how much
20 it actually cost Lovelady to run the
21 center for one patient, to provide
22 services to that one client.
23    A.   No.

Page 79

1     Q.   Like you?
2     A.   I don't know.
3     Q.   But you stated earlier you
4 didn't pay for all of the previous rehab
5 facilities you've been in, but you did pay
6 for one that cost about twenty thousand
7 dollars for twenty-eight days; is that
8 correct?
9     A.   I did not pay for that one.  I
10 stated I did not pay for that, but that
11 was the cost of the program.  It was a
12 little over twenty thousand dollars, and I
13 don't know if that was accurate.  That
14 came from another patient who was paying
15 himself.  He said that was the cost of the
16 treatment of the program.  So...
17    Q.   And who paid for that program?
18 That was the --
19    A.   Wise.
20    Q.   The Friary?
21    A.   The Friary was paid for by
22 Women Intervention Services and Education.
23    Q.   That's correct.  But you don't

Page 80

1 know how much it cost Lovelady to have one
2 client and provide services for that
3 client?
4     A.   No, I don't.
5     Q.   Do you know how Lovelady is
6 funded, how they get money?
7     A.   No.
8     Q.   Do you know if there are
9 volunteers or churches that give money?
10    A.   I do know that the residents
11 pay a hundred and fifty dollars, plus the
12 nine fifty intake fee.  Other than that, I
13 don't know.
14    Q.   Do you think it cost more than
15 a hundred and fifty dollars a week to
16 provide services, food, shelter,
17 counseling, transportation to a particular
18 client each week?
19    A.   I don't know.
20    Q.   Okay.  What services did you
21 receive when you were at the Lovelady
22 Center?
23    A.   Can you clarify that question

**Tyler Eaton Morgan Nichols & Pritchett**          877-373-3660

**Rhonda Gaddis**

Page 81

¹ by services?
²     Q.   Did you receive, for example,
³ rehab counseling?
⁴     A.   Yes.
⁵     Q.   Was that something worthwhile?
⁶     A.   Yes, it was.
⁷     Q.   Did you receive separate
⁸ counseling from just the rehab? Did you
⁹ meet with a counselor?
¹⁰     A.   Yes.
¹¹     Q.   Was that something worthwhile?
¹²     A.   No. But it's a requirement of
¹³ the program. So I did it.
¹⁴     Q.   Why was it not worthwhile?
¹⁵     A.   Because nothing that you say
¹⁶ is held confidential in your counseling
¹⁷ session like they're supposed to be. If
¹⁸ you say something they don't like, it goes
¹⁹ straight back to the client rep. And as a
²⁰ result, myself and lot of other ladies
²¹ that I know don't talk about their real
²² issues there.
²³     Q.   But you said the rehab was

Page 82

¹ good for you?
²     A.   Overall, no. It's put a lot
³ of stress, financial stress and emotional
⁴ stress on me. Being paid less than
⁵ minimum wage and losing pell grant money
⁶ and now not being able to go to school
⁷ because I have no idea what happened to
⁸ seven thousand dollars worth of my pell
⁹ grant money.
¹⁰     Q.   Is it better to be addicted to
¹¹ drugs than to be in rehab?
¹²     A.   No.
¹³     Q.   So was the rehab program at
¹⁴ Lovelady good for you? Getting you off
¹⁵ drugs, was that good?
¹⁶     A.   Technically, I was already off
¹⁷ drugs when I came into the center. I was
¹⁸ there because I needed housing,
¹⁹ employment. Was it good for me to stay
²⁰ off drugs? Yes, absolutely.
²¹     Q.   So the rehab part of Lovelady
²² was overall a positive impact on your life
²³ staying off drugs?

Page 83

¹     A.   Staying off drugs has been a
² positive impact on my life, yes, but is
³ that due to the Lovelady Center? No.
⁴     Q.   The counseling sessions you
⁵ had?
⁶     A.   Uh-huh.
⁷     Q.   Were those positive for you
⁸ overall?
⁹     A.   No.
¹⁰     Q.   Did you get job services at
¹¹ Lovelady? Did you get advice on how to
¹² look for jobs?
¹³     A.   When I first got there we did
¹⁴ a thing where they taught us how to go
¹⁵ online and create a resume, so that was
¹⁶ helpful. Although I had already done it,
¹⁷ so I already knew how to do it, but I
¹⁸ think that was helpful.
¹⁹     Q.   Did they teach you how to
²⁰ manage your money?
²¹     A.   No.
²²     Q.   Did they teach you how to take
²³ interviews for jobs?

Page 84

¹     A.   No.
²     Q.   Did they give you any other
³ sort of services to help prepare you for
⁴ life outside of a rehab center?
⁵     A.   The classes that I took,
⁶ those, some of the spiritual classes were
⁷ helpful.
⁸     Q.   What were the spiritual
⁹ classes like?
¹⁰     A.   I mean, it just depended on
¹¹ which class. I can't give you the
¹² specifics of each class. I did
¹³ particularly enjoy the Christian Life
¹⁴ Evangelism course, though.
¹⁵     Q.   You did or did not?
¹⁶     A.   I did. I found that helpful.
¹⁷     Q.   And did Lovelady also provide
¹⁸ you meals?
¹⁹     A.   Yes.
²⁰     Q.   And as you said, lodging?
²¹     A.   Yes.
²²     Q.   Did Lovelady provide
²³ educational courses?

Page 85

1    A.   There were provided and
2  required.
3    Q.   And what types of courses were
4  provided?
5    A.   Tennessee Temple University
6  came and gave various classes at different
7  times, different, you know, because each
8  round of classes lasted a certain period
9  of time and then, so they were different,
10  each class.
11    Q.   Do you know the subject matter
12  of those courses?
13    A.   Most of them were spiritually
14  based, Biblical based, but there were also
15  English and math and computer skills
16  classes.
17    Q.   Did Lovelady provide
18  transportation for you to various places?
19    A.   Yes.
20    Q.   Okay.  Did you get along with
21  other clients at Lovelady and the
22  employees at Lovelady?
23    A.   Yes.

Page 86

1    Q.   Is there anybody at Lovelady
2  that you don't get along with or you
3  didn't like?
4    A.   I'm sure there was, but I
5  don't really recall.  I didn't have any
6  major conflicts.
7    Q.   Did you like it at Lovelady?
8  Was it a safe place to be?
9    A.   I didn't like it.  Because I
10  was taken advantage of, and I should have
11  been paid for the hours that I worked, and
12  I wasn't paid, and the pell grant
13  situation I was aware of before I ever
14  left the center and started asking
15  questions, and nobody could give me
16  answers to or wanted to give me answers
17  to.  So was I happy there?  No, I wasn't.
18    Q.   Was it a safe place for you to
19  be?
20    A.   When you say safe, what do you
21  mean?
22    Q.   Did you feel safe living at
23  Lovelady?

Page 87

1    A.   As long as I kept to myself in
2  my room, yes, but there were drugs inside
3  the center, so sometimes, no.
4    Q.   Let's talk a little bit about
5  the program itself and the phases that you
6  and other clients at Lovelady went
7  through.  So I know you said that you were
8  clean when you arrived at Lovelady?
9    A.   Yes.
10    Q.   But did you go through a
11  couple weeks period where you were
12  required to stay off any sort of drugs?
13    A.   You can't use drugs at all
14  times while you're in that program.  Why
15  would you -- the purpose is not to use
16  drugs.
17    Q.   Right.  But there's a phase
18  where if you had started at Lovelady
19  initially and were addicted, that you
20  would be required to go through kind of a
21  detox phase.  Did you go through a phase
22  like that?
23    A.   No.  I didn't go through

Page 88

1  detox.  I had been sober for almost a
2  year.
3    Q.   So what did you do when you
4  started out at Lovelady?  What was it
5  like?
6    A.   I came in.  I got put in the
7  crisis dorm, which is where they house a
8  lot of different women all in the same
9  room.  And I went to classes.  They gave
10  me a sheet, and I had to attend those
11  classes and get them signed off on in
12  order to graduate to the next phase of the
13  program.
14    Q.   So did you do any chores or
15  work at all for the first couple of weeks
16  when you were kind of just getting started
17  in the program?
18    A.   Yeah.  Everybody does chores.
19  You do chores from like day one.  You get
20  a client rep.  The client rep assigns your
21  chores.  You do the chores.
22    Q.   Okay.  The first day you
23  entered the program, you started doing

Page 89

1   chores at Lovelady?
2       A.   Not the first.
3       Q.   The second day?
4       A.   The second day, yes.
5       Q.   What type of chores were you
6   doing on the second day of your enrollment
7   at Lovelady?
8       A.   I had to clean the crisis
9   dorm, clean the counters and whatever.
10  There was someone else in there that told
11  me what she wanted me to do, and I did it.
12      Q.   So are you familiar with the
13  different phases of the program?
14      A.   I don't remember all of the
15  details, specific details of the phases,
16  and the program changed.  From the time
17  that I came in, I had been there for a few
18  months, and they changed the entire
19  structure, so I don't know.
20      Q.   So when you arrived, since you
21  were already clean, you started clean as
22  in you were not addicted to any illegal or
23  prescription drugs or alcohol?

Page 90

1       A.   Correct.
2       Q.   You started in the program and
3   began chores and other tasks for Lovelady,
4   correct?
5       A.   Yes.
6       Q.   And did you understand that
7   those chores and tasks and
8   responsibilities that you had for Lovelady
9   gave you credit against money that you
10  owed Lovelady for staying at Lovelady and
11  for them providing services to you?
12      A.   There was no crediting for the
13  chores.  They were just a mandatory part
14  of the program.  The opportunity credits,
15  what they call them, went towards my fees,
16  but I don't know.  It's my understanding,
17  I think it was twenty-one hours that I
18  worked for the opportunity credits, and I
19  don't know how much that would take off my
20  fees.
21      Q.   Okay.
22           MR. COUCH:  I want to show you
23  what I've marked as Defendant's Exhibit 9.

Page 91

1           (Whereupon, Defendant's
2            Exhibit 9 was marked for
3            identification and attached
4            to the deposition.)
5       Q.   Can you explain what this
6   document is to me?
7       A.   This is one of the opportunity
8   credits.  This is from the thrift store,
9   the call center, so this would have been
10  after I was working at Burger King, I
11  think.  Yeah.
12      Q.   But this has nothing to do
13  with Burger King.  It's a document that
14  tracks your hours for credit against the
15  fees that you owe Lovelady, correct?
16      A.   Yes.
17      Q.   And what type of duties were
18  you responsible for at this time
19  approximately?  In June of 2013?
20      A.   This sheet was for the call
21  center.  I just did cold calling for day
22  admissions for the Lovelady Center.
23      Q.   Okay.  And so how many hours

Page 92

1   per day did you work for opportunity
2   credits approximately?
3       A.   I don't recall.  It varied
4   from week to week because I was also
5   working for Burger King.  So I was trying
6   to get my balance down to zero.  I mean,
7   this day says eight hours, so...
8       Q.   How many hours approximately
9   per week did you work for Lovelady?
10      A.   I don't know.
11      Q.   Did you always write your
12  hours down?
13      A.   No.
14      Q.   Why not?
15      A.   Because there was stuff that
16  we did inside the center that didn't get
17  written down.  I only wrote down what was
18  required to be written down, like they
19  came off my rent.  And I had to record the
20  time that I got there and the time that I
21  left.
22      Q.   So you did not always record
23  the hours where you were doing chores and

Page 93

¹ other duties for Lovelady?
²     A.   No, I didn't.
³     Q.   Why not?
⁴     A.   We weren't required to.
⁵     Q.   Did you always turn in your
⁶ time sheets like this for opportunity
⁷ credits?
⁸     A.   Yes.
⁹     Q.   Did anyone make sure that you
¹⁰ did the specific chore that you were
¹¹ assigned to?
¹²     A.   If you didn't do it you'd get
¹³ in trouble with your client rep, so...
¹⁴     Q.   So was your client rep
¹⁵ responsible for ensuring that you
¹⁶ completed your chores?
¹⁷     A.   I guess so, yeah.
¹⁸     Q.   Who was your client rep when
¹⁹ you were at Lovelady?
²⁰     A.   Initially, it was Cindy
²¹ Likens, and when they restructured the
²² basis of the program, they changed it so
²³ that you no longer kept the same client

Page 94

¹ rep throughout the program, but you saw
² different client reps in different phases.
³ So when the program changed, I then had
⁴ Jennifer Bean as my client rep.  And after
⁵ that was Jennifer Miles so...
⁶     Q.   Who came up with the schedules
⁷ for your chores or other responsibilities
⁸ at the center?
⁹     A.   I don't know.  I just know
¹⁰ what time we had to be down there.  We had
¹¹ to be down there by 6:30 to do chores.
¹²     Q.   So when you went to a common
¹³ location at the center at a certain time
¹⁴ of day, and at that point, were you
¹⁵ assigned a specific task?
¹⁶     A.   Yes.
¹⁷     Q.   And do you know what the
¹⁸ reason for having those chores was?  Was
¹⁹ it to give you a sense of responsibility
²⁰ and to help train you for your life
²¹ outside the center?
²²     A.   I don't know.  I just assumed
²³ they wanted to keep the place clean.

Page 95

¹ So...
²     Q.   Did it give you any sense of
³ accomplishment when you did certain chores
⁴ or had certain responsibilities?  Did that
⁵ make you feel good?
⁶     A.   No.  I hated the chores.
⁷     Q.   The chores that you had, would
⁸ you consider that the type of activities
⁹ you were doing a job sort of in the real
¹⁰ world outside of the rehab center?
¹¹     A.   It was work for the center.
¹² It benefited the center, so...
¹³     Q.   Would you be treated -- were
¹⁴ you treated like an employee?
¹⁵     A.   At the thrift store?  Yes.
¹⁶ Inside the center?  Well, I was
¹⁷ supervised, and I had to do it.  I didn't
¹⁸ have a choice whether or not to.  It
¹⁹ wasn't like I could just say, hey, I'm not
²⁰ going to do my chores today.
²¹     Q.   What happened if you didn't do
²² your chores?
²³     A.   You'd get in trouble.  You'd

Page 96

¹ get your bags pulled, your privileges,
² your phone.  I'm assuming if you continued
³ not to do them, you probably would be
⁴ dismissed.
⁵     Q.   But did you get disciplined if
⁶ you didn't do a chore because you were
⁷ given a lot of privileges at the center?
⁸     A.   We got disciplined if we
⁹ didn't do a chore because we didn't do the
¹⁰ chore because we were required to do the
¹¹ chore.
¹²     Q.   That's right.  My question is
¹³ were certain privileges given to you when
¹⁴ you enrolled at the center that you didn't
¹⁵ otherwise have before you entered the
¹⁶ center?
¹⁷     A.   No.  A lot of my freedom was
¹⁸ taken away when I entered the center.
¹⁹     Q.   Well, you actually were in
²⁰ jail before you entered the center.  So
²¹ you had more privilege in jail than you
²² did at Lovelady Center?
²³     A.   No.  I was out of jail before

Page 97

1  I came to the Lovelady Center.
2      Q.   The three days before you came
3  to the Lovelady Center?
4      A.   I had more privileges, yes.
5      Q.   So you had more privileges at
6  Lovelady than you did have at jail?
7      A.   No.  I had more privileges in
8  the outside world before I entered the
9  center than I did before I entered the
10 center.
11     Q.   That's not my question.  My
12 question is did you have more privileges
13 in the Lovelady Center than you did in
14 jail?
15     A.   Yes.
16     Q.   And you entered Lovelady
17 Center because partially, I think you
18 represented earlier, if you hadn't, you
19 would have had to do another five years in
20 jail, correct?
21     A.   Prison.  I would have done
22 five years in prison.
23     Q.   So do you think you had more

Page 98

1  privileges and opportunity at the Lovelady
2  Center than you would have had spending
3  another five years in prison?
4      A.   Yes.
5          MS. COUCH:  I'm going to show
6  you what I've marked as Defendant's
7  Exhibit 10.
8          (Whereupon, Defendant's
9          Exhibit 10 was marked for
10         identification and attached
11         to the deposition.)
12     Q.   Can you tell me what this
13 document is?
14     A.   It's a time sheet for the
15 success program.
16     Q.   Okay.  Does it indicate that
17 during this week in August 2013 you worked
18 thirty-seven hours?
19     A.   It does.
20     Q.   And where were you working at
21 this time?
22     A.   I'm pretty sure this was after
23 I went to work for the thrift shore for

Page 99

1  the Lovelady Center.
2      Q.   And so can you tell me what
3  the success program is?
4      A.   It's a program where you work
5  for the center, and you get paid a certain
6  amount, and they take your fees directly
7  out of your paycheck.
8      Q.   And what fees do those go to?
9      A.   Towards your rent, the hundred
10 and fifty dollars a week that you owe.
11     Q.   So does the success program --
12 is there anything within the success
13 program that helps you learn how to hold a
14 job, or did you participate in any
15 training, did you do anything to prepare
16 for the outside world?
17     A.   Gave me work experience but
18 outside of that, no.
19     Q.   But work experience is a
20 skill.
21     A.   That's true.
22     Q.   That you could use in the
23 outside world after completing rehab, yes?

Page 100

1      A.   Yes.
2      Q.   So did you understand when you
3  were working at the call center, had any
4  other duties and responsibilities with
5  Lovelady, did you understand that a
6  certain amount of the money that you
7  earned within the Success program would be
8  credited towards the fees that you owed
9  Lovelady?
10     A.   I knew that if you worked full
11 time, which would be at least -- well,
12 supposed to be forty hours a week.  If you
13 worked forty hours a week, that a hundred
14 and fifty would go towards your fees.  But
15 if you owed back fees, you had to pay more
16 than that.  You only get to keep twenty
17 dollars of your check until your balance
18 is a zero.
19     Q.   So you understood that you
20 were -- you understood that you had duties
21 and responsibilities within Lovelady to
22 help offset the cost of you living at the
23 center, eating at the center, receiving

**Rhonda Gaddis**

Page 101

1 services at the center, correct?
2    A.   I understood that I was
3 working for them, and when I got paid, I
4 had to pay them at least a hundred and
5 fifty dollars a week.  That was what I --
6    Q.   But did you understand that
7 that hundred and fifty dollars a week was
8 because Lovelady was providing you
9 services?
10    A.   Because we live there and we
11 eat there, yes.
12    Q.   Right.  And Lovelady also
13 provided other services?
14    A.   Transportation, yes.
15    Q.   And counseling, and rehab?
16 Correct?
17    A.   I'm not going to agree with
18 the counseling one.
19    Q.   Would you dispute that there
20 were actually counselors that were
21 employed by Lovelady that provided
22 services?
23    A.   I don't know if they're

Page 102

1 licensed counselors.  They're client reps.
2 So...
3    Q.   Were you also required to
4 participate as a volunteer?
5    A.   There are volunteer hours.
6 They call them volunteer hours, but
7 they're not really volunteer.  They're
8 mandatory.  They're required.  Two hundred
9 and fifty hours from the time you entered
10 the program until you reach that amount.
11 At least ten hours a week, I believe, was
12 the requirement, and those had to be done
13 within the center in addition to the
14 chores that are also mandatory.  But they
15 weren't volunteer.  They were required.
16 As a part of the program.  You didn't do
17 them, you were going to be out.
18    Q.   Do you know what the purpose
19 of the volunteer work was?
20    A.   I don't know what their
21 purpose was, but I know that it benefited
22 the center, kept the center clean.
23    Q.   Did you get any benefit for

Page 103

1 doing volunteer work?
2    A.   No.
3    Q.   What type of work were you
4 doing when it was volunteer?
5    A.   It varied.  Different weeks,
6 different days.  Sometimes it was taking
7 out the trash.  Sometimes it was painting.
8 Sometimes it was cleaning the smoke yard.
9 Sometimes it was sweeping, mopping.
10 Whatever task they said needed to be done.
11    Q.   Did the volunteer work help
12 others?
13    A.   I don't know.
14    Q.   What's your understanding of
15 what it means to be a volunteer?
16    A.   You're actually a volunteer.
17 You're volunteering your time, and you're
18 not being compensated for it, but I wasn't
19 a volunteer.  I had to do it.
20    Q.   Have you done any other type
21 of volunteer work outside of Lovelady
22 Center?
23    A.   No.

Page 104

1    Q.   Would you expect to get paid
2 for work done as a volunteer?
3    A.   No.
4    Q.   So did you understand that
5 Lovelady had a requirement for a specific
6 number of hours for volunteer hours?  Did
7 you understand that you would not be paid
8 for those hours?
9    A.   At the time I just knew I had
10 to do them.  I didn't know if they -- I
11 didn't even know whether they were going
12 to go towards my fees or not.  I just knew
13 that I had to do those hours.  It was a
14 requirement program, so...
15    Q.   But you also understood that
16 the volunteer hours would not be paid,
17 correct?
18    A.   I mean, they weren't paid.
19 Should they have been paid?  Yes.  But
20 they weren't.
21    Q.   But you just said a minute ago
22 that you would not normally expect to be
23 paid for volunteer hours, correct?

**Rhonda Gaddis**

Page 105

1    A.    They weren't volunteer hours,
2  is what I'm telling you.  I did not
3  volunteer my time.  I did not get up out
4  of the goodness of my heart and say I'm
5  going to clean the sidewalk today.  No. I
6  was told "You did this, it's a part of the
7  program or you lose your privileges," and
8  when you have gotten in trouble enough,
9  they dismiss you, so I did what I was told
10  to do.
11    Q.    But you understood when you
12  enrolled in the program that Lovelady
13  required you to participate in a certain
14  amount of volunteer hours, correct?
15    A.    Initially, no.  After the
16  first week they explained things to me,
17  and yes, I understood that I had to do
18  those things.
19    Q.    And did you understand that
20  you would not be paid for those hours?
21    A.    Yes.  But that has nothing to
22  do with the thrift store.
23    Q.    Did Lovelady provide

Page 106

1  transportation to you when you worked at
2  the thrift store or at Burger King?
3    A.    Yes.  Both.
4    Q.    Okay.  And let's talk about
5  your time at the thrift store.  When did
6  you work for the thrift store?
7    A.    In July or August, I started
8  working for the thrift store at the call
9  center.
10    Q.    Of 2013?
11    A.    Yes.  I don't really recall
12  all these dates.  It was a very hectic
13  schedule.
14    Q.    And were you still enrolled as
15  a client at Lovelady at that time?
16    A.    Yes.
17    Q.    Were you in the Success
18  program at that time?
19    A.    Yes.
20    Q.    So did your hours where you
21  were working at the thrift store, did
22  those hours count towards the Success
23  program?

Page 107

1    A.    Well, they counted towards the
2  time that I was paid, and if I worked
3  forty hours, I was paid a set amount, and
4  then my fees would come out of what I was
5  paid.
6    Q.    Correct.  So when you were
7  working at the thrift store in July or
8  August of 2013, you were enrolled at
9  Lovelady?
10    A.    Yes.
11    Q.    And in the Success program?
12    A.    Yes.
13    Q.    And so your time spent at the
14  thrift store would be recorded on, for
15  example, a sheet similar to Exhibit 10?
16    A.    The Success program, my actual
17  work hours should be recorded on the
18  Success program sheet, but there were also
19  opportunity credit sheets for additional
20  hours that I worked.  There should be,
21  somewhere.
22    Q.    So did you ever work time at
23  the thrift store and not record it on one

Page 108

1  of those sheets, either the opportunity
2  credit sheet or the Success program sheet?
3    A.    Yes.
4    Q.    Why didn't you record your
5  time?
6    A.    Because my supervisor told me
7  I was not allowed to record more than
8  forty-five hours a week.
9    Q.    Who was your supervisor?
10    A.    At that time the person that
11  actually gave me that directive was Robin
12  Watford Payne.  She had multiple last
13  names.
14    Q.    Were any of the hours spent
15  after forty hours a week volunteer hours?
16    A.    No.
17    Q.    Were they ever recorded in any
18  other way on any other sheet?
19    A.    Not that I'm aware of.
20    Q.    Do you have any evidence of
21  working over forty-five hours a week at
22  the thrift store?
23    A.    I don't, no.  There are time

**Rhonda Gaddis**                                                              **28**

Page 109

1 sheets that record up to forty-five hours,
2 but that's the highest we were allowed to
3 put.
4     Q.   Did you work over forty-five
5 hours at the thrift store?
6     A.   Yes.  Frequently.
7     Q.   How often?
8     A.   I would say almost every week.
9 I almost always worked at least one double
10 per week.  And there were many weeks that
11 I worked two and three doubles a week,
12 which is a fifteen-hour day.  But you only
13 get to record thirteen hours on your
14 paycheck because you get there at 7:00 in
15 the morning, but you don't leave until, if
16 you're closing the store, at least 9:30 at
17 night.  Sometimes later, depending on how
18 wrecked the store is.
19     Q.   So about how many hours were
20 you working per week at the thrift store?
21     A.   I would estimate at least -- I
22 would say fifty-five hours a week
23 probably.

Page 110

1     Q.   And what was your job title
2 there?
3     A.   Originally, I was in the call
4 center with Elizabeth, and I don't know
5 what the job title would be for that, but
6 I then became a cashier, and after I was
7 there for a while, I became the head
8 cashier, so...
9     Q.   Did you apply for that job?
10     A.   No.
11     Q.   Did you have an interview for
12 that job?
13     A.   Yes.  I did talk to Jennifer
14 Cox, and Robin Watford before they decided
15 to put me in the position.
16     Q.   When you say talked to, what
17 do you mean?
18     A.   Like they asked me about my
19 previous work experience and why I wanted
20 to be a cashier so...
21     Q.   Did you provide them any
22 resume?
23     A.   No.

Page 111

1     Q.   Or recommendations from
2 previous employers?
3     A.   No.  My recommendation came
4 from Elizabeth in the call center.
5     Q.   Who made sure that you did
6 work at the call center or at the thrift
7 store?
8     A.   In the call center my
9 immediate supervisor was Elizabeth.
10     Q.   What's Elizabeth's last name;
11 do you recall?
12     A.   I don't.  I'm sorry.  As a
13 cashier, my immediate supervisors were Joy
14 Jones, Robin Watford Payne, and Jennifer
15 Cox, and then above Jennifer was Hugh
16 Thomas, but there were a lot of other
17 ladies, people that had been there for
18 longer periods or that were already
19 graduates of the program that also
20 instructed me what to do.  Sally
21 Bellsnyder was also a floor supervisor, so
22 she told us what to do on occasion.
23     Q.   Who came up with your

Page 112

1 schedule?
2     A.   I think Robin, but I'm not
3 sure.  Robin or Jennifer.
4     Q.   And that's Robin or Jennifer
5 at the Lovelady Center?
6     A.   Yeah.  Jennifer Cox or Robin
7 Watford Payne were supervisors.
8     Q.   Did you graduate from the
9 Lovelady program?
10     A.   I did.
11     Q.   When did you graduate?
12     A.   February 21st, 2014.
13     Q.   What did you do after you
14 graduated?
15     A.   I moved into the grad
16 apartment.  I mean, I stayed in the center
17 until the grad apartment became available,
18 and then I moved into the grad apartment.
19     Q.   Did you still work at the
20 thrift store?
21     A.   I did.
22     Q.   Did you work anywhere else
23 outside the center at that time or

Page 113

1 previously while you were enrolled before
2 you graduated?
3      A.   I worked for Burger King when
4 I first came to the center before I went
5 to work for the thrift store, and then I
6 worked for Burger King after I left the
7 Thrift Store and I was still at the grad
8 house.
9      Q.   When did you work for Burger
10 King when you were enrolled at the center
11 before you graduated?  What dates?
12      A.   To be honest with you, I don't
13 recall the exact dates, but it was March,
14 sometime in March until July, I think, as
15 a cashier on the Highway 280 location.
16      Q.   March or to July 2013?
17      A.   Yes.
18      Q.   And did someone from Lovelady
19 give you transportation to Burger King?
20      A.   Yes.
21      Q.   Were you paid by Burger King?
22      A.   I was.
23      Q.   Was anybody at Lovelady

Page 114

1 responsible for your duties while you were
2 employed by Burger King?
3      A.   Just the chores that I did
4 inside the center, stuff that I had to do
5 for the center and the mandatory ten hours
6 a week.
7      Q.   So no one at Lovelady was
8 responsible for your job duties and your
9 work at Burger King, correct?
10      A.   Correct.
11      Q.   And how often did you work at
12 Burger King?  Every day?
13      A.   I was working full time, so
14 thirty-six hours a week.
15      Q.   Did you turn in time sheets to
16 your supervisor at Burger King?
17      A.   No.  They have a computer that
18 you punch in and punch out on.
19      Q.   Did somebody at Burger King
20 come up with that schedule, your work
21 schedule?
22      A.   Yes.  But it also had to be
23 cleared through your client rep before you

Page 115

1 could leave the building.
2      Q.   Was that for purposes of
3 transportation to make sure that they
4 could get you there?
5      A.   We had to sign a
6 transportation sheet for that so that they
7 knew who they had to take where and when,
8 but I'm guessing that was so the client
9 reps could keep track of where you were.
10 And I also was instructed by my client rep
11 in the beginning that I could not leave on
12 my breaks while at Burger King, that I had
13 to stay in the restaurant.  I wasn't
14 allowed to leave the property while I was
15 at work.
16      Q.   Is that a requirement at
17 Burger King?
18      A.   Nope.
19      Q.   And so you worked at Burger
20 King for how long when you were at
21 Lovelady before you graduated?
22      A.   Just a few months, two or
23 three months.

Page 116

1      Q.   Why did you leave Burger King?
2      A.   Because I had been working in
3 the call center for Elizabeth for
4 opportunity credit, and she offered me a
5 job at the call center, and it was easier
6 taking transportation.  If you have an
7 outside job, it's really difficult,
8 especially if you work at night on 280.
9 It would sometimes be three, three and a
10 half hours before I got back to the
11 center.  Or two or three hours that I
12 would have to leave early in order to get
13 to my job on time, but the thrift store
14 van is a completely separate
15 transportation vehicle, and it was more
16 convenient.
17      Q.   So did you quit your job at
18 Burger King?
19      A.   I did.
20      Q.   And then you said you were
21 working at the thrift center, the thrift
22 store, and then you graduated in February
23 of 2014?

**Rhonda Gaddis**

Page 117

1  A.  Uh-huh.
2  Q.  And you were living in
3  graduate housing.  When did you go to work
4  for Burger King again?
5  A.  I think it was July.  I don't
6  remember.  Maybe August of 2014.
7  Q.  Did you stay employed at
8  Burger King?
9  A.  I did.
10  Q.  For how long?
11  A.  Until a week after I was
12  dismissed from the grad house.
13  Q.  Why were you dismissed from
14  the grad house?
15  A.  For taking Viva Zen.
16  Q.  What's Viva Zen?
17  A.  Just over-the-counter herbal
18  energy supplement.
19  Q.  Did you fail a drug test?
20  A.  They said I did.
21  Q.  Do you have any reason to
22  dispute that you failed a drug test?
23  A.  Yes.  Because there were no

Page 118

1  drugs in my system.
2  Q.  Do you have any evidence that
3  there was no drugs in your system?
4  A.  Yes.  Actually, I took a drug
5  test for my probation officer a couple of
6  days after that, and it came back
7  negative.
8  Q.  So do you have that with you
9  here?
10  A.  I don't.
11  Q.  You said it was a couple of
12  days after the previous drug test?
13  A.  Yes.  But their drug test said
14  I was positive for Methadone.  I did not
15  take Methadone.  I was not taking any
16  illegal drugs, but I did take Viva Zen.
17  Q.  Were you required to leave
18  Lovelady?
19  A.  The option was to restart the
20  program or leave.  I chose to leave.
21  Q.  And what did you do after you
22  left Lovelady?
23  A.  Moved in with a friend in

Page 119

1  Odenville and went to work for Subway.
2  Q.  Are you currently employed by
3  Subway?
4  A.  No.
5  Q.  How long did you work for
6  Subway?
7  A.  Six months.
8  Q.  Why did you leave Subway?
9  A.  Because I moved again.
10  Q.  Did you apply for your job at
11  Subway?
12  A.  I did.
13  Q.  Did you interview for your job
14  at Subway?
15  A.  I did.
16  Q.  Did you submit any resume or
17  letter of recommendation from previous
18  employers when you applied for your job at
19  Subway?
20  A.  Not a resume.  Just an
21  application.
22  Q.  You worked there for six
23  months.  Did you quit?

Page 120

1  A.  I did.
2  Q.  Did you work anywhere after
3  Subway?
4  A.  I went to work for McDonald's
5  previously.
6  Q.  McDonald's where?
7  A.  In Trussville.
8  Q.  Did you apply for your job at
9  McDonald's?
10  A.  I did.
11  Q.  Did you submit a resume or a
12  letter of application?
13  A.  No resume.  Just application.
14  Q.  Did you interview for your job
15  at McDonald's?
16  A.  Yes.
17  Q.  How long did you work at
18  McDonald's?
19  A.  Until June the 12th.  I went
20  to work for --
21  Q.  2015?
22  A.  Yes.  When I went to work for
23  my current employer, Collegiate Admission

**Rhonda Gaddis**

Page 121

1  and Retention Solutions June the 8th.  And
2  so after my initial training week with
3  CARS, I quit working at McDonald's and
4  just stayed with CARS.
5      Q.   So did you apply for your job
6  at CARS?
7      A.   I did.
8      Q.   Did you interview for your
9  job?
10     A.   I did.
11     Q.   Did you submit a resume or a
12  letter of recommendation from previous
13  employers?
14     A.   Not a resume, just an
15  application.
16     Q.   What's your job duties at
17  CARS?
18     A.   I'm a student information
19  specialist.
20     Q.   Did you receive training for
21  that?
22     A.   I did.
23     Q.   What type of training?

Page 122

1      A.   Pretty extensive voice and
2  call procedure training actually.
3      Q.   Did you receive training on
4  the job or separate training before you
5  were able to do certain duties?
6      A.   No.  Well, you spend your
7  first week completely in training.  You're
8  not actually taking live calls.  You're
9  just going through call simulations, which
10  is like a computerized version of it, and
11  you learn the call procedures, and then
12  they put you on the floor where you take
13  actual calls with clients, so...
14          MR. CAMP:  Can we take a break?
15          (Recess taken.)
16     Q.   Let's clarify some dates that
17  we were talking about earlier.  I think
18  you stated that you came to the Lovelady
19  Center in April 2013?
20     A.   Yes.
21     Q.   After being court ordered to?
22     A.   Yes.
23     Q.   And you did duties, and you

Page 123

1  had responsibilities, and you did chores
2  for the center once you arrived, correct?
3      A.   Yes.
4      Q.   When then did you first work
5  for Burger King after arriving at the
6  center?
7      A.   I don't remember the exact
8  date, but it was, to the best of my
9  knowledge, it was within four weeks of
10  arriving at the center.
11     Q.   So it was likely in May of
12  2013 that you worked at Burger King for
13  the first time since enrolling at
14  Lovelady?
15     A.   I think so.
16     Q.   And you just worked there for
17  a couple of weeks, correct?
18     A.   Until I went to work at the
19  thrift store so until July or August, and
20  I wasn't there.  I wasn't at Burger King
21  for a long time.
22     Q.   So you worked at Burger King
23  for a couple of months while you were

Page 124

1  enrolled at the center?
2      A.   To the best of my memory, yes.
3      Q.   And then after you stopped,
4  after you quit your job at Burger King,
5  and you stopped working at Burger King,
6  you took a job where?
7      A.   At the thrift store working in
8  the call center.
9      Q.   And how long did you work at
10  the call center at the thrift store?
11     A.   A few weeks, two or three
12  weeks before I got transferred to a
13  cashier position.
14     Q.   At the thrift store?
15     A.   At the thrift store, yes.
16     Q.   How long did you work as a
17  cashier at the thrift store?
18     A.   Until August of 2014.
19     Q.   And why did you stop in August
20  of 2014?
21     A.   Because I got tired of working
22  overtime that I wasn't getting paid for.
23     Q.   Did you get a different job?

Page 125

1    A.    And being paid less than
2  minimum wage.  Yes, I did.
3    Q.    What was your job?
4    A.    I went to work as an hourly
5  wage for Burger King on Gadsden Highway in
6  Trussville.
7    Q.    What was your salary?
8    A.    Eight fifty an hour.
9    Q.    Did Lovelady provide you
10  transportation to the Burger King?
11    A.    Yes, they did.
12    Q.    So in August of 2014 you went
13  to work for Burger King when you were
14  enrolled in the program at Lovelady?
15    A.    I was no longer in the program
16  when I went back to work for Burger King.
17  I was in the grad housing at that point.
18    Q.    So just to get it straight,
19  you enrolled at Lovelady in April 2013?
20    A.    Uh-huh.
21    Q.    You worked for Burger King in
22  approximately May to June or July in 2013
23  while you were enrolled in the program?

Page 126

1    A.    Yes.
2    Q.    You graduated in February
3  2014, and after that time, you worked
4  again in August 2014 for Burger King as an
5  hourly manager?
6    A.    Yes.  After I graduated the
7  program.
8    Q.    Before you worked for Burger
9  King in August 2014, did you work for the
10  thrift store after you graduated?
11    A.    Yes.
12    Q.    So after you graduated in
13  February you were working for the thrift
14  store for several months?
15    A.    Yes.
16    Q.    And then you took a job for
17  Burger King?
18    A.    Yes.
19    Q.    And when did you stop working
20  for Burger King as an hourly manager?
21    A.    It was a week after I was
22  dismissed from the Lovelady Center.  I
23  don't remember what the date was, to be

Page 127

1  honest with you.
2    Q.    Did you state earlier that you
3  voluntarily left the Lovelady Center in
4  October 2013?
5    A.    Yes.  I was given the option
6  of starting the program over or leaving.
7  I chose to leave.
8    Q.    Earlier in the deposition we
9  talked about various employees at
10  Lovelady, and supervisors you may have
11  had.  I think you called them client reps;
12  is that correct?
13    A.    Uh-huh.
14    Q.    Were the client reps or any
15  other employees at Lovelady clients like
16  you were?  Were they getting treatment for
17  any substance abuse problem?
18    A.    I believe the client reps were
19  all previous except for maybe one, they
20  were all previous Lovelady graduates.
21    Q.    So they had graduated
22  Lovelady, and they were not current
23  clients of Lovelady?

Page 128

1    A.    To the best of my knowledge.
2  But at the thrift store things were
3  different.  I had like Sally Bellsnyder
4  was a floor supervisor.  She was not a
5  graduate.  She was still in the program.
6  Christina Ellenburg was a head cashier.
7  She also had supervising responsibilities,
8  and she was still in the program, so...
9    Q.    But at Lovelady Center, the
10  employees who were giving counseling
11  services, rehab services to the clients,
12  were they currently clients themselves of
13  the program?
14    A.    Not that I'm aware of, no.
15    Q.    So you as a client at
16  Lovelady, were you doing the same types of
17  duties?  Did you have the same times of
18  responsibilities as, for example, the
19  client reps?
20    A.    No, I did not.
21    Q.    Okay.  Do you know what this
22  lawsuit is about?
23    A.    It's about being compensated

Page 129

1 for the hours that I worked.
2     Q.   What are your claims in this
3 lawsuit?
4     A.   I just want to be paid for the
5 time that I worked, that I was an
6 employee, that I was being paid less than
7 minimum wage.  And I wanted to be paid for
8 the overtime that I didn't get paid for at
9 all.
10     Q.   When do you think that you
11 were not paid overtime that you were due
12 overtime?
13     A.   The time that I was in the
14 center until the time -- the time that I
15 went to work for the thrift store until
16 the time that I graduated the program, and
17 the entire period I did not get paid at
18 least minimum wage, and I did get 1099's
19 as a private contractor and could not pay
20 taxes on that income, but I filled out a
21 W4 when I started working at the thrift
22 store.  So I was under the impression that
23 I was going to be paying taxes just like

Page 130

1 any other job that I've ever had.  I did
2 not know until the end of my first year of
3 employment with Lovelady Center that I was
4 a 1099 and a private contractor.
5     Q.   So are your claims only
6 limited to the overtime that you allege
7 you were due for working at the thrift
8 store?
9         MR. CAMP:  Object to the form.
10 Her attorneys will decide what claims she
11 can legally bring and what she can't.
12     Q.   The facts associated with your
13 legal claims -- I'm not asking you a legal
14 question or the specific claims that
15 you're bringing in this lawsuit.  I'm
16 asking you about the facts that correspond
17 to those claims.  Are you alleging in this
18 lawsuit anything other than the facts
19 surrounding your time spent working at the
20 thrift store?
21     A.   Whatever time that I spent
22 working what they called opportunity
23 credits, I expected to be compensated for

Page 131

1 those as well.
2     Q.   Were you working anywhere else
3 at the center when you were given
4 opportunity credits?
5     A.   What do you mean was I working
6 anywhere else?
7     Q.   Well, a lot of the time today
8 we've talked about your work at the thrift
9 store.
10     A.   Okay.
11     Q.   I'm asking whether that your
12 claims in this lawsuit relate to any of
13 your other time spent working?
14     A.   Yeah.  The opportunity credits
15 were done inside the center.  They weren't
16 in the thrift store.
17     Q.   So you claim you were due
18 overtime for opportunity credits?
19     A.   I don't think I worked
20 overtime hours for the opportunity
21 credits, but I also don't think I was paid
22 minimum wage for the opportunity credits
23 and I was never -- they never discussed

Page 132

1 with me what was coming out of my fees.
2 What my work, like what type of
3 compensation could go towards my fees,
4 which is what the opportunity credits were
5 supposed to be for.
6     Q.   Okay.  Do you think that you
7 were an employee of Lovelady?
8     A.   I was an employee of Lovelady.
9     Q.   Do you think that all of the
10 clients at Lovelady were employees?
11     A.   Inside the center?
12     Q.   Anywhere.
13     A.   At Lovelady Thrift Store we
14 were employees, yes.
15     Q.   What do you think would happen
16 if Lovelady had to pay everyone for every
17 hour spent at the thrift store, for
18 example?  Do you think they would have
19 funds to do that?
20     A.   I don't know.  That's not
21 really something for me to answer.  It has
22 nothing to do with me.
23     Q.   Did Lovelady Center give you

**Rhonda Gaddis**                                                    **34**

---

Page 133

¹ any benefits?
²     A.   Meaning?
³     Q.   Anything?  Did anything good
⁴ come out of your time at Lovelady?
⁵     A.   Yeah.  The work experience
⁶ that I got.  And some of the relationships
⁷ that I developed were beneficial.
⁸     Q.   So all in all it was a good
⁹ thing in your life?
¹⁰     A.   No.  It's made my life pretty
¹¹ complicated now.
¹²     Q.   But you got certain benefits
¹³ from participating in the program?
¹⁴     A.   There was some benefits, yes,
¹⁵ but overall my life is more complicated
¹⁶ now, and it's preventing me from
¹⁷ furthering my education.
¹⁸     Q.   How is it preventing you from
¹⁹ furthering your education?
²⁰     A.   Because thousands of dollars
²¹ worth of pell grant money disappeared and
²² was unaccounted for as well as my taxes
²³ that were sent to Shawn Magahey that never

Page 134

¹ got filed.  So I cannot now go back to
² school because I don't qualify for a pell
³ grant until all of these issues are
⁴ resolved.
⁵     Q.   So what do you think Lovelady
⁶ Center did to your pell grant?
⁷     A.   I don't know.
⁸     Q.   What is a pell grant?
⁹     A.   It's federal money that is
¹⁰ supposed to be refunded to the government
¹¹ if not used for education, but I never got
¹² the balance of those grants, however, I
¹³ did receive tax documents that said
¹⁴ someone got the balance of those grants.
¹⁵ I don't know what happened to the rest of
¹⁶ it.
¹⁷     Q.   Do you have any evidence that
¹⁸ Lovelady ever had your pell grant, ever
¹⁹ was authorized to do anything with it?
²⁰     A.   There are accounts set up in
²¹ our name at the Lovelady Center.  Do I
²² know that they got it?  No, I don't.  Do I
²³ have evidence that they had it?  No, I

Page 135

¹ don't.  But I do have evidence that
² someone got it.  And it wasn't me.  And
³ from what I understand, it wasn't
⁴ Tennessee Temple.  So...
⁵     Q.   So you're just surmising that
⁶ it was Lovelady?  You have no evidence,
⁷ correct?
⁸     A.   At this point, no.
⁹     Q.   You mentioned something about
¹⁰ a tax return?
¹¹     A.   Right.  When I got 1099'd as a
¹² private contractor for over seven thousand
¹³ dollars, I'm required to pay taxes on
¹⁴ that, and the 1099 also turned it into
¹⁵ what's considered a complicated tax
¹⁶ refund.  So to have your taxes done cost
¹⁷ hundreds of dollars, which I didn't have
¹⁸ because I made less than minimum wage.
¹⁹ And I sent my information to Shawn, and I
²⁰ don't know.  I'm trying to resolve the
²¹ issue.  I don't know if my taxes ever got
²² filed.
²³     Q.   And who is Shawn?

Page 136

¹     A.   Shawn Magahey is Melinda's
² husband.  He's a tax accountant or at
³ least does taxes.
⁴     Q.   Is he an employee at Lovelady
⁵ Center?
⁶     A.   I don't remember.
⁷     Q.   So are part of your claims in
⁸ this lawsuit surrounding the fact that you
⁹ have missing pell grant money?
¹⁰     A.   Not part of this lawsuit, no.
¹¹     Q.   Do you have another lawsuit
¹² related to that?
¹³     A.   Not at this time.
¹⁴     Q.   So the claims in this lawsuit
¹⁵ only relate to --
¹⁶     A.   The work I did for the
¹⁷ Lovelady Center.
¹⁸     Q.   Did you ever tell anyone at
¹⁹ Lovelady while you were enrolled there or
²⁰ afterwards that you should be paid
²¹ overtime?
²² •    A.   Yes.
²³     Q.   When did you tell someone and

Page 137

¹ who did you tell?
²     A.   I don't recall all the
³ instances, but a lot of the thrift store
⁴ employees were disgruntled for not being
⁵ paid overtime.  We've discussed it.  I can
⁶ tell you that I remember talking to my
⁷ roommate, Sally Bellsnyder as well as Joy
⁸ Jones, but I cannot tell you each and
⁹ every instance of every person that I
¹⁰ talked to.
¹¹     Q.   Okay.  I'm going to mark what
¹² I think is our last exhibit, Exhibit
¹³ Number 11.
¹⁴         (Whereupon, Defendant's
¹⁵         Exhibit 11 was marked for
¹⁶         identification and attached
¹⁷         to the deposition.)
¹⁸     Q.   This is your declaration.  Did
¹⁹ you sign this document, Ms. Gaddis?
²⁰     A.   Yes.
²¹     Q.   Did you draft this document?
²²     A.   Did I draft it -- you mean did
²³ I type it?  No.

Page 138

¹     Q.   Did your attorney type this
² for you?
³     A.   He did.
⁴     Q.   Did you tell him the substance
⁵ of the information in this affidavit?
⁶     A.   All of it, yes, I did.
⁷     Q.   And you believe that the
⁸ statements in this declaration are correct
⁹ and true today?
¹⁰     A.   I do.
¹¹     Q.   Did you ever refer anyone to
¹² the Lovelady Center?
¹³     A.   I think I referred a friend
¹⁴ but only because she was in a desperate
¹⁵ situation.  And she didn't go.  So...
¹⁶     Q.   So you said you referred her
¹⁷ because she was in a desperate situation?
¹⁸ Did you think Lovelady Center would be a
¹⁹ good fit for her?
²⁰     A.   It would be safer than active
²¹ addiction and the situation she was living
²² in at the time.
²³     Q.   Did you ever consider

Page 139

¹ returning to the Lovelady Center?
²     A.   I did.
³     Q.   When was that?
⁴     A.   In June, May or June of this
⁵ year.
⁶     Q.   And why did you consider
⁷ returning?
⁸     A.   Because I separated from my
⁹ boyfriend, and I didn't have anywhere else
¹⁰ to go and I didn't want to live in a
¹¹ shelter.
¹²     Q.   Had you relapsed into your
¹³ drug addiction at that time?
¹⁴     A.   No.
¹⁵     Q.   Did you decide to enroll in
¹⁶ Lovelady again?
¹⁷     A.   I would have but I never heard
¹⁸ back from Melinda or Shay in the intake
¹⁹ department, and I found a better place to
²⁰ live, a different place to live.
²¹     Q.   Did you submit a new
²² application for enrollment at Lovelady?
²³     A.   I never submitted an

Page 140

¹ application for enroll to begin with.
²     Q.   How did you contact Lovelady?
³ Did you say it was May of this year?
⁴     A.   I called.
⁵     Q.   2015?
⁶     A.   It was May or June.
⁷     Q.   May or June of 2015, you
⁸ called Lovelady?
⁹     A.   Well, I think I texted Melinda
¹⁰ but I called intake.  So...
¹¹     Q.   And you wanted to return to
¹² Lovelady?
¹³         (Interruption.)
¹⁴     A.   I didn't really want to, but I
¹⁵ would have rather than go to a shelter.
¹⁶     Q.   Did you go to a shelter?
¹⁷     A.   I did not.
¹⁸     Q.   Where did you go?
¹⁹     A.   I moved in with a friend.
²⁰     Q.   Did you ever contact Lovelady
²¹ again to see if you could enroll there
²² after you first called?  In May or June of
²³ 2015?

**Rhonda Gaddis**                                                                36

Page 141

1      A.   Well, I think I initially
2  talked to intake, and then a couple of
3  days later I talked to Melinda, but after
4  that, no.
5      Q.   Okay.  We talked earlier about
6  the department of labor and the
7  investigation and the fact that you
8  received a settlement check for overtime,
9  correct?
10     A.   It wasn't for overtime because
11 I couldn't prove those hours.  It was for
12 the time after I graduated the program,
13 paying me minimum wage for the recorded
14 hours.  That's what the check was for.
15     Q.   Okay.  And you were paid money
16 that you accepted and deposited or cashed,
17 correct?
18     A.   I accepted it for -- yes.
19     Q.   Is there any reason, do you
20 believe there's any reason that you were
21 not paid the amount you were due at that
22 time?
23     A.   I don't know what the reason

Page 142

1  is, and had I known my rights, I would not
2  have accepted that settlement or that
3  compensation, amount of compensation.
4      Q.   So at this time do you think
5  you were not paid the amount that you were
6  due?
7      A.   Yes.
8      Q.   So to state it another way,
9  you do not think that you were paid the
10 amount you were due?
11     A.   I think I am owed more money
12 than what that check covered, yeah.
13         MR. CAMP:  That's better.
14     Q.   Has anyone told you that you
15 were due overtime?
16     A.   You're legally supposed to be
17 paid for any hours you work overtime time
18 and a half.  It's the law, yeah.
19     Q.   Did anyone tell you that you
20 were due overtime pay for your work at the
21 Lovelady Center?
22     A.   If the labor department had
23 records that could have proven the

Page 143

1  overtime that I worked, then yes, I would
2  have been compensated for that as well.
3      Q.   Did anyone tell you --
4      A.   Yes.  The lady at the labor
5  department that we had a conversation
6  about it, that you were supposed to be
7  compensated for overtime hours time and a
8  half.
9      Q.   Did she tell you that you were
10 actually due money for overtime?
11     A.   Me personally?
12     Q.   For overtime pay?
13     A.   No, me personally.
14     Q.   Has anyone told you that you
15 are due overtime pay for your time worked
16 at the Lovelady Center?
17     A.   No.
18     Q.   Has your lawyer told you that?
19         MR. CAMP:  Object to the form.
20     Q.   I'm not trying to get into --
21 I'm trying to say anyone besides your
22 lawyer.  If he has, that's not what I'm
23 asking, but anyone besides your lawyer.

Page 144

1  Have you had a conversation about whether
2  or not you were owed overtime pay?
3      A.   I've had conversations about
4  the overtime pay that I know I'm owed
5  with.  Other employees of the thrift store
6  as well as supervisors at the thrift store
7  who no longer work there, so, yes.
8      Q.   The supervisors you're
9  referring to, though, at the thrift store,
10 were those supervisors also clients at the
11 time?  So kind of in your position or were
12 they -- what was their position?
13     A.   No.  They were actually on
14 payroll and were graduated.  They don't
15 live in the grad house.  They have
16 graduated the program and moved on.  They
17 had years of sobriety.
18     Q.   And those supervisors told you
19 that you were due overtime?
20     A.   Jennifer Cox was one, yeah.
21     Q.   So have you given us all of
22 the documents in addition to the ones I
23 just gave to you early this morning that

**Rhonda Gaddis**                                                    **37**

1  you contend support your claims that you
2  were an employee of Lovelady?
3      A.   You have everything that I
4  have, so, yes.
5      Q.   Have we talked about all of
6  the reasons why you think that you were an
7  employee?
8          MR. CAMP:  Objection.
9      Q.   Earlier today we talked about
10  the fact that you worked a certain number
11  of hours at the thrift store.  And you
12  contend that you were not paid for certain
13  of those hours that you worked overtime?
14     A.   Right.
15     Q.   Are there any other reasons
16  why you think you are owed overtime pay
17  apart from your work at the thrift center,
18  the thrift store?  Excuse me.
19     A.   Well, whatever opportunity
20  credits that I worked over forty hours,
21  those, too, I think should be included.
22  And the volunteer hours that we had to do
23  that weren't really volunteer hours, yeah,

1  I think those should be included as well.
2      Q.   Do you have any other evidence
3  to support your claims besides the
4  documents that we've received from you and
5  your testimony here today?
6      A.   No.
7      Q.   I think we are probably
8  finished with your questions.  We're going
9  to keep the deposition open, though.  We
10  have objections to some of the discovery
11  responses, so if we need to open up again
12  at another time because of that, we
13  reserve that right.
14         MR. CAMP:  I'm not going to
15  agree to keep the deposition open,
16  however, they're free to make a motion to
17  the Court if they need to in the future.
18  I have a few questions.
19
20  EXAMINATION BY MR. CAMP:
21     Q.   The opportunity credits that
22  she spoke of, did you expect to receive
23  any compensation in exchange for the work

1  you did and record it as an opportunity
2  credit?
3      A.   Yes.
4      Q.   And what was that
5  compensation?
6      A.   It was supposed to be money
7  taken off of my fees.  Was the purpose of
8  the opportunity credits, was to bring your
9  fees down, so compensation that went
10  towards fees.
11     Q.   And the work that you did in
12  the Success program, did you expect
13  compensation in exchange for that work?
14     A.   I did.
15     Q.   And what compensation did you
16  expect to receive?
17     A.   Well, there was a set amount
18  that you get paid in the beginning, and
19  your fees come directly out of that, but
20  it was less than minimum wage so -- and I
21  expected to be paying taxes and not be
22  1099'd as a private contractor.  But yes,
23  I expected compensation for the Success

1  program if I worked forty hours.
2      Q.   What would happen if the
3  number of hours you worked in the Success
4  program were less than forty hours a week?
5          MS. COUCH:  Object to the
6  form.
7      A.   You wouldn't actually get any
8  money from working because it wouldn't
9  cover your fees, so like there was a set
10  amount of hours that you had to work
11  before your fees were met, and if you
12  didn't get that, then you would be behind.
13  So...
14     Q.   So am I to understand that if
15  you didn't work forty hours, if you worked
16  less than forty hours, Lovelady would take
17  the entire amount that you were supposed
18  to receive to satisfy the fees?
19         MS. COUCH:  Object to the
20  form.  Mischaracterizes testimony.
21     A.   When you're working for the
22  thrift store and Lovelady Center is
23  actually your employer then, yes, your

**Rhonda Gaddis**                                                            **38**

Page 149

¹ fees come out first.  They come out before
² anything else.  So if your check is a
³ hundred and fifty dollars and you owe a
⁴ hundred and fifty dollars, you pay that.
⁵      Q.   And if you work over forty
⁶ hours, is there a possibility that you'll
⁷ receive cash in addition to the fees being
⁸ credited?
⁹      A.   I mean, you get a set amount
¹⁰ for forty hours.  If you worked forty-five
¹¹ you get a slight compensation, but I think
¹² it's like five dollars an hour for the
¹³ extra five hours.  So it's not -- I don't
¹⁴ know how they calculate it.  You'd have to
¹⁵ ask them.  I never really got that.  Yeah.
¹⁶ You get your fees plus like at the end
¹⁷ when I was working for the thrift store, I
¹⁸ made two fifty a week.  So if I worked a
¹⁹ minimum of forty hours, my fees were
²⁰ covered, which was the one fifty, and then
²¹ I had a hundred dollars in addition to, if
²² I worked at least forty hours a week.
²³      MR. CAMP:  Okay.  And if you

Page 150

¹ worked less than forty, the entire amount
² was kept by the Lovelady Center.
³      MS. COUCH:  Object to the
⁴ form.
⁵      Q.   Is that accurate?
⁶      A.   When I was still inside the
⁷ program, yes, usually.
⁸      Q.   Now, at any point in time did
⁹ you believe that the work you were doing
¹⁰ and recording was an opportunity credit
¹¹ whereas part of the Success program was
¹² volunteer work?
¹³      A.   No.
¹⁴      Q.   Did you ever authorize anybody
¹⁵ at the Lovelady Center to deduct volunteer
¹⁶ hours from the work you recorded for
¹⁷ opportunity credits for the Success
¹⁸ program?
¹⁹      A.   No.
²⁰      Q.   Did Shawn Magahey always do
²¹ your taxes?
²² A.   In 2013 he did, and in 2014 he
²³ was going to, supposed to.  I don't know

Page 151

¹ if he did or not.  I faxed him the
² information.  He was going to.
³      Q.   And are you saying today that
⁴ through trying to get the pell grants, you
⁵ don't believe the taxes were filed?
⁶      MS. COUCH:  Object to form.
⁷      A.   Yes.
⁸      Q.   That's correct?
⁹      A.   That's what I believe, yes.
¹⁰      Q.   And when you went to Lovelady,
¹¹ when you were at the Lovelady Center in
¹² the program and Temple University came in,
¹³ did someone there at the university have
¹⁴ you complete pell grant paperwork?
¹⁵      MS. COUCH:  Object to the
¹⁶ form.
¹⁷      A.   Yes.
¹⁸      Q.   So it was your understanding
¹⁹ that you or the government was paying for
²⁰ the courses offered by Temple University?
²¹      A.   Yes.
²²      Q.   It wasn't a benefit of being
²³ part of the Lovelady's program, correct?

Page 152

¹      MS. COUCH:  Object to the
² form.
³      A.   No.  They were paid for with
⁴ the pell grants.
⁵      Q.   At any point in time that you
⁶ were performing work and receiving pay
⁷ from the Lovelady Center, did they pay you
⁸ overtime compensation for hours worked
⁹ over forty?
¹⁰      A.   No.
¹¹      Q.   And that's hours worked over
¹² forty in a week, correct?
¹³      A.   Yes.
¹⁴      Q.   Were there times where the
¹⁵ amount of time that you recorded for
¹⁶ volunteer work, plus the amount of time
¹⁷ that you recorded as opportunity credits
¹⁸ exceeded forty in a week?
¹⁹      MS. COUCH:  Object to the
²⁰ form.
²¹      A.   Yes.
²²      Q.   And you're seeking overtime
²³ for those hours over forty as well?

Page 153

1    A.   Yes.

2    Q.   Is there any medical staff

3 onsite at the Lovelady Center?  Like

4 doctors?

5    A.   There are psychiatrists.

6 There's a psychiatrist that visits, and

7 also an optometrist at one point came.

8 But I don't think they're always there.

9 It's just like they come at certain times.

10   Q.   If I am correct you had

11 stopped your employment with Burger King

12 as of July, August of 2013, correct?

13   A.   I think so, yes.

14   Q.   And you have testified earlier

15 that you had completed a W9 form for the

16 Lovelady Center for tax returns, correct?

17   A.   Yes.

18      (Whereupon, Plaintiff's

19      Exhibit 1 was marked for

20      identification and attached

21      to the deposition.)

22      MR. CAMP:  I'll show you

23 what's marked as Plaintiff's Exhibit 1.

Page 154

1    Q.   It's a W9 form dated September

2 3rd of 2013.  This is a W9 you completed

3 while at the Lovelady Center that they

4 have produced to us?

5    A.   Okay.

6    Q.   Do you believe that to be the

7 W9 you completed before you started

8 working as a cashier at the thrift store?

9    A.   Yes.

10      MS. COUCH:  What's the Bates

11 for that document unless you have another

12 copy?

13      MR. CAMP:  Sure.  It's your

14 document.  Gaddis VLT0024.

15      (Whereupon, Plaintiff's

16      Exhibit 2 was marked for

17      identification and attached

18      to the deposition.)

19   Q.   And so if you could look at

20 Plaintiff's Exhibit 2.  It's a document

21 from the department of labor.  Can you

22 tell me what period of time this

23 settlement agreement deals with?

Page 155

1    A.   This is on the time after I

2 graduated, goes from February the 23rd,

3 which is two days after I graduated the

4 program until August the 3rd.

5    Q.   And so am I correct that from

6 July and August, July or August of 2013 up

7 through February 22nd of 2014, you were

8 still working at the thrift store for the

9 Lovelady Center?

10   A.   I was.

11   Q.   And did your job change any

12 from the point in time that you graduated?

13 Were your job duties different?

14   A.   No.

15   Q.   And were there other graduates

16 that you worked alongside at the thrift

17 store?

18   A.   A few, yes.

19   Q.   And for those that were

20 cashiers or working on the floor were

21 their job responsibilities any different

22 than yours were?

23   A.   No.  Except for Sally.  Sally

Page 156

1 had more responsibility than I did.  She

2 was a floor supervisor and a cashier.

3      MR. CAMP:  I'm going to mark

4 this as PX3.

5      (Whereupon, Plaintiff's

6      Exhibit 3 was marked for

7      identification and attached

8      to the deposition.)

9    Q.   It's a picture.  It's Bates

10 stamped Walker v Freedom Rain Inc., R

11 Gaddis.  I can't make out the Bates.  I

12 believe it is 000003.

13   Q.   Can you tell me what this is a

14 picture of?

15   A.   It's a picture of the poster

16 that's up in the thrift store.

17   Q.   And what's it a picture of?  I

18 mean, what's --

19   A.   The poster reads "Employees

20 only beyond this point."  It's put up in

21 the section down with the furniture and

22 electronics, and there's another one in

23 the hallway behind the men's clothing

Page 157

1  section.
2      Q.   Is it a poster that's posted
3  near doorways?
4      A.   Yes.
5      Q.   And were you allowed beyond
6  this point?
7      A.   Yes.
8      Q.   And were other clients that
9  were ladies that were classified or
10 entitled clients allowed to go beyond that
11 point?
12     A.   Yes.  As long as you worked
13 there.
14     Q.   In applying for jobs since
15 you've left the Lovelady Center, do you
16 name the Lovelady Center as your former
17 employer?
18     A.   Yes.
19         MR. CAMP:  That's all I have.
20         FURTHER DEPONENT SAITH NOT
21
22
23

Page 158

1          C E R T I F I C A T E
2  STATE OF ALABAMA)
3  JEFFERSON COUNTY)
4
5      I hereby certify that the above and
6  foregoing proceedings were taken down by
7  me using computer-aided transcription and
8  that the foregoing is a true and correct
9  transcript of said proceedings taken down
10 by me and transcribed by me.
11     I further certify that I am neither
12 of kin nor of counsel to the parties to
13 the action, nor am I in anywise interested
14 in the result of said cause.
15     I further certify that I am duly
16 licensed by the Alabama Board of Court
17 Reporting as a Certified Court Reporter as
18 evidenced by my ACCR number below.
19
20     _____
21     Lisa Roussell, ACCR #427
22     Freelance Court Reporter
23     COMMISSIONER - NOTARY PUBLIC

Page 159

1          C E R T I F I C A T E
2  STATE OF ALABAMA)
3  JEFFERSON COUNTY)
4
5      I hereby certify that the above and
6  foregoing proceedings were taken down by
7  me using computer-aided transcription and
8  that the foregoing is a true and correct
9  transcript of said proceedings taken down
10 by me and transcribed by me.
11     I further certify that I am neither
12 of kin nor of counsel to the parties to
13 the action, nor am I in anywise interested
14 in the result of said cause.
15     I further certify that I am duly
16 licensed by the Alabama Board of Court
17 Reporting as a Certified Court Reporter as
18 evidenced by my ACCR number below.
19
20     _____
21     Lisa Roussell, ACCR #427
22     Freelance Court Reporter
23     COMMISSIONER - NOTARY PUBLIC

**U.S. Department of Labor**
**Wage and Hour Division**
**Receipt for Payment of Back Wages, Liquidated Damages,**
**Employment Benefits, or Other Compensation**

 DEFENDANT'S EXHIBIT 4



I, _____Gaddis, D Rhonda_____ , have received payment of wages, liquidated damages, employment
(typed or printed name of employee)
benefits, or other compensation due to me from _____*Freedom Rain, Inc.*_____
(name and location of the establishment)
_____*720 Ludington Lane Birmingham AL 35210*_____

for the period beginning with the workweek ending _____ *02/23/2014* _____ through the
workweek ending _____ *08/03/2014* _____. The amount of the payment I received is shown below.

This payment of wages and other compensation was calculated or approved by the U.S. Department of Labor Wage and Hour Division (WHD) and is based on the findings of a WHD investigation. This payment is required by the Act(s) indicated below in the marked box(es):

☑ Fair Labor Standards Act ( FLSA )

Gross Amount Back Wages _____ *$1,250.59* Gross Amount Liquidated Damages _____ *$0.00*

Legal Deductions from Back Wages _____ Other Amount Paid _____
(please specify type)
Net Amount Received _____

NOTICE TO EMPLOYEE: Your acceptance of this payment of wages and/or other compensation due under the Fair Labor Standards Act (FLSA) or Family Medical Leave Act (FMLA). based on the findings of the WHD means that you have given up the right you have to bring suit on your own behalf for the payment of such unpaid minimum wages or unpaid overtime compensation for the period of time indicated above and an equal amount in liquidated damages, plus attorney's fees and court costs under Section 16(b) of the FLSA or Section 107 of the FMLA. Generally, a suit for unpaid wages or other compensation, including liquidated damages, must be filed within two years of a violation of the FLSA or FMLA. Do not sign this receipt unless you have actually received this payment in the amount indicated above.

RETALIATION AND KICKBACKS PROHIBITED: Your employer is prohibited from retaliating against you for accepting payment of wages you are owed or from requiring you to return or decline payment of the wages owed to you. Your employer is also prohibited from retaliating against any person who files a complaint with the Wage and Hour Division (WHD) or cooperates with a WHD investigation. Your employer is also prohibited from interfering with, restraining, or denying the exercise of Family Medical Leave Act (FMLA) rights. You should contact the WHD immediately if your employer takes any of these actions or fails to comply with the law in the future. Your identity will be kept confidential to the maximum extent possible under existing law. You may contact the WHD by calling 1-866-487-9243 or 205-536-8570 .

Signature of employee _____ Date _8/26/15_
Address _____

I understand that my signature on this receipt and waiver attests to the fact that I have actually received the payment in the amount indicated above of the wages, liquidated damages, or other compensation due to me, and that I waive my right to bring suit as described above, and covering the period set forth above.

EMPLOYER'S CERTIFICATION TO WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR:

I hereby certify that I have on this (Date) _____ paid the above-named employee in full covering lost or denied wages, liquidated damages, or other compensation as stated above. I further certify that I have not and will not retaliate against the above-named employee for accepting this payment and I have not and will not ask the employee to return all or part of this payment to me.

Signature _____ Title __CFO__
(employer or authorized representative)

PENALTIES INCLUDING FINES OR IMPRISONMENT ARE PRESCRIBED FOR A FALSE
STATEMENT OR MISREPRESENTATION UNDER U.S. CODE, TITLE 18, SEC. 1001

REDACTED



*The*
*Lovelady*
*Center*
restoring hope

7916 2nd Avenue South
Birmingham, Alabama 35206
205-833-7410

February 26, 2015

The Lovelady Center agrees to pay Rhonda Gaddis $1250.59.  Ms. Wood agrees this
is all the money due and agrees The Lovelady Center owes her nothing else.

_Rhonda Gaddis_ 2/26/15
Rhonda Gaddis\Date

_Rosie Mullen_ 02/26/15
On behalf of Lovelady Rosie Mullen\Date

WARNING: THIS DOCUMENT HAS SECURITY FEATURES IN THE PAPER

The Lovelady Center, Inc.
Rhonda Gaddis

2/13/2015                                          55799

                                                   1,250.59

Servis First Bank                                  1,250.59

FORM# 7000 (Standard Business 3-up)

Current Date:          February 27, 2015

Account Number:
Capture Date:          February 27, 2015
Item Number:
Posted Date:           February 27, 2015
Amount:                1,250.59
Record Type:           Debit

FREEDOM RAIN INC
7916 2ND AVENUE SOUTH
BIRMINGHAM AL 35206



WARNING: THIS DOCUMENT HAS SECURITY FEATURES IN THE PAPER

The Lovelady Center, Inc
7916 2nd Ave South
Birmingham, AL 35206
205-833-7410

ServisFirst Bank
3300 Cahaba Road
Birmingham, AL 35223
205-949-0340

55799

DATE    2/13/2015

PAY TO THE
ORDER OF        Rhonda Gaddis                                    $    **1,250.59

One Thousand Two Hundred Fifty and 59/100***************************************************
                                                                            DOLLARS

Rhonda Gaddis
7916 2nd Ave South
Birmingham AL 35206

MEMO



REDACTED



DEFENDANT'S EXHIBIT

5

## Resident Rights and Nondiscrimination Policy

The Board of Directors and staff of The Lovelady Center endorse the right of the clients throughout the recovery process, and support and protect the fundamental human, civil, constitutional, and statutory rights of each resident. The Lovelady Center staff share the responsibility of pursuing recovery from addictive diseases, and in this context the following rights and responsibilities are presented.

1. The Lovelady Center does not discriminate in admissions or employment on the basis of sex, national origin or ethnic group, color, age, religion, disability, or military service. The compliance officer (Melinda McGahee) can be reached at (205) 833-7410, for affirmative action, equal employment opportunity and disability action.

2. Each resident has the right to receive appropriate treatment and care when available in a safe and humane environment. The Lovelady Center reserves the right of admission refusal if it is determined to be detrimental to the applicant or the Center. The reasons, among others deemed necessary by the Administration of The Lovelady Center may include; mental incapacity, health maintenance requirements, drug related behavior at time of application or admission, or evidence of recent violent behavior. Denial appeals may be submitted to the Executive Director.

3. Each resident has the right to participate in the formulation of her recovery plan, and to acknowledge, by signature, the content of the final plan or any adjustments thereto.

4. Each resident has the right to expect personal information contained in their records only to be released according to the confidentiality standards under HIPPA (see Acknowledgement of Confidentiality form).

5. Each resident has the right to know that the performance of all assigned housekeeping and general maintenance duties may be performed without compensation.

6. Each resident has the right to manage her own personal financial affairs if it is not determined by the Administration of The Lovelady Center to be disadvantageous for the resident.

7. Each resident has the right to know that all personal articles, living quarters, and vehicles are subject to be searched at any given time by The Lovelady Center staff and that in an emergency it may not be feasible for the resident to be present at the time of a property search. The Lovelady Center will not at any time be discriminatory in the case of a property search, but it will be imperative to perform routine property searches in order to protect the residents, staff, and guests on the premises of The Lovelady Center.

Client: _Rhonda D. Goode_     Date: _4-22-13_

Witness: _L. Lott_     Date: _4-22-13_

The Lovelady Center
Revised 1/5/2009

Gaddis v. LC  0010



DEFENDANT'S EXHIBIT

6

## Statement of Understanding and Agreement

This is to certify that I understand and agree to the following terms and conditions while receiving
recovery services through The Lovelady Center.

1. I, *Rhonda Gaddis*, am a voluntary/court ordered
   admission to The Lovelady Center, and understand that I have been determined through
   assessment of my drug or alcohol use, am eligible for residential rehabilitation, or that I
   have been determined through other circumstances harmful to myself or others, to be
   eligible to complete The Lovelady Center rehabilitation program.

2. I hereby consent to provide urine and/or saliva samples for alcohol and screening upon request
   so long as I remain in residence at The Lovelady Center, and that I am subject to immediate
   dismissal from the program if any chemical use is discovered. Nonconformity of this policy
   could result in a "positive drug test" to be recorded.

3. I do hereby give my consent to The Lovelady Center staff to search my room person and
   personal property at any time deemed necessary as long as I remain a resident of this
   facility, whether I am present or not.

4. I have received a copy of the Client Policy Manuel and hereby agree to obey all rules and
   regulations of The Lovelady Center.

5. I do hereby waive all rights to claim suit against The Lovelady Center and the Board of Directors
   of The Lovelady Center.

6. I understand that The Lovelady Center is a non-medical facility. If I should require medical
   treatment, I authorize The Lovelady Center staff to arrange for any treatment, but it is understood
   that any expenses incurred are my sole responsibility and not the responsibility of The Lovelady
   Center. In the event of a medical emergency I authorize The Lovelady Center to contact the
   following persons:

   X Name: *Janice Jacobs*          X Name: _____
   Address: ████████████           Address: _____
   ████████████                     _____
   Telephone: ████████████          Telephone:( ) _____

7. I also understand that I have the right to revoke this agreement by voluntarily discharging myself
   from the program. At such time I am no longer bound under any authorization I initially agreed
   to accept to the extent of actions that had already been taken in reliance through my initial
   authorization.
   Client Signature: *Rhonda Huddel*          Date: *4/22/13*
   Witness: *S. Lott*          Date: *4/22/13*

The Lovelady Center
Revised 3/6/2008

Gaddis v. LC 0006

REDACTED



**DEFENDANT'S EXHIBIT**

7

# Financial Obligation Agreement between
# Resident and The Lovelady Center/TLC Residential Rehabilitation

Initial by which option(s) applies:

X _____ RG _____ I understand and agree that I am responsible to pay the intake fee of $500. In addition to the intake fee, I understand to enter the program I must pay $450.00. This covers the first 3 (three) weeks. **This total amount $950.00 is due upon intake.** **__All fees are non-refundable.__**

X _____ RG _____ I understand I am responsible to pay a $150 or 40% of my gross pay, depending on my specified program, weekly for participating in the program. (Any program requires a minimum of $150 weekly)

X _____ RG _____ I am entitled to a $20 weekly discount when I am eligible to and have my own car, valid driver license insurance, and do not use Lovelady transportation at all.

X _____ RG _____ I understand that I will be charged $20 for every drug test unless it is random at The Lovelady Center discretion. However, if I test positive for a random drug test, I will be charged the $15.

X _____ RG _____ I understand that I will be charged $10.00 for not signing transportation the night before.

X _____ RG _____ If you have a child residing here, your account will be charged $30 for the first child then $50 for second or more. This is to provide child care Monday thru Friday 6am to 6pm.

X _____ RG _____ I also understand that The Lovelady Center will receive my food stamp benefits and if my children are residing here their benefits will also go to The Lovelady Center while residing at the center. If I am not eligible for food stamps, I understand an additional $150 monthly is added to my account and must be paid.

X _____ RG _____ I understand if any of our Client Reps go to court with me, I will be billed $50, if Lindsay, Tina, or Sharon accompanies me, $75 will be charged to my account.

X _____ RG _____ If I fail to comply, I understand certain privileges may be revoked, and may be subject to dismissal from the program.

According to the above agreement, I have paid $ _500.00_, with $ _____ balance being billed to me. I understand that on _____ (date) that additional fees will be added to my account weekly.

Name _Rhonda Gaddis_ Date _7-22-13_ Program _Transitional_

Employment Status _Phase 1_ ____ Employment Eligible Hire Date _____

X Resident Signature _Rhonda Gaddis_

Intake _L. Lott_ ____ Client Representative _Cindy Jenkins_

Copy given to:
_____ Job Placement   _____ Accounting

April 9, 2013