FILED
2016 Apr-08 PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 4

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

CASE NUMBER: 2:15-CV-00274-MHH
BRIANA WALKER, individually and on behalf of
herself and all others similarly situated,
 PLAINTIFFS,

VS

FREEDOM RAIN, INC., d/b/a The Lovelady Center,
 DEFENDANT.

DEPOSITION OF AMANDA HARRISON:

    It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of AMANDA HARRISON, at the offices of WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC at 301 19th Street North, Birmingham, Alabama, on the 16th day of February, 2016, is taken pursuant to the Federal

## Page 2

1  Rules of Civil Procedure and that said
2  deposition may be taken before Janet Arledge,
3  RPR, CRR, Court Reporter and Commissioner for
4  the State of Alabama at Large, without the
5  formality of a commission; that objections to
6  questions other than objections as to the form
7  of the questions need not be made at this time
8  but may be reserved for a ruling at such time as
9  the deposition may be offered in evidence or
10 used for any other purpose as provided for by
11 the Federal Rules of Civil Procedure.
12      IT IS FURTHER STIPULATED AND AGREED by
13 and between counsel representing the parties in
14 this case that said deposition may be introduced
15 at the trial of this case or used in any manner
16 by either party hereto provided for by the
17 Federal Rules of Civil procedure, that the
18 signature to and the reading of the deposition
19 by the witness is waived.

## Page 3

    I N D E X

EXAMINATION BY:        PAGE NUMBER:
MR. CAMP:             5 - 219

EXHIBITS:
(All Exhibits are premarked.)
PLAINTIFFS:
Number 20 - L.Mackins 0029
Number 23 - Lovelady 001
Number 41 - Number 41 - LC0683, LC654, LC0678, LC644, LC0679, LC646, LC0680, LC649, LC0684, LC655, LC0685, LC658, LC659, LC0686, LC661, LC0688, LC664, LC0689, LC666, LC0690, LC668, LC0691, LC670, LC0692, LC672, LC0693, LC675, LC0681, LC0696, LC676, LC653, LC616
Number 51 - General 009130
Number 52 - General 000304
Number 53 - General 0094, 0088, 0094, 0080, 0094
Number 54B- General 000290-000293
Number 55A- General 000284-000286
Number 55B- LC0707, LC669, LC572-574
Number 55C- General 000280-283

## Page 4

EXHIBITS CONTINUED:
Number 55D- LC0708, LC575-577, LC671
Number 55E- General 000277-278
Number 55F- General 279, LC0709, LC673, LC578-580
Number 55G- General 000274-276
Number 55H- LC0710, LC674, LC582
Number 55I- LC0696, LC676, LC583-585, General 000269-271
Number 55J- LC0712, LC677, LC583-585, LC0714, LC0713
Number 55K- General 000265-267

Page 13

1  Q. Okay. So, it wasn't a condition of the
2  court, it was a condition of the bondsman?
3  A. Yes, sir.
4  Q. Is that normal? Have you heard of
5  bondsman doing that before?
6  A. Uh-huh (yes). Bondsman can put any
7  stipulation on a bond that they feel is
8  necessary.
9  Q. What was the substance you were
10  manufacturing?
11  A. Methamphetamine.
12  Q. And if the bondsman wanted you to go
13  into the Center, why didn't you go?
14  A. I did go into the Center. I think I
15  stayed about two-and-a-half months, and then I
16  left.
17  Q. Why did you leave?
18  A. Well, I guess I just wasn't ready.
19  Q. What does that mean?
20  A. I -- my husband was not incarcerated,
21  he was still free, and that was another
22  condition of my bond, that I couldn't have
23  contact with my husband, and so I left.

Page 14

1  Q. Why couldn't you have contact with your
2  husband?
3  A. Condition of the bond.
4  Q. And why did he care if he had contact
5  with your husband?
6  A. Because my husband was a co-defendant
7  in my manufacturing cases.
8  Q. And did he serve time?
9  A. He -- yes, eventually he did.
10  Q. How long was he in?
11  A. I'm not certain. He served time in
12  Jefferson County and Blount County, separately
13  but he didn't go to prison. He was in the
14  county jail.
15  Q. For a year, for less than a year, I
16  mean?
17  A. A little more than a year.
18  Q. Are you still married to him?
19  A. I am.
20  Q. When you were in the Lovelady program
21  -- was your possession charge also for
22  methamphetamine?
23  A. Yes.

Page 15

1  Q. Sure?
2  A. Yes. Yes.
3  Q. When you were in the Lovelady program,
4  did you participate in the Success Program?
5  A. Yes, sir.
6  Q. What departments did you work in within
7  the Center?
8  A. I worked in the kitchen. I worked in
9  the kid zone. I worked the front desk, the
10  transportation desk, and I was also a driver for
11  transportation. I also worked in the Job
12  Placement Department as the contact person for
13  the Blackwells, Haymon Homes and Tri-County
14  contracts.
15  Q. Anywhere else?
16  A. No. I think -- I think that's all.
17  Q. Transportation, would that also include
18  escort?
19  A. No, sir, I was never an escort.
20  Q. So what's transportation do compared to
21  escort?
22  A. The transportation desk is downstairs.
23  They -- you answer the phones, you check people

Page 16

1  in and out of the building, keep up with where
2  they're going, what time they're supposed to be
3  back, stay in contact with the drivers, let them
4  know who's ready to be picked up, where they
5  need to be picked up, and things like that.
6  Q. So then what time period were you in
7  Job Placement?
8  A. I was in Job Placement -- I can't be
9  exact on when it was. I just know it was the
10  end of 2012 until August of 2013.
11  Q. Okay. You graduated in May, though,
12  correct?
13  A. Yes, sir.
14  Q. And you were part of the Success
15  Program, so how are you in Job Placement as part
16  of the Success Program after May of 2011?
17  A. I was still -- I still lived inside the
18  building. One, I was a court order until -- I
19  was court-ordered a year, and my year wasn't up,
20  so I just continued on Success, because I still
21  lived inside the building.
22  Q. Well, you entered in October of 2010,
23  correct?

## Page 81

1  A. She was a graduate of our program as
2  well.
3  Q. And Shawnda Heflin, do you know her?
4  A. No, I don't believe so.
5  Q. Do they work for Lovelady Center?
6  A. Do they work for us?
7  Q. Yes.
8  A. No.
9  Q. Who do they work for?
10 A. I don't know who they work for now.
11 Q. Who did -- who have you known them to
12 work for?
13 A. When they were with the Lovelady, they
14 worked or they participated in the Success
15 Program at Blackwells. But then I believe they
16 transferred over where they were under our like
17 -- they weren't under our Success Program
18 anymore. They just --
19 Q. Did Jeff Spahn also tell you to bill
20 for Ashley Hancock, Bridgette Chasse, and
21 Shawnda Heflin's time?
22     MS. COUCH: Object to the form.
23 A. I billed for Ashley Hancock and

## Page 82

1  Bridgette Chasse when they still participating
2  in the Success Program.
3  Q. And when they left?
4  A. I don't believe I billed for them, no.
5  Q. What did they do for Blackwells?
6  A. Their position at Blackwells?
7  Q. Yes, ma'am.
8  A. When they were with -- when they were
9  on Success?
10 Q. When they worked for Blackwells. When
11 they were their employee.
12 A. I don't know. I wasn't involved in any
13 of that.
14 Q. You didn't have any involvement with
15 them?
16 A. No.
17 Q. I want to show you Walker v Freedom
18 Rain General 008558 through 008559. This fax
19 was sent one minute after the fax I had shown
20 you previously.
21 A. Uh-huh (yes).
22 Q. Have you ever seen a fax requesting
23 payment for those three individuals before,

## Page 83

1  separate from the normal girls on the Success
2  Program?
3     MS. COUCH: Object to the form.
4  A. I mean, I can't say that I remember
5  this exactly.
6  Q. Not that one exactly, any request,
7  payroll request, to have those three ladies
8  paid?
9     MS. COUCH: Object to the form.
10 A. I mean, like I said, when -- Shawnda
11 Heflin never -- I don't think she was ever a
12 Lovelady, I mean...
13 Q. Right.
14 A. I don't recognize her.
15 Q. Which is kind of odd.
16 A. But Ashley and Bridgette were Love
17 ladies. They did work on our Success. I did
18 bill for them, but not -- they called it
19 "outside staff", because they weren't under --
20 they weren't a client of the Lovelady, so they
21 weren't bound by the same rules.
22 Q. Who called it outside staff?
23 A. Well, that's what Blackwells -- they

## Page 84

1  kind of -- to differentiate between like regular
2  like staff and Lovelady staff, because Lovelady
3  staff had different rules as far as -- if you
4  weren't a client at the Lovelady, it's just
5  like, you know, anywhere else you would work out
6  in the world.
7     As long as you come to work and you do
8  your job, and there's no problems, they don't
9  care about what you do in your personal time.
10 Lovelady, as long as you are a Lovelady client,
11 it's not like that.
12    Any rules that apply at our Center
13 apply outside of the Center, as long as you are
14 a client, whether you're at work or at home, or
15 anywhere else, and that's -- that's mostly what
16 I was there for is --
17 Q. So, the outside staff referenced on the
18 second page of that facsimile, you know that
19 term, correct?
20    MS. COUCH: Objection to form.
21 Q. You just described to me that's a
22 Blackwells Way's term?
23 A. Uh-huh (yes).