FILED
2016 Apr-08  PM 06:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT  17

**Briana Walker** 1

---

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4  CIVIL ACTION NO. 2:15-CV-274-MHH

5

6  BRIANA WALKER, individually and on behalf of

7  herself and all others similarly situated,

8           Plaintiffs,

9  vs.

10  FREEDOM RAIN, INC., d/b/a THE LOVELADY CENTER,

11  et al.,

12        Defendants.

13

14        DEPOSITION OF BRIANA WALKER

15    Wiggins Childs Pantazis Fisher & Goldfarb

16        301 19th Street North

17      Birmingham, Alabama  35203

18        October 19, 2015

19

20  REPORTED BY:  Laura H. Nichols

21        Certified Realtime Reporter,

22        Registered Professional

23        Reporter and Notary Public

---

Page 2

1        A P P E A R A N C E S

2

3  FOR THE PLAINTIFFS:

4    Mr. Russell W. Adams

5    Attorney at Law

6    Wiggins Childs Pantazis

7      Fisher & Goldfarb

8    The Kress Building

9    301 19th Street North

10    Birmingham, Alabama 35203

11    205.314.0500

12    radams@wigginschilds.com

13

14

15

16

17

18

19

20

21

22

23

---

Page 3

1    A P P E A R A N C E S  (Continuing)

2

3  FOR THE DEFENDANTS:

4    Mr. T. Matthew Miller

5      and Ms. Anne Knox Averitt

6    Attorneys at Law

7    Bradley Arant Boult Cummings LLP

8    One Federal Place

9    1819 Fifth Avenue North

10    Birmingham, Alabama 35203

11    205.521.8000

12    tmmiller@babc.com

13    aaveritt@babc.com

14

15  OTHERS PRESENT:

16    Ms. Miyoshi Bates

17    Ms. Laketta Mackins

18    Ms. Melinda MeGahee

19

20

21

22

23

---

Page 4

1        INDEX OF EXAMINATION

2

3              Page:

4  EXAMINATION BY MR. MILLER        7

5  EXAMINATION BY MR. ADAMS        90

6  REEXAMINATION BY MR. MILLER      92

7  REEXAMINATION BY ADAMS        95

8

9

10      INDEX OF DEFENDANTS' EXHIBITS

11

12              Page:

13  Defendants' Exhibit 1        23

14    (Statement of Understanding and

15  Agreement)

16  Defendants' Exhibit 2        27

17    (Phase I through IV

18  descriptions)

19  Defendants' Exhibit 3        31

20    (Volunteer hour sheet)

21  Defendants' Exhibit 4        40

22    (Opportunity credit sheet)

23

---

Page 5

1   INDEX OF DEFENDANTS' EXHIBITS (Continuing)

2

3                          Page:

4   Defendants' Exhibit 5          41

5       (Financial Obligation Agreement

6   between Resident and The Lovelady

7   Center/TLC Residential

8   Rehabilitation)

9   Defendants' Exhibit 6          44

10      (Resident rights and

11  nondiscrimination policy)

12  Defendants' Exhibit 7          88

13      (Collective consent forms)

14  Defendants' Exhibit 8          88

15      (Interrogatory responses)

16

17

18

19

20

21

22

23

Page 6

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED, by

3   and between the parties, through their

4   respective counsel, that the deposition of

5   BRIANA WALKER may be taken before Laura H.

6   Nichols, Commissioner, Certified Realtime

7   Reporter, Registered Professional Reporter and

8   Notary Public;

9        That the signature to and reading

10  of the deposition by the witness is waived, the

11  deposition to have the same force and effect as

12  if full compliance had been had with all laws

13  and rules of Court relating to the taking of

14  depositions;

15       That it shall not be necessary for

16  any objections to be made by counsel to any

17  questions, except as to form or leading

18  questions, and that counsel for the parties may

19  make objections and assign grounds at the time

20  of trial, or at the time said deposition is

21  offered in evidence, or prior thereto.

22

23

Page 7

1        I, Laura H. Nichols, a Certified

2   Realtime Reporter and Registered Professional

3   Reporter of Birmingham, Alabama, and a Notary

4   Public for the State of Alabama at Large,

5   acting as Commissioner, certify that on this

6   date, as provided by the Federal Rules of Civil

7   Procedure of the United States District Court,

8   and the foregoing stipulation of counsel, there

9   came before me at the law offices of Wiggins

10  Childs Pantazis Fisher & Goldfarb, 301 19th

11  Street North, Birmingham, Alabama 35203, on

12  October 19, 2015, commencing at 3:21 p.m.,

13  BRIANA WALKER, witness in the above cause, for

14  oral examination, whereupon the following

15  proceedings were had:

16

17        BRIANA WALKER,

18  being first duly sworn, was examined and

19  testified as follows:

20

21  EXAMINATION BY MR. MILLER:

22       Q.   Good afternoon, Ms. Walker.

23       A.   Hey.

Page 8

1        Q.   Hey.  I am Matt Miller.  I am a

2   lawyer with Bradley Arant Boult Cummings.  I

3   represent Lovelady here in this case.  We are

4   here today to take your deposition in

5   connection with the lawsuit that you have

6   brought against Lovelady.

7        A.   (Nodding.)

8        Q.   You understand that you are sworn

9   in under oath?

10       A.   I do.

11       Q.   Okay.  And that by being sworn in

12  and under oath for the deposition, it is just

13  like you are in front of a judge and jury and

14  that rules of perjury apply to this situation,

15  you understand that?

16       A.   I do.

17       Q.   The difference is that we are a

18  little bit less formal here than we would be if

19  we were over at the courthouse.  So if you want

20  to take a break, we need to take a break, just

21  let us know.  We'll do that.  We will probably

22  take some breaks as we go --

23       A.   Okay.

Page 9

1    Q.   -- to take care of the old guy
2  lawyers who can't go more than about an hour
3  without a break, me being the one I'm talking
4  about.  If I ask you a question and you answer
5  it, I am going to assume that you understood my
6  question unless you tell me otherwise; is that
7  fair?
8    A.   Uh-huh.
9    Q.   So if you answer it, I am going to
10  assume that you understood it.
11    A.   Okay.
12    Q.   When you answer, make sure that
13  you give a yes or a no or a verbal response
14  because the court reporter will have a
15  difficult time taking down a nod of the head or
16  an uh-huh or a huh-uh.
17    A.   Okay.
18    Q.   She will say something to us.  And
19  if we do it too many times, we will be put in
20  the penalty box.
21      Is there any reason today that you
22  can't testify?
23    A.   No.

Page 10

1    Q.   Are you on any type of medication
2  that would affect your ability to testify?
3    A.   No.
4    Q.   Are you taking any medication?
5    A.   No.
6    Q.   Where do you live right now?
7    A.   In Gadsden, Alabama.
8    Q.   In Gadsden?
9    A.   Uh-huh.
10    Q.   How long have you lived in
11  Gadsden?
12    A.   Since July, so three months.
13    Q.   July 2015?
14    A.   July of 2015.
15    Q.   What do you do in Gadsden?  Do you
16  have a job there?
17    A.   I don't work in Gadsden.
18    Q.   Do you have a job now?
19    A.   I do.
20    Q.   Okay.  Where do you work?
21    A.   Pell City.
22    Q.   Okay.  And what do you do in Pell
23  City?

Page 11

1    A.   I am an assistant manager at
2  Murphy's.
3    Q.   Murphy's?
4    A.   Uh-huh.
5    Q.   Is Murphy's a retail store or is
6  it --
7    A.   It is a retail gas station.
8    Q.   Gas station.  Okay.
9    A.   Yeah.
10    Q.   There used to be a Murphy's in
11  North Alabama that was like a little retail
12  store.  It was like a small Kmart type store.
13  Okay.  How long have you been working at
14  Murphy's?
15    A.   Two and a half months, since
16  August 20th, 2015.
17    Q.   And have you been the assistant
18  manager the whole time?
19    A.   I have.
20    Q.   You were hired in as assistant
21  manager?
22    A.   I was.
23    Q.   And before that, did you have a

Page 12

1  job immediately before Murphy's?
2    A.   I did.
3    Q.   And what was that?
4    A.   I was also -- I was assistant
5  manager at Chevron.
6    Q.   Chevron?
7    A.   Uh-huh.
8    Q.   Where was that located?
9    A.   On Highway 280 in Birmingham.
10    Q.   280 in Birmingham, the Inverness
11  area?
12    A.   Yes.
13    Q.   And what was your position there?
14    A.   Assistant manager.
15    Q.   And how long were you there?
16    A.   About a year and seven months.
17    Q.   Is that the job that you went into
18  immediately after leaving Lovelady?
19    A.   No.
20    Q.   Was there another job?
21    A.   There was, yeah.
22    Q.   Tell me the jobs you have had
23  since Lovelady.

**Briana Walker** 4

Page 13

1  A.  Hampton Inn, which I was hired in
2 through a temp service, was my immediate hire
3 after The Lovelady, then Chevron and then
4 Murphy's.
5  Q.  Okay.  When you applied at any of
6 those locations, did you submit an application?
7  A.  I did.
8  Q.  And tell me, where was the Hampton
9 Inn again?
10  A.  It is in the Colonnade.
11  Q.  The Colonnade.  Okay.  And what
12 position did you receive there?
13  A.  Housekeeper.
14  Q.  Did you submit a resume for any of
15 these jobs?
16  A.  Yes.
17  Q.  Do you have a current resume?
18  A.  No.
19  Q.  Did you submit a resume for
20 Murphy's?
21  A.  No.
22  Q.  Did you submit one for Chevron?
23  A.  No.

Page 14

1  Q.  Did you submit one for Hampton
2 Inn?
3  A.  I did.
4  Q.  Okay.  And that was 2013?
5  A.  '13.
6  Q.  Right after Lovelady?
7  A.  Right.
8  Q.  You left in July, I think?
9  A.  July of 2013.
10  Q.  End of July is when you left
11 Lovelady?
12  A.  Right.
13  Q.  And when did you get your job at
14 Hampton Inn?
15  A.  The end of August.
16  Q.  End of August.  All right.  I
17 think you said you got the Hampton Inn through
18 a placement company?
19  A.  Correct.
20  Q.  What was the name of that agency?
21  A.  First Choice.
22  Q.  First Choice.  How did that work?
23 Did they send you out for an interview at

Page 15

1 Hampton Inn?
2  A.  Yes.
3  Q.  You filled out --
4  A.  Actually -- yes, that is how that
5 worked, yes.  Yes.
6  Q.  And you interviewed with somebody
7 out there?
8  A.  Yes.
9  Q.  And you filled out an application.
10 Did you fill it out at the placement agency or
11 at Hampton Inn or both?
12  A.  Both.
13  Q.  At both.  Who was your supervisor
14 at the Hampton Inn?
15  A.  At the time, it was Jackie.  I
16 cannot remember her last name.
17  Q.  And why did you leave there?
18  A.  Not enough pay, not enough hours.
19  Q.  How many hours were you getting?
20  A.  Twenty-four to thirty-four.
21  Q.  What were they paying you?
22  A.  Seven twenty-five.
23  Q.  Minimum wage?

Page 16

1  A.  Uh-huh.
2  Q.  And what about Chevron, how many
3 hours were you getting there?
4  A.  Forty.
5  Q.  And what were they paying you
6 there?
7  A.  Started out eight.
8  Q.  And what did you finish up?
9  A.  Nine fifty.
10  Q.  Why did you leave Chevron?
11  A.  I moved.
12  Q.  You moved to --
13  A.  Gadsden.
14  Q.  -- Gadsden?
15  A.  Uh-huh.
16  Q.  What about your current job, how
17 much are you making?
18  A.  Eleven.
19  Q.  Eleven dollars an hour?
20  A.  An hour, yes.
21  Q.  How many hours are you working?
22  A.  Forty to fifty.
23  Q.  Forty to fifty.  Do you punch a

**Briana Walker**

Page 17

1 time clock or do the time card?  How do you
2 record your time?
3      A.   On a computer.  We punch it in on
4 the computer.
5      Q.   Are you making overtime?
6      A.   If I work over forty, yes.
7      Q.   Get time and a half?
8      A.   Yes.
9      Q.   When did you first become familiar
10 with the idea of overtime pay at time and a
11 half?  When did you first realize if I work
12 more than forty hours on a job, I may get time
13 and a half?
14      A.   Honestly, I believe I became
15 aware, like actually aware of that I want to
16 say about three to four years ago because I
17 never understood it at first until somebody
18 broke it down for me.
19      Q.   Was it before you went to Lovelady
20 or after?
21      A.   It was during.
22      Q.   When you were there?
23      A.   Yes.

Page 18

1      Q.   Who broke it down for you?
2      A.   I can't recall exactly who it was.
3      Q.   Was it somebody at Lovelady?
4      A.   No.
5      Q.   Somebody --
6      A.   It was a friend of mine outside,
7 actually, yeah.
8      Q.   So the first time you were aware
9 of the idea of overtime was when you were at
10 Lovelady?
11      A.   Correct.
12      Q.   And a friend from the outside told
13 you about it?
14      A.   Correct.
15      Q.   Are you familiar with the Fair
16 Labor Standards Act, that law?
17      A.   Yes.
18      Q.   What do you know about the Fair
19 Labor Standards Act?  What can you tell me
20 about it?
21      A.   That there's a -- you can work
22 forty hours.  Anything over forty is time and a
23 half.  That is about it.  That is all I know.

Page 19

1      Q.   Okay.  Outside of what you talked
2 about with your lawyers in this case --
3      A.   Yes.
4      Q.   -- did you have knowledge of what
5 the Fair Labor Standards Act was?
6      A.   A little bit.
7      Q.   From where?
8      A.   From just, you know, common
9 conversation, general conversation with people.
10      Q.   I want to talk a little bit
11 about or a good bit about, actually, The
12 Lovelady Center and your enrollment there.  It
13 is my understanding that you first came to
14 Lovelady Center in September of 2012.
15      A.   Correct.
16      Q.   Tell me what brought you there.
17 How did you learn about The Lovelady Center?
18      A.   A friend of mine, actually, his
19 mother was a client rep there years ago, so she
20 told me about it.  And what brought me there, I
21 wanted to get clean.
22      Q.   Okay.  So you heard about it from
23 a friend?

Page 20

1      A.   Correct.
2      Q.   And did you just show up there or
3 did you call up there ahead of time?  How did
4 that process work?
5      A.   His mother called up there for me
6 and spoke to Melinda.
7      Q.   And said I know somebody that
8 really could --
9      A.   Right.
10      Q.   -- benefit from your program,
11 something like that?
12      A.   Right.
13      Q.   And then what happened, Melinda
14 said send her our way?
15      A.   Yeah, on Monday.
16      Q.   So you then went down on Monday?
17      A.   Yeah.  She spoke to Melinda on
18 Friday, and I went on Monday.
19      Q.   Okay.  And when you showed up, did
20 you test positive for some illegal substances?
21      A.   I did.
22      Q.   Okay.  And did you have a warrant
23 pending for your arrest at that time?

**Briana Walker**

**6**

Page 21

1    A.   I can't -- I don't recall.
2    Q.   From maybe Trussville?
3    A.   Yes.  Yes, I did.  Yes, I did.
4    Q.   And were you having trouble as a
5 result of the substances keeping your life
6 together?
7    A.   Right.
8    Q.   Is that a fair statement?
9    A.   Yes.
10    Q.   And the reason you went to
11 Lovelady was to try to get clean, sober, get
12 your life back together?
13    A.   Correct.
14    Q.   Is that accurate?
15    A.   Yes.
16    Q.   And it is my understanding that
17 you left about ten months after you started.
18 You left in July of 2013; is that correct?
19    A.   It is.
20    Q.   And that when you left, you went
21 to Melinda and said, "I think I have got what I
22 needed.  I am going to leave."  Is that
23 accurate?

Page 22

1    A.   No.
2    Q.   Tell me why you left.
3    A.   I left because -- well, I was
4 already planning on leaving because nobody had
5 went over my graduation details or how many
6 credits I had.  Nobody sat me down and actually
7 went over that with me because I was never at
8 the Center.
9         So when I got ready to leave, I
10 went to my client rep and I told her, "Hey, you
11 know, I am leaving on July 31st."  She later
12 told me that she would graduate me.  I believe
13 it is like August 2nd.  I can't recall.  So
14 that didn't work out, so I did leave July 31st.
15    Q.   What didn't work out?
16    A.   Graduation.
17    Q.   Why didn't it work out?
18    A.   Because she never got the
19 paperwork together, and that is basically it.
20    Q.   When you first went to Lovelady,
21 you filled out some paperwork?
22    A.   Correct.
23    Q.   You didn't fill out a job

Page 23

1 application when you showed up out there,
2 correct?
3    A.   Correct.
4    Q.   What you filled out was intake
5 forms, right?
6    A.   Right.
7    Q.   Let me show you some of those.
8         (Defendants' Exhibit 1 was marked
9          for identification.)
10    Q.   (BY MR. MILLER:)  I will mark this
11 as Exhibit 1.  That document is labeled
12 "Statement of Understanding and Agreement."  Do
13 you see that?
14    A.   I do.
15    Q.   And it is dated September 10th,
16 2012, right?
17    A.   Right.
18    Q.   And that coincides with the date
19 you first were admitted; is that correct?
20    A.   Right.
21    Q.   And is that your signature on the
22 bottom there?
23    A.   It is.

Page 24

1    Q.   Okay.  In any case, it has got the
2 word "voluntary" circled on the top.  It looks
3 like that's indicating that you were
4 voluntarily coming to The Lovelady Center.
5    A.   Correct.
6    Q.   As opposed to being required to go
7 there by a court or something of that nature.
8    A.   Correct.
9    Q.   And that it was determined that
10 through an assessment of your drug or alcohol
11 use you were eligible for residential
12 rehabilitation.  Do you see that?
13    A.   I do.
14    Q.   And it says that, on the very top,
15 "This is to certify I understand and agree to
16 the following terms and conditions while
17 receiving recovery services through The
18 Lovelady Center."
19    A.   (Nodding.)  I see that.
20    Q.   Okay.  So you were receiving
21 recovery services when you were there, and you
22 understood that?
23    A.   Correct, yes.

**Briana Walker**

Page 25

1    Q.    And the recovery services were a
2  number of different things, right?
3    A.    Right.
4    Q.    There was rehabilitation for
5  substances.
6    A.    Right.
7    Q.    There was counseling.
8    A.    Correct.
9    Q.    There was church-related or
10 faith-based services that you would go to.
11   A.    Correct.
12   Q.    And there was work therapy program
13 that was part of that where you would actually
14 go out and work as part of the program, either
15 internally or externally.
16   A.    Right.  It wasn't called work
17 therapy at the time.
18   Q.    What was it called at the time?
19   A.    It was just work.  Like I never
20 heard the word "work therapy."
21   Q.    Did you ever hear it called any
22 particular name?
23   A.    Well, you had voluntary hours and

Page 26

1  then just your specific jobs that you went out
2  on.
3    Q.    Okay.  This document I am looking
4  at, Number 4, it says that you had received a
5  copy of the client policy manual and that you
6  would obey the rules and regulations.
7    A.    I did.
8    Q.    And it also says that you waive
9  the rights to claim suit against The Lovelady
10 Center.  Do you see that in Number 5?
11   A.    I do see that.
12   Q.    But even though you signed that,
13 you are, in fact, suing The Lovelady Center?
14   A.    I am.
15   Q.    The policy manual had in it an
16 explanation of what it took to graduate --
17   A.    Yes.
18   Q.    -- as part of what was in here,
19 right?
20   A.    Yes.
21   Q.    And to graduate, as I understand
22 it, you would go through a number of different
23 phases of the program.

Page 27

1    A.    Yes.
2         (Defendants' Exhibit 2 was marked
3         for identification.)
4    Q.    (BY MR. MILLER)  I will mark this
5  as Defendants' Exhibit 2.  Now, if we look at
6  that, on here it says Phase I through IV.
7    A.    Yes.
8    Q.    Are you familiar with those
9  phases?
10   A.    I am.
11   Q.    Are you familiar with this
12 document as part of that manual?
13   A.    Yes.
14   Q.    So it talks about in Phase I you
15 are going through, it looks like,
16 rehabilitation; is that correct?
17   A.    Correct.
18   Q.    You are getting some case plans
19 and some educational plans put together.
20   A.    Correct.
21   Q.    Getting some counseling.
22   A.    Correct.
23   Q.    And then it says to get out of

Page 28

1  this, to move to the next phase, you need a
2  minimum of twenty volunteer hours.
3    A.    Correct.
4    Q.    So you were familiar from this
5  form that part of the program itself was doing
6  volunteer work?
7         MR. ADAMS:  Object to form.
8    Q.    (BY MR. MILLER)  You can answer.
9  He may do that sometimes.  You were aware as
10 part of the program that part of it in order to
11 graduate was that you would do a certain number
12 of volunteer hours?
13        MR. ADAMS:  Object to form.
14 Object to characterization.  You can answer.
15   Q.    (BY MR. MILLER)  You can answer.
16   A.    Okay.  Yes.
17   Q.    And for Phase I it was twenty
18 hours.
19   A.    Yes.
20   Q.    A minimum of twenty.  And then
21 when you got to Phase II, you would have a
22 minimum of forty volunteer hours there to move
23 to the next phase.

**Briana Walker**                                                                                                 8

---

Page 29

1      A.    Yes.

2      Q.    And as you moved to the phase, you

3   had different levels of counseling and things

4   like that as you moved through.

5      A.    Correct.

6      Q.    When you got to Phase II, you

7   would also go into full-time employment?

8      A.    Correct.

9      Q.    And then in Phase III, that one,

10  there's volunteer hours, forty volunteer hours,

11  correct?

12     A.    Correct.

13     Q.    And then maintaining full-time

14  employment.  And you could use the Success

15  program for sixteen weeks only.

16         (Whereupon, a break was had from

17         2:39 p.m. until 2:42 p.m.)

18     Q.    (BY MR. MILLER:)  And were you

19  ever in the Success program?

20     A.    No.

21     Q.    Okay.  What was your understanding

22  of the Success program?

23     A.    I really did not have an

---

Page 30

1   understanding of the Success program.

2      Q.    Okay.

3      A.    To be honest with you, a lot of

4   this I didn't have an understanding of at the

5   time.

6      Q.    So you never, to your knowledge,

7   participated in the Success program?

8      A.    No.

9      Q.    All right.  When you look at Phase

10  III, in addition to the volunteer hours and

11  some other things, you had the requirement that

12  you maintain full-time employment.

13     A.    Yes.

14     Q.    And that is something you did do,

15  you went out and you got a job at Blackwell's?

16     A.    The Lovelady sent me to

17  Blackwell's.

18     Q.    But you had a job out of

19  Blackwell's?

20     A.    At Blackwell's.

21     Q.    And if you look at Phase III, it

22  said you had to be employed outside of TLC,

23  which is Lovelady Center, before advancing to

---

Page 31

1   Phase IV.  Do you see that?

2      A.    I do see that.  I was not aware of

3   that.

4      Q.    Okay.  But you had this document,

5   you said.  You told me --

6      A.    I did.

7      Q.    All right.  When you do volunteer

8   hours, you fill out a little sheet; is that --

9      A.    Correct.

10     Q.    Let me show you an example.

11         (Defendants' Exhibit 3 was marked

12         for identification.)

13     Q.    (BY MR. MILLER:)  Is that a

14  volunteer hour sheet?

15     A.    That is.

16     Q.    Is that something you would have

17  filled out or somebody filled out for you?  How

18  did that work?

19     A.    Both.  We would put our name on it

20  and get it signed by whoever we worked for.

21     Q.    And then whatever hours are

22  showing up on here, you would get credit for

23  them towards your volunteer hour requirement?

---

Page 32

1      A.    Correct.

2      Q.    And on this sheet it explains that

3   you had to have a minimum of, it says five (ten

4   hours per week if you work inside the Center).

5   If you are employed outside, you had to have a

6   minimum of five hours per week, right?

7      A.    Right.

8      Q.    So you had these forms and you

9   understood, whether you were inside or outside

10  as part of the program, you had to get your

11  volunteer hours?

12     A.    Correct.

13     Q.    There were also something called

14  opportunity credits.  Did you know about those?

15     A.    I little bit.

16         MR. MILLER:  That will be 4?

17         THE REPORTER:  Yes.

18     Q.    (BY MR. MILLER:)  This is

19  Exhibit 4.  Is that your signature on that

20  document?

21     A.    It is.

22     Q.    Is this the kind of sheet that you

23  would use for your opportunity credits?

---

Page 33

1    A.   Yes.
2    Q.   Now, if I understand opportunity
3  credits correctly, that was a way for you to
4  pay for your fees that you owed to the Center.
5    A.   Correct.
6    Q.   And when you showed up, did you
7  pay your intake fee or did you have a zero
8  payment?
9    A.   Zero payment.
10    Q.   Okay.  And the fee was what, five
11  hundred --
12    A.   Five hundred.
13    Q.   -- plus was it four fifty more for
14  the counseling?  There was a piece, another
15  four fifty in there?
16    A.   Yes, yes.
17    Q.   And then there was a hundred fifty
18  dollars a week that you paid for staying at the
19  Center, for all that came with that?
20    A.   Correct.
21    Q.   Transportation to your job, meals,
22  staying there on-site, counseling, all those
23  things rolled into that one fifty fee.

Page 34

1    A.   Right.  Transportation was also
2  taken out additionally for Haymon Homes and
3  Blackwell's, so, yes.
4    Q.   Taken out of your opportunity
5  credits?
6    A.   Taken out of our actual pay.
7    Q.   You had to pay for that?
8    A.   Yes.
9    Q.   Is that what you are saying, pay
10  an additional amount?
11    A.   Yes.
12    Q.   Okay.  Just like if you were
13  working anywhere else and you took a bus or you
14  took a cab, you had to pay for it?
15    MR. ADAMS:  Object to form.
16    Q.   (BY MR. MILLER:)  Is that right?
17    A.   Yes.
18    Q.   So if we look at this opportunity
19  credit form on the top, it said, "This sheet is
20  for credit to fees only."
21    A.   Yes.
22    Q.   "Don't take this sheet if you are
23  on the Success program or if you are an

Page 35

1  employee."
2    A.   Yes.
3    Q.   When you were doing this work for
4  opportunity credits, you understood that this
5  was to get credit toward your fees?
6    A.   Yes.
7    Q.   And that it was not as an
8  employee?
9    MR. ADAMS:  Object to form.
10  Object to characterization.  Object to the
11  extent it calls for a legal conclusion.
12    Q.   (BY MR. MILLER:)  Okay.  You can
13  answer.
14    A.   Well, to my knowledge, I was an
15  employee of the Center.
16    Q.   But if I read this right, it says
17  "Do not," in big letters, "take this sheet if
18  you are an employee."  Right?
19    A.   Right.  It does say that.
20    Q.   Okay.  And it has got a little
21  parens by "employees" that says "time sheet."
22    A.   Right.
23    Q.   Okay.  I don't know if you will

Page 36

1  know now, but looking at this document, can you
2  tell me what it was you were doing to get these
3  opportunity credits?
4    A.   This one in particular, it looks
5  like it was my security hours and as -- well,
6  this one, escorting and security.
7    Q.   Okay.
8    A.   On those two off days, I was
9  escorting.
10    Q.   You were escorting.  What is that?
11  What were you doing?
12    A.   Escorting is where you escort a
13  client to the hospital or another -- anywhere
14  outside of the Center.  They need an escort to
15  go with them.
16    Q.   Were you driving them or were you
17  riding with them in a car?
18    A.   I was riding with them.
19    Q.   Okay.  Was it anybody who left
20  needed an escort?
21    A.   No.  Phase I and some of Phase II.
22    Q.   Okay.  So this meant you had
23  progressed past those and you were helping

Page 37

1  other people out, basically, by escorting?
2      A.   Right.
3      Q.   Tried to keep them from doing
4  something they weren't supposed to do, was that
5  the idea?
6      A.   Basically.
7      Q.   Or if they needed help, you would
8  know what to do?
9      A.   Basically, yes.
10     Q.   And then the security part, what
11 were you doing for security?
12     A.   I would do perimeter walks, walk
13 around the perimeter, check the doors.  I would
14 help in intake, search the new clients coming
15 in.  I would do room checks.  And sometimes we
16 would have to search some of the stuff in their
17 rooms.
18     Q.   Okay.  And then from the
19 opportunity credits, you could use the work you
20 did inside for opportunity credits to go
21 towards your volunteer hours, correct?
22          MR. ADAMS:  Object to form.
23 Object to the extent she had knowledge of which

Page 38

1  hours were characterized as volunteer.
2      A.   No.
3      Q.   (BY MR. MILLER:)  You couldn't use
4  this work towards your volunteer?
5      A.   No.  This was basically -- this
6  was work.  This was how you paid your fees or
7  rent.  The voluntary hours was required, as you
8  see right here, it was required separately from
9  your opportunity credits.
10     Q.   Okay.  Could you use time that you
11 worked doing security or escorting people, you
12 could use that towards volunteer hours as well
13 if you needed to?
14     A.   No, opportunity credits, not
15 volunteer hours.
16     Q.   You couldn't use it for both?
17     A.   No.
18     Q.   All right.  Could you use time you
19 worked at Blackwell's toward your volunteer?
20     A.   No.  No.
21     Q.   Are you sure?
22     A.   I am positive.
23     Q.   How do you know that?

Page 39

1      A.   Because why would you put
2  working -- okay.  Blackwell's was a job.  We
3  went out.  We worked.  So why would I put that
4  as voluntary work?  And it was outside of the
5  Center.
6      Q.   Okay.  I'm not asking why you
7  would put it, but could it be credited toward
8  your volunteer hours?
9      A.   No.
10     Q.   No?
11     A.   No.
12     Q.   Okay.  You know that for a fact or
13 that is just what you think?
14     A.   That is what -- how we did it,
15 yes.
16     Q.   That is how you remember doing it?
17     A.   Yes.
18     Q.   All right.  So by doing this work
19 in security and escorting, you received
20 opportunity credits --
21     A.   Correct.
22     Q.   -- which were then applied to the
23 fees that you owed the Center, and they would

Page 40

1  reduce or eliminate your fees?
2      A.   Correct.
3      Q.   Were you able to pay all your fees
4  off through work that you did, either through
5  opportunity credits or through Lovelady?
6      A.   Yes.
7      Q.   When you left, did you owe any
8  fees?
9      A.   No.
10     Q.   Would you have been able to pay
11 off your fees if you didn't have that work?
12 Did you have other income that you could have
13 used to pay off those fees?
14     A.   No.
15     Q.   So you needed the opportunity
16 credits and later the Blackwell's in order to
17 pay your fees and stay at the Center?
18     A.   Correct.
19     Q.   When you went in, did you
20 understand that is part of how it would work,
21 that is how you would be able to pay for it?
22     A.   Yes.
23          (Defendants' Exhibit 4 was marked

Page 41

1        for identification.)
2        Q.   (BY MR. MILLER:)  I show you
3   another document.  Do you have any children?
4        A.   No.
5        Q.   Okay.  So you didn't have any
6   children who had to stay with you at the
7   Center?
8        A.   No.
9        Q.   Did other people --
10       A.   No.
11       Q.   -- have children who stayed there?
12       A.   Yes.
13       Q.   Did you ever help in the child
14  care or watch anybody's children?
15       A.   No.
16       Q.   Could you have if you wanted to?
17  Is that one option, you can go help out in
18  child care?
19       A.   Yes.
20            (Defendants' Exhibit 5 was marked
21            for identification.)
22       Q.   (BY MR. MILLER:)  Let me show you
23  what I will mark as Defendants' 5.  When you

Page 42

1   first came to Lovelady, one of the documents
2   you first filled out was this one, right?
3        A.   Right.
4        Q.   Is that your signature on it?
5        A.   Yes.
6        Q.   That is dated September 10th,
7   2012?
8        A.   Correct.
9        Q.   This was the document I was
10  thinking of before.  You didn't pay any money,
11  you had a five hundred dollars balance?
12       A.   Correct.
13       Q.   It says you are going to have
14  additional fees in the future.
15       A.   Correct.
16       Q.   In one of these lines, it says you
17  understand that The Lovelady would receive your
18  food stamp benefits.  Did you have any food
19  stamp benefits?
20       A.   Upon entering the Center, no.
21       Q.   You then applied for them?
22       A.   Yes.
23       Q.   And received them?

Page 43

1        A.   Yes.
2        Q.   Turned them over to the Center?
3        A.   Yes.
4        Q.   And that paid for your food?
5        A.   Yes.
6        Q.   Or part of your fees?
7        A.   It was something we had to do
8   so --
9        Q.   But you did receive the food stamp
10  benefits and turned them over?
11       A.   Yes.
12            (Off-the-record discussion.)
13       Q.   (BY MR. MILLER:)  It says on here,
14  "I understand I am responsible to pay a hundred
15  fifty dollars or forty percent of my gross pay,
16  depending on my specified program, weekly for
17  participating in the program."  Do you see
18  that?
19       A.   I do.
20       Q.   And you understood that when you
21  came?
22       A.   I did.
23       Q.   And there's another document --

Page 44

1            MR. MILLER:  That was Exhibit 6?
2   Is that 6, 5?
3            MR. ADAMS:  I think that is 5.
4        A.   5.
5            MR. MILLER:  5.  This will be 6.
6            (Defendants' Exhibit 6 was marked
7            for identification.)
8        Q.   (BY MR. MILLER:)  There's another
9   document I will show you called a Resident
10  Rights and Nondiscrimination Policy.  Is that
11  your signature on that one?
12       A.   It is.
13       Q.   Is that another document you
14  signed when you started at Lovelady?
15       A.   It is.
16       Q.   It is dated September 10th, 2012?
17       A.   It is.
18       Q.   It says on there, Number 5, that
19  you had the right to know that performance of
20  all assigned housekeeping and general
21  maintenance duties may be performed without
22  compensation.  Do you see that?
23       A.   I do see that.

Page 45

1      Q.   Did you ever do any housekeeping?

2      A.   I did.

3      Q.   Was that part of something you

4  would do for opportunity credits?

5      A.   No.

6      Q.   When would you do the

7  housekeeping?

8      A.   That was part of our chores.

9      Q.   So you understood when you came in

10  that your chores were something that you

11  weren't going to be compensated for?

12      A.   I did.

13      Q.   Okay.  Tell me how you came to

14  start working at Blackwell's.  I guess I will

15  start by asking you, was that Phase III?

16      A.   Phase III.

17      Q.   Phase III.  Okay.

18      A.   I believe I was in Phase III.

19  Like I said, my client rep and I really never

20  went over where I was and how many credits I

21  had so --

22      Q.   But it sounds like you progressed

23  almost through the program before you left.

Page 46

1      A.   I did.

2      Q.   And it sounds like you have done

3  pretty well since.  Did you benefit from the

4  program?

5      A.   I did benefit from the program.

6      Q.   I mean, you have held two

7  assistant manager jobs since then --

8      A.   Yes.

9      Q.   I mean that is pretty good.

10      A.   Right.

11      Q.   By the time you went to

12  Blackwell's, you think you were in maybe Phase

13  III?

14      A.   Correct.

15      Q.   Okay.  How did that come about?

16      A.   Well, my fees were not coming

17  down.  They just seemed like they kept going up

18  and going up and going up, although I was doing

19  the opportunity credits.  We couldn't figure

20  that out.

21          So my client rep suggested that I

22  go and speak to job placement about

23  Blackwell's.  She said that would be a fast way

Page 47

1  to pay my fees off.

2          So I went and spoke to job

3  placement, spoke to Holly Warren.  And a week

4  later, I was sent out to training.

5      Q.   Did you go to training at Haymon?

6      A.   I did.

7      Q.   And how long did that last?

8      A.   A week.

9      Q.   It was a week.  And you got a

10  certificate?

11      A.   I did.

12      Q.   All right.  Who trained you?

13      A.   Haymon Homes.

14      Q.   Do you remember who it was that

15  was doing it?

16      A.   Barbara I know was her first name,

17  I believe.

18      Q.   Did she work for Haymon?

19      A.   She did.

20      Q.   Haymon and Blackwell's, are they

21  two different places?

22      A.   They are.

23      Q.   They work together, or how does

Page 48

1  that work?

2      A.   That is what I -- yes, I believe

3  so.  Because if you worked at Haymon Homes, you

4  were sent to Blackwell's.  You know, you could

5  work either/or.

6      Q.   Did you ever work at Haymon Homes?

7      A.   As in --

8      Q.   Were you actually ever sent out

9  there to work at Haymon Homes?

10      A.   Yes.

11      Q.   So you worked at both Blackwell's

12  and Haymon Homes?

13      A.   And Haymon Homes, yes.

14      Q.   After your training?

15      A.   Yes.

16      Q.   All right.  When you were at

17  Lovelady, you came in, we have talked about a

18  number of different forms that you signed.

19      A.   Uh-huh.

20      Q.   Was there ever a form that was an

21  employment agreement with Lovelady?

22      A.   Yes.

23      Q.   Okay.

**Briana Walker**

Page 49

1    A.   For Blackwell's.
2    Q.   Okay.  Did you ever sign a
3 document that says this is an employment
4 agreement for Lovelady?
5    A.   I don't recall.
6    Q.   Okay.  You said you signed
7 something at Blackwell's that was an employment
8 agreement?
9    A.   Yes.  We signed a lot of documents
10 for Blackwell's.
11    Q.   Okay.  Where did you sign those?
12    A.   Job placement in The Lovelady
13 Center.
14    Q.   Okay.  So they had documents that
15 you were signing?  What did they say?
16    A.   I don't recall.
17    Q.   You don't remember any of them?
18    A.   I don't recall.
19    Q.   Okay.  But you don't ever recall
20 specifically signing any document that said
21 this is an employment agreement with Lovelady;
22 is that correct?
23    A.   Correct.

Page 50

1    Q.   Did you ever talk to anybody about
2 working outside of Lovelady, any place else
3 other than Haymon Homes and Blackwell's?
4    A.   While I was at The Lovelady
5 Center?
6    Q.   Yes.
7    A.   Yes.
8    Q.   What did you talk about?
9    A.   Job placement, you know, they
10 placed you.  It was like a temporary service
11 kind of like.  There was an interview for
12 Mooyah, I want to call it.
13    Q.   What?
14    A.   Mooyah.
15    Q.   What do they do?
16    A.   It is a food place.  But they sent
17 out --
18        MR. ADAMS:  Sell hamburgers.
19        MR. MILLER:  They what?
20        MR. ADAMS:  They sell hamburgers.
21        MS. MEGAHEE:  Milk shakes.
22 Colonnade.
23    Q.   (BY MR. MILLER:)  Did you go out

Page 51

1 there and interview at Mooyah?
2    A.   I did.
3    Q.   All right.  And what --
4    A.   No.  No, I did not.
5    Q.   Did not?
6    A.   They came to the Center.
7    Q.   And interviewed?
8    A.   Yes.
9    Q.   Did they interview several people?
10    A.   Yes.
11    Q.   Was somebody hired, to your
12 knowledge?
13    A.   Yes.  Yes.
14    Q.   Who was it who got hired?
15    A.   I don't remember names.
16    Q.   But you didn't end up getting a
17 job at Mooyah?
18    A.   No.
19    Q.   Did the interview go bad or were
20 you not interested once you talked to them or
21 how did that play out?
22    A.   They had already hired so many
23 Loveladies.

Page 52

1    Q.   How were those, the people who
2 worked at Mooyah, how were they paid, do you
3 know?
4    A.   I don't know.
5    Q.   Were there other people at
6 Lovelady who worked in jobs other than
7 Blackwell's or Haymon Homes, that sort of
8 thing?
9    A.   Yes.
10    Q.   What other places might they work?
11    A.   I know some worked at Piggly
12 Wiggly in Homewood, Wendy's on 280.  That is
13 all -- there are several other places.
14    Q.   Was the fact that you were
15 required to have the outside job, do you think
16 that was helpful as part of your
17 rehabilitation?
18    A.   Yes.
19    Q.   And why?
20    A.   Because you get to step out of the
21 Center and interact, regain how to live.
22    Q.   Am I correct that before you came
23 to the Center, you were having a difficult time

**Briana Walker**

Page 53

1  holding down a job?
2      A.   Correct.
3      Q.   And since you have left the Center
4  and been through this program, have you ever
5  been terminated from a job?
6      A.   No.
7      Q.   Have you quit a job other than to
8  move to take another job somewhere else?
9      A.   No.
10      Q.   It sounds like the program was
11  helpful.
12      A.   It was helpful.  Very helpful.
13      Q.   Was it more helpful for some
14  people than others, would you say?
15      A.   It depends on you -- I mean
16  individually.
17      Q.   Your motivation?
18      A.   Correct.
19      Q.   When you ended up going to job
20  placement and talking to them about
21  Blackwell's, did you do a job interview with
22  anybody from Blackwell's?
23      A.   It was sort of like -- sort of

Page 54

1  like that.
2      Q.   With who?  Who did you talk to?
3      A.   Holly Warren.
4      Q.   Where was Holly?
5      A.   In job placement.
6      Q.   And what type of questions did she
7  ask?
8      A.   She just -- basic questions.
9      Q.   Did she ask you what kind of
10  things you liked to do or what skills you had?
11      A.   Right.  Yes, she did.
12      Q.   Did she ask you what places you
13  might want to work?
14      A.   No.
15      Q.   When you went to her, did you tell
16  her, hey, I want to work at Blackwell's?
17      A.   She was specifically over
18  Blackwell's.
19      Q.   Oh, she was?
20      A.   Yes.
21      Q.   Okay.  So they had somebody who
22  was there for Blackwell's?
23      A.   Yes.

Page 55

1      Q.   Do you know if she did other stuff
2  as well?
3      A.   No.
4      Q.   You don't know?
5      A.   Huh-uh.
6      Q.   Is that correct?
7      A.   Correct.
8      Q.   Okay.  When you went to
9  Blackwell's, I think I may have asked you, did
10  you take a resume or anything like that with
11  you?
12      A.   When I went to Blackwell's?
13      Q.   Yes.
14      A.   No.
15      Q.   Who did you report to when you
16  went to Blackwell's?  Was there a supervisor
17  on-site that you worked with?
18      A.   When we -- when we got to our
19  houses, we called Holly Warren.
20      Q.   To let her know you were there?
21      A.   Correct.
22      Q.   Okay.  Was there a nurse on-site?
23      A.   Not on-site at all times.

Page 56

1      Q.   Well, most of the time.
2      A.   Sometimes.
3      Q.   Was there somebody who was an
4  administrator for Blackwell's?
5      A.   Yes.
6      Q.   Obviously, they had staff that
7  were --
8      A.   Yes.
9      Q.   -- on-site there with the group
10  home, right?
11      A.   Yes.
12      Q.   Did they have a main office?
13      A.   Yes.
14      Q.   And who was in that main office?
15      A.   Kanesha Quicksey.
16      Q.   That is one person or two?
17      A.   That is one person.
18      Q.   Kanesha Quicksey?
19      A.   Yeah.
20      Q.   What was Kanesha Quicksey's job?
21      A.   She was the head nurse.
22      Q.   And was she there most of the time
23  that you were there?

Page 57

1     A.   No.

2     Q.   Did she have another nurse that

3   might be there in the office when she wasn't

4   there?

5     A.   Yes.

6     Q.   Was there always a nurse on staff?

7     A.   No.

8     Q.   What would happen if you had a

9   medical emergency for one of the patients at a

10   time when there was no nurse on staff?

11     A.   Then we would have to call

12   Kanesha.

13     Q.   Kanesha Quicksey?

14     A.   Uh-huh, yes.

15     Q.   And she would make sure somebody

16   got out there?

17     A.   Yes.

18     Q.   Did you ever have that happen?

19     A.   Yes.

20     Q.   Okay.  Tell me about that.

21     A.   Well, I had a client that had a

22   colostomy bag, and she liked to pick at it.

23   Well, she slung her colostomy bag off and threw

Page 58

1   it at us.  So we had to call the head nurse,

2   Kanesha, which she came out and handled that.

3     Q.   Okay.  If you had a situation

4   where one of the patients was being unruly or

5   acting out -- did that ever happen?

6     A.   Yes.

7     Q.   Who would you call about that?

8     A.   One of the head nurses.  Well,

9   first you would call the head nurse.  Then you

10   would call -- if you couldn't get in touch with

11   her, the other head nurse.  Then you would call

12   Holly.  You had to call Holly, or which later

13   became Summer, at all times to let them know

14   what was going on on the premises, if you was

15   being transported to different houses, stuff

16   like that.

17     Q.   You had to let them know what

18   house you were working in?

19     A.   Yes.

20         MR. ADAMS:  Object to form.

21   Object to characterization.

22     Q.   (BY MR. MILLER:)  You can answer.

23   Is that correct?

Page 59

1     A.   Can you repeat the question?

2     Q.   You would let them know --

3         MR. ADAMS:  Your prior answer.

4     A.   Yes.

5     Q.   (BY MR. MILLER:)  But Holly was

6   not providing medical treatment or advice to

7   the patient, the people who were in the home?

8     A.   No.

9     Q.   And Holly was how far away from

10   Blackwell's?

11     A.   At The Lovelady Center.

12     Q.   That is Birmingham?  Where is

13   Blackwell's?

14     A.   Pinson.

15     Q.   So how long of a drive is that?

16     A.   Fifteen minutes.  Twenty minutes.

17     Q.   Okay.  Was Holly ever at

18   Blackwell's?

19     A.   No.

20     Q.   Were there any other people other

21   than the head nurse who would have been there,

22   administrative people that would walk around,

23   check on what was going on, anything like that?

Page 60

1     A.   No.

2     Q.   Was there a head person at

3   Blackwell's other than the head nurse?

4     A.   She was the head nurse.  No.

5     Q.   She was the head person?

6     A.   Yes.  There was two.

7     Q.   If you did a bad job at

8   Blackwell's or she felt like you were doing,

9   could she say don't send her back anymore?

10     A.   Yes.

11     Q.   Laquisha or -- what was her --

12     A.   Laquisha?

13         MS. AVERITT:  Kanesha.

14     A.   Kanesha.

15     Q.   (BY MR. MILLER:)  Kanesha Quick --

16     A.   Quicksey.

17     Q.   She could say don't send Briana

18   back, she is not doing what she is supposed to

19   be doing?

20     A.   Right.

21     Q.   But that didn't happen?

22     A.   No.

23     Q.   Did it happen to anybody that you

**Briana Walker**

16

Page 61

1 are aware of?

2    A.   Not that I am aware of.

3    Q.   Could you work at Blackwell's if

4 you had tested positive for drugs?

5    A.   No.

6    Q.   Was that a patient safety issue?

7    A.   That was a -- their requirement

8 issue and a patient safety issue.

9    Q.   So from a patient standpoint, it

10 was a safety point.  From the Center

11 standpoint, it was a violation of the program;

12 is that correct?

13    A.   Correct.

14    Q.   And if you violated the program

15 for testing positive, you would either be

16 dismissed from the program or go back to an

17 earlier phase?  Is that how that worked?

18    A.   Correct.

19    Q.   And have to work your way back

20 through?

21    A.   Right.

22    Q.   You were learning how to stay

23 clean and sober and, if you relapsed, get back

Page 62

1 on your feet and work through again?

2    A.   Correct.

3    Q.   There were some people who

4 relapsed a couple of times, two or three times,

5 right?

6    A.   Correct.

7    Q.   And at that point, they were

8 subject to being dismissed from the program?

9    A.   Depending on the person.

10    Q.   To your knowledge, what would be

11 the difference between when somebody would be

12 dismissed or just go back to an earlier phase?

13    A.   Like I said, depending on the

14 person.

15    Q.   Was it part of their own

16 motivation, whether they were motivated to

17 continue doing it or --

18    A.   Are you asking me like why they --

19 like if somebody tested positive three times

20 and didn't get dismissed, why they didn't get

21 dismissed?  Is that what you are asking me?

22    Q.   Exactly, yes.  I'm trying to

23 figure out what the differentiation is between

Page 63

1 when somebody would get dismissed for testing

2 positive --

3         MR. ADAMS:  Object to the extent

4 it calls for speculation.  If you know, you can

5 answer.

6    Q.   (BY MR. MILLER:)  To the extent

7 you know.  I think you told me that you thought

8 it depended on the person, and I was just

9 trying to figure out --

10    A.   Favoritism.

11    Q.   So you thought some people were

12 treated better than others?

13    A.   Yes.

14    Q.   How were you treated?

15    A.   I was treated good.

16    Q.   I understand you were --

17    A.   Fair.

18    Q.   I understand you were well liked

19 and thought well of and all that.  Is that how

20 you felt?

21    A.   Yes.  Can I take a break?

22         MR. MILLER:  Absolutely.

23         (Whereupon, a break was had from

Page 64

1    4:17 p.m. until 4:22 p.m.)

2         MR. MILLER:  Back on the record.

3    Q.   (BY MR. MILLER:)  You understand

4 you are still under oath?

5    A.   I do.

6    Q.   Tell me what it is that

7 Blackwell's does.  What kind of service do they

8 provide to people who are --

9    A.   It is a group home for the

10 mentally ill.

11    Q.   How do people get there?  Do they

12 come through like DHR, a government program?

13    A.   A government program.

14    Q.   Government program.

15    A.   Uh-huh.

16    Q.   And Blackwell's you said is in

17 Pinson?

18    A.   Yes.

19    Q.   And Haymon is where?

20    A.   In Fyffe.

21    Q.   Fyffe.  Okay.  Up in DeKalb

22 County; is that right?

23    A.   I believe so.

Page 65

1    Q.   Kind of up 59, up in the
2  mountains?
3    A.   It is north, yes.
4    Q.   Did Lovelady own Blackwell's?
5        MR. ADAMS:  Object to form.
6  Object to the extent it calls for speculation.
7    Q.   (BY MR. MILLER:)  If you know.
8    A.   I am not sure.
9    Q.   What about Haymon, did they own
10 Haymon?
11   A.   No.
12   Q.   Do you know who owned Haymon?
13   A.   Haymon owns -- no.  All we knew
14 was Ms. Haymon.
15   Q.   So there was a lady named
16 Ms. Haymon?
17   A.   Yes.
18   Q.   Was there a Ms. or Mr. Blackwell?
19   A.   No.
20   Q.   Do you have any reason to believe
21 that Lovelady was leasing the building or the
22 property there at Blackwell's or Haymon?
23   A.   I did hear that.

Page 66

1    Q.   And who told you that?
2    A.   I don't recall.
3    Q.   Was that thirdhand?  You heard it
4  from somebody else?
5    A.   Yes.
6    Q.   Do you have any personal knowledge
7  of that?
8    A.   No.
9    Q.   Do you know one way or the other?
10   A.   No.
11   Q.   What about when you went up there
12 to work at Blackwell's or Haymon, were you
13 provided with any type of nursing equipment?
14   A.   No.
15   Q.   Did you have like cleaning
16 supplies?
17   A.   In the house, yes.
18   Q.   Okay.  Who provided those?
19   A.   Blackwell's.
20   Q.   Did y'all have any type of like
21 medical supplies that would be in there, basic
22 stuff, like sterile wipes or latex gloves that
23 you would use, anything like that?

Page 67

1    A.   Yes.
2    Q.   Who provided that stuff?
3        MR. ADAMS:  Object to form.
4  Object to the extent it calls for speculation.
5    Q.   (BY MR. MILLER:)  Do you know who
6  provided that?
7    A.   I'm not sure, actually.  It was
8  just in the house.
9    Q.   It was there?
10   A.   It was there, yes.
11   Q.   You didn't take it with you?
12   A.   No.  No.
13   Q.   I was going to show you this.  I
14 don't have to mark it.  It is a case document.
15 You filed a document in this case called a
16 Consent to Join.  Let me make sure I am looking
17 at the same one you are.
18   A.   Yes.
19   Q.   And that says, "I am currently or
20 was formerly employed by Lovelady, Inc."?
21   A.   Yes.
22   Q.   And "I worked at this location
23 from October 2012 to January 2013."

Page 68

1    A.   Yes.
2    Q.   Okay.  Is that correct?  That is
3  when you were at Lovelady performing work, was
4  that time period?
5    A.   Yes.
6    Q.   All right.  From September until
7  October 2012, you were in Phase I and not doing
8  any work; is that correct?
9    A.   Yes.
10   Q.   And then beginning in January
11 2013, you went to Haymon Homes, as reflected on
12 this document; is that correct?  And I am just
13 asking you that because you have got three of
14 these and they have different time periods on
15 them.  This shows one date of 1/13 to 2/13?
16   A.   Yes.
17   Q.   So was that the time period when
18 you were at Haymon?
19   A.   Yes.  I also would go between --
20 yes.  Yes.
21   Q.   After February 2013, did you ever
22 go to Haymon again?
23   A.   No.  Just this, right, yes.

Page 69

1    Q.    During that time period you were
2  at both?  You were at Haymon?
3    A.    Yes.
4    Q.    From January of 2013 to February
5  2013, you were at Haymon?
6    A.    Yes.
7    Q.    And not at Blackwell's?
8    A.    Yes.
9    Q.    Okay.  And then there's one here
10 that says Lovelady, Inc./Blackwell's Way, 2/13
11 to 7/13.
12   A.    Yes.
13   Q.    Okay.  You left the Center in
14 July '13, correct?
15   A.    Yes.
16   Q.    And you started working at
17 Blackwell's in February 2013?
18   A.    Yes.
19   Q.    Okay.  During that time period,
20 did you work anywhere else other than
21 Blackwell's?
22   A.    No.
23   Q.    Okay.  Did you ever work in the

Page 70

1  thrift store?
2    A.    No.
3    Q.    Have you ever had any other
4  lawsuits other than this one?
5    A.    No.
6    Q.    Have you ever filed for
7  bankruptcy?
8    A.    No.
9    Q.    Have you ever testified at a trial
10 or here --
11   A.    No.
12   Q.    -- in court?  Tell me how your pay
13 would work when you were at Blackwell's.  How
14 were you paid?
15        MR. ADAMS:  Object to form.
16   A.    We were paid a check.  The
17 Lovelady Center paid us.
18   Q.    (BY MR. MILLER:)  Okay.  Did
19 Blackwell's send money to Lovelady?
20        MR. ADAMS:  Object to form to the
21 extent it calls for speculation.
22   A.    Yes.
23   Q.    (BY MR. MILLER:)  And then

Page 71

1  Lovelady would take out your program fees?
2    A.    Yes.
3    Q.    And give you what was left?
4    A.    Yes.
5    Q.    And you could do whatever you
6  wanted to with what was left?
7    A.    Yes.
8    Q.    Did you get paid, to your
9  knowledge, for all the hours that you worked at
10 Blackwell's?
11   A.    To my knowledge, yes.
12   Q.    Did you ever complain to anybody
13 at Lovelady while you were there about what you
14 were being paid?
15   A.    Yes.
16   Q.    Okay.  Who did you complain to?
17   A.    Summer Burdette.
18   Q.    Who is Summer?
19   A.    She later took over Blackwell's
20 through The Lovelady Center.
21   Q.    Okay.  Was she in job placement --
22   A.    Yes.
23   Q.    -- at Lovelady?  And what did you

Page 72

1  say to Summer?
2    A.    Well, I discussed with her about
3  the hours, time and a half.
4    Q.    What do you specifically remember
5  talking to Summer about?  Tell me as much as
6  you remember about it.
7    A.    Basically about how many hours we
8  were working.
9    Q.    Did you want to work fewer hours?
10   A.    In a different -- in a few days'
11 time, yes.
12   Q.    What do you mean?
13   A.    They -- like we would -- by the
14 end of the day, we would end up working
15 eighteen to twenty hours a day some days.
16   Q.    What were you doing?  What were
17 you doing for eighteen to twenty hours a day at
18 Blackwell's?
19   A.    Taking care of the clients.
20   Q.    Tell me your normal day, what you
21 would do.
22   A.    You -- when you get to the house,
23 you sign in to your book, you -- you go over

Page 73

1  their charts, their medication charts and
2  their -- then you also have to document their
3  eating, your cleaning, their medication, their
4  bowel movements.  Then you have training to do
5  with each client.  Each client specifically had
6  their own training.
7      Q.   Like what?  What kind of training
8  did they have?
9      A.   Just depends on the client.  It
10 could be, for instance, teaching them how to
11 sweep the floor or going over what they learned
12 at their school or their workplace during the
13 day, math problems, just everyday -- assisting
14 in everyday living.
15     Q.   Were you giving them any
16 medication?
17     A.   Yes.
18     Q.   Okay.  Was it like a chart that
19 said whoever the person is, give this person
20 this medication at this time?
21     A.   Yes.
22     Q.   And you had to keep track of it?
23     A.   Yes.

Page 74

1      Q.   Somebody referred to it as part
2  babysitting.  Did you feel like you were just
3  sitting there with them and watching them?
4      A.   Yes.
5      Q.   Did you ever play games with them
6  or read books to them or anything like that?
7      A.   Yes.  Did their hair, painted
8  their toenails, did their laundry.
9      Q.   How many people would you have
10 there at any given time in a home?
11     A.   Depending on the house, could be
12 one, could be three, could be five.
13     Q.   How many houses were there?
14     A.   Five, to my knowledge, five or
15 six.
16     Q.   And did each house have a
17 different kind of patient in it or somebody
18 with different needs?
19     A.   Correct, yes.
20     Q.   You said you had talked to
21 Summer -- Summer, is that right?
22     A.   Summer.
23     Q.   How many times did you talk to her

Page 75

1  about your pay?
2      A.   I don't recall.
3      Q.   Was it more than once?
4      A.   Yes.
5      Q.   Like more than ten times?
6      A.   No.  I don't recall.
7      Q.   Do you remember anything about
8  your conversation with her other than what you
9  have told me?
10     A.   No.
11     Q.   What did she say to you, if you
12 remember?
13     A.   Just that that is just how it was,
14 you know.  That is basically it.
15     Q.   Did you have the ability to say I
16 don't want to work at Blackwell's anymore, I
17 want to do something different?
18     A.   Yes.
19     Q.   Did you do that?
20     A.   No.
21     Q.   And why not?
22     A.   Because I was trying to catch my
23 fees up and that was the way to do it.

Page 76

1      Q.   To work a lot?
2      A.   To work all those hours, yes.
3      Q.   And you caught your fees up?
4      A.   I did.
5      Q.   Have you ever looked at what it
6  would cost to go to rehab at somewhere like
7  Bradford or one of those private rehab places?
8      A.   No.
9      Q.   Do you have any idea how it
10 compares to Lovelady?
11     A.   No.
12     Q.   Were you ever part of a Department
13 of Labor investigation?
14     A.   Not that I am aware of, no.
15     Q.   Any investigators come talk to you
16 from the U.S. Department of Labor?
17     A.   No.
18     Q.   Or did you go to their office?
19     A.   No.
20     Q.   You said that there were some
21 other employees who you thought might want to
22 join the lawsuit.  And you named Kerry Green.
23 Who is Kerry Green?

**Briana Walker**

Page 77

1   A.   She was a client.
2   Q.   At The Lovelady when you were
3 there?
4   A.   Yes.
5   Q.   Do you know if she is going to
6 join?
7   A.   I don't.
8   Q.   Have you talked to her?
9   A.   Not recently, no.
10   Q.   Did you talk to her before you
11 filed the lawsuit?
12   A.   No.
13   Q.   Have you ever talked to her about
14 joining the case?
15   A.   No.
16   Q.   What about Florencia Greene?
17   A.   She was a client.
18   Q.   Have you ever talked to her about
19 joining the case?
20   A.   No.
21   Q.   Casey Shelton?
22   A.   Yes.
23   Q.   You have talked to her about the

Page 78

1 case?
2   A.   Yes.
3   Q.   Joining the case?  When was that?
4   A.   When this first started, so say
5 July of last year.
6   Q.   What did Casey say when you talked
7 to her?
8   A.   She was -- she was interested.
9 And then we just never talked about it again.
10   Q.   What about Celsea Fason?
11   A.   I never talked to her.
12   Q.   Why did you list her as somebody
13 who might join?
14   A.   Because she was working at Mooyah
15 and somewhere else and she had complained a lot
16 about it, I believe.  I believe that is why I
17 put her on there.
18   Q.   Is there anybody other than who we
19 have talked about just now who you have talked
20 to about this case, other than your lawyers?
21   A.   No.
22   Q.   No other clients that you have
23 talked to about it?

Page 79

1   A.   No.
2   Q.   Do you know how many people there
3 were who were clients of Lovelady during the
4 time period you were there?
5   A.   How many people were there?
6   Q.   How many clients?
7   A.   Four -- four to five hundred.
8   Q.   How many of them worked at
9 Blackwell's?
10   A.   I am not sure.
11   Q.   Or Haymon?
12   A.   Maybe fifty, sixty of us.
13   Q.   The people who didn't work at
14 Haymon's or Blackwell's, do you know what their
15 arrangement was with whatever outside company
16 they worked with?
17   A.   No.
18   Q.   Do you know how they got their
19 paychecks?
20   A.   No.
21   Q.   Do you know if they were paid
22 overtime?
23   A.   No.

Page 80

1   Q.   Have you ever talked to anybody at
2 Blackwell's about feeling like you had worked
3 too much --
4   A.   No.
5   Q.   -- or that you felt like you
6 should get overtime?
7   A.   Yes.
8   Q.   You talked to somebody at
9 Blackwell's?
10   A.   Not -- no.  No.  Are you asking
11 like as an employee or as a client, like from
12 client to client or for me to Kanesha, for
13 instance?
14   Q.   Right.  That is what I am talking
15 about.
16   A.   No.
17   Q.   What documents or other evidence
18 do you have in support of your position that
19 you were an employee of Lovelady?
20   A.   I have provided all the documents.
21   Q.   Okay.  Do you remember what
22 specifically that you provided that you
23 think --

Page 81

1    A.   The check stub itself.

2    Q.   Okay.  And what about that is it

3  that makes you feel like you were an employee

4  of Lovelady?

5    A.   The Lovelady Center is on the top

6  of my checks.

7    Q.   All right.  Anything else?

8    A.   No.  Well, the fact that they sent

9  us to Blackwell's.

10   Q.   When you were at Blackwell's or

11 Haymon, did you ever sleep while you were out

12 there?

13       MR. ADAMS:  Object to form.

14   A.   No, not technically.

15   Q.   (BY MR. MILLER:)  What do you mean

16 not technically?

17   A.   Not technically.  At Haymon, they

18 would -- when we got picked up, if we didn't

19 have another house to go to, then we could go

20 to The Lovelady trailer and we could get a

21 couple of hours of sleep there, but, no.

22   Q.   You never slept on the job?

23   A.   No.

Page 82

1    Q.   Okay.  Do you have any type of

2  audio recordings or video recordings or

3  anything like that that would support your

4  claims?

5    A.   No.

6    Q.   You talked about your paycheck

7  having Lovelady on there.  You knew Lovelady

8  was getting money from Blackwell's?

9    A.   Correct.

10   Q.   Do you know how Lovelady was

11 funded?

12   A.   No.

13   Q.   Let me ask, do you go to any

14 church?  Do you have a church you go to?

15   A.   I do.

16   Q.   What church do you go to?

17   A.   The Well in Gadsden.

18   Q.   Are you aware that churches from

19 around the community would send people out to

20 Lovelady to volunteer?

21   A.   Yes.

22   Q.   Did you ever see those people?

23   A.   Yes.

Page 83

1    Q.   Were you aware that churches would

2  give money to Lovelady for its programs?

3    A.   I wasn't aware.

4    Q.   Do you know how Lovelady is

5  funded?

6    A.   No.  By -- by our fees that we

7  pay.  You know, they benefited from us as well.

8    Q.   Do you know if those fees that

9  y'all would pay would be enough to keep that

10 Center running on its own?

11   A.   Well, take how much you pay our

12 fees times it by how many clients are in there.

13 You know, that is a good bit of money.  I am

14 not saying I know how much the bills are, but I

15 am just saying that is a good bit of money.

16   Q.   Could you, to your knowledge, find

17 a place to stay that was safe that would

18 provide you with all your meals, counseling,

19 all those services for a hundred fifty dollars

20 a week --

21       MR. ADAMS:  Object to form.

22   Q.   (BY MR. MILLER:)  -- other than

23 Lovelady?

Page 84

1        MR. ADAMS:  Object.

2  Mischaracterizes the fees that are paid,

3  including food stamps.  You can answer.

4    A.   Right.  My food stamps were

5  included.

6    Q.   (BY MR. MILLER:)  Well, even

7  including your food stamps.

8    A.   I can't -- I don't know.

9    Q.   How much does it cost you to live

10 right now?

11   A.   Right now?

12       MR. ADAMS:  Object to form.  This

13 is beyond the scope of what has been allowed.

14 This has nothing to do with whether or not she

15 is an employee.

16       MR. MILLER:  Okay.

17   Q.   (BY MR. MILLER:)  Go ahead.

18       MR. ADAMS:  Don't answer.

19   A.   I'm not answering.

20   Q.   (BY MR. MILLER:)  Oh, you are not

21 going to answer?

22   A.   No.

23   Q.   You are going to take your

**Briana Walker**

Page 85

¹ lawyer's instruction not to answer?

²      MR. ADAMS:  She is going to take

³ my instruction not to answer how much her house

⁴ costs right now.  It has nothing to do --

⁵      A.   No.

⁶      MR. ADAMS:  -- since she left the

⁷ Center, yeah.

⁸      MR. MILLER:  You are really going

⁹ to instruct her not to answer?

¹⁰      MR. ADAMS:  I am.

¹¹      MR. MILLER:  We are going to go on

¹² the record and move to keep the deposition open

¹³ and for appropriate fees and sanctions if

¹⁴ necessary from the Court and reserve the right

¹⁵ to come back to ask questions since the

¹⁶ Federal Rules of Civil Procedure do not

¹⁷ provide --

¹⁸      MR. ADAMS:  You are asking

¹⁹ questions --

²⁰      MR. MILLER:  Steve.

²¹      MR. ADAMS:  You are asking

²² questions about how much her house costs now.

²³ It has nothing to do with The Lovelady Center,

Page 86

¹ has nothing to do with whether or not she was

² an employee.  That was the very limited thing

³ we were allowed to do discovery on.

⁴      MR. MILLER:  We are going to keep

⁵ this open, reserve the right to come back,

⁶ seeking fees for --

⁷      MR. ADAMS:  Do you care for

⁸ answering that question?

⁹      A.   No.  I don't really think that it

¹⁰ has anything to do with this.

¹¹      MR. ADAMS:  Do you care to say how

¹² much you pay?

¹³      A.   No.

¹⁴      MR. ADAMS:  All right.  Say it.

¹⁵      A.   Like I do care.

¹⁶      MR. ADAMS:  Go ahead and answer.

¹⁷      A.   Nine hundred dollars.

¹⁸      Q.   (BY MR. MILLER:)  That is for

¹⁹ housing?

²⁰      A.   That is for everything.

²¹      Q.   Housing and food?

²²      A.   Yes.

²³      Q.   And you live with somebody else?

Page 87

¹      A.   Yes.

²      Q.   Do they contribute?

³      A.   Yes.

⁴      Q.   Do they pay money too?

⁵      A.   Yes.

⁶      Q.   Okay.  And the person you live

⁷ with now, was that person also a resident of

⁸ Lovelady?

⁹      A.   Yes.

¹⁰      Q.   A client at one point?  Are they

¹¹ part of this lawsuit?

¹²      A.   No.

¹³      Q.   Why?  Have you talked to that

¹⁴ person about it?

¹⁵      A.   Yes.

¹⁶      Q.   And how does that person feel

¹⁷ about what you are claiming?

¹⁸      A.   She feels like it is too

¹⁹ time-consuming and she doesn't have the time to

²⁰ do it.

²¹      Q.   Let me show you what I am going to

²² mark as --

²³      MR. MILLER:  Which one am I?

Page 88

¹      MR. ADAMS:  If you didn't mark

² these, then you are ready for 7.

³      MR. MILLER:  Yeah.  I didn't mark

⁴ those because those are filed in with the

⁵ Court's.  Well, heck, let's mark that last

⁶ batch, your consent form.  Let's just mark them

⁷ all as Exhibit 7.

⁸      (Defendants' Exhibit 7 was marked

⁹      for identification.)

¹⁰      MR. MILLER:  Collective Exhibit 7.

¹¹ And then we will do Exhibit 8.

¹²      (Defendants' Exhibit 8 was marked

¹³      for identification.)

¹⁴      Q.   (BY MR. MILLER:)  I will give you

¹⁵ this document.  Do you recognize this document

¹⁶ as your responses to what is called

¹⁷ interrogatories that we sent to you?

¹⁸      A.   Yes.

¹⁹      Q.   I was trying to see.  I don't

²⁰ think your signature is on this document.  So

²¹ if you don't mind, if you would just look

²² through it, and then I am going to ask you if

²³ the information appears to be correct, since

**Briana Walker**

Page 89

1  you can tell me under oath.  That way you don't
2  have to sign it in front of a notary, okay?
3      A.  Okay.
4          (Pause.)
5      Q.  (BY MR. MILLER:)  Did you have a
6  chance to look at that document?
7      A.  I did.
8      Q.  Is it accurate, your responses?
9      A.  It is, yes.
10     Q.  Anything you want to change?
11     A.  No.
12     Q.  Let me ask you one other question
13 before we take a break.  Have you ever been
14 convicted of any crimes?
15     A.  No.  Just tickets, like speeding
16 tickets.
17     Q.  Speeding tickets.  When you had
18 that outstanding warrant --
19     A.  It was on a failure to appear on a
20 ticket.
21     Q.  A speeding ticket?
22     A.  A driving while suspended ticket.
23     Q.  What ended up happening with that?

Page 90

1      A.  I turned myself in.
2      Q.  Okay.  Did you pay a fine or jail
3  time or what --
4      A.  I did.  I paid a fine.
5      Q.  Any other criminal --
6      A.  No.
7      Q.  Okay.
8          MR. MILLER:  All right.  Let's
9  take a break for just a second.
10         (Whereupon, a break was had from
11         4:51 p.m. until 4:59 p.m.)
12         MR. MILLER:  I don't have any more
13 questions.
14         MR. ADAMS:  Okay.
15         MR. MILLER:  Thank you.
16
17 EXAMINATION BY MR. ADAMS:
18     Q.  Ms. Walker, I will show you what
19 has been marked as Defendants' Exhibit 4.  It
20 is the opportunity credits, and it shows forty
21 hours.  Were you aware that this ten hours was
22 deducted from that forty hours?
23     A.  No.

Page 91

1          MR. MILLER:  Object to the form.
2      Q.  (BY MR. ADAMS:)  And do you know
3  whether or not they took ten hours, volunteer
4  hours, away from the hours you worked at Haymon
5  Homes and/or Blackwell's?
6          MR. MILLER:  Object to the form.
7      A.  No.
8      Q.  (BY MR. ADAMS:)  So that is
9  possible?
10     A.  Yes.
11     Q.  Okay.  You mentioned earlier a
12 trailer at Haymon Homes.  Tell me about that.
13     A.  The Lovelady trailer, as they
14 called it.
15     Q.  Uh-huh.
16     A.  There was two Lovelady trailers.
17 You had your graduate trailer and your Lovelady
18 trailer.  That is where they dropped us off.
19 And that is where we stayed for the couple of
20 hours.
21     Q.  Who ran The Lovelady trailer?  Was
22 there a housemother?
23     A.  Yes.

Page 92

1      Q.  And who was that?
2      A.  It varied.
3      Q.  And but was she somebody from The
4  Lovelady Center?
5      A.  Yes.
6      Q.  Okay.  And would she be the one
7  who gave you your assignments?
8      A.  Yes.
9          MR. MILLER:  Object to the form.
10         MR. ADAMS:  Okay.  All right.  I
11 don't have any more.
12
13 REEXAMINATION BY MR. MILLER:
14     Q.  When you would go up to Haymon
15 Homes, how many times did you stay in the
16 trailer?
17     A.  Three, four.
18     Q.  Total?
19     A.  Yes.
20     Q.  Okay.  When you said that the
21 housemother would give you assignments, did the
22 housemother simply tell you which house at
23 Blackwell's to go to?

**Briana Walker**                                                                                                    **24**

Page 93

1   A.   Yes.
2   Q.   Would she tell you exactly when to
3   give the people their medicine -- or would the
4   person, the housemother who was in the trailer,
5   would she tell you anything about your job
6   other than which house you were supposed to go
7   to?
8   A.   Yes.  She would tell us about the
9   house and the clients and what to do with the
10   clients.
11   Q.   Like what?
12   A.   Just on -- for like she would tell
13   us about the clients, specifically
14   individually, what they needed, what to do with
15   them, what to expect.  So, yeah.
16   Q.   Then when you got there, there was
17   actually --
18   A.   A book.
19   Q.   -- a book that told you the
20   details of what you needed to do?
21   A.   Yes.
22   Q.   And you were only at that trailer,
23   you said, a total of three or four times?

Page 94

1   A.   Like in periods.  You know, I mean
2   like one week when I was out there, that was
3   one time.  And then another --
4   Q.   Okay.
5   A.   That was in trips.
6   Q.   A total of three or four times?
7   A.   Trips, yes.
8   Q.   Three or four trips.  Okay.  How
9   many trips did you have as a total to
10   Blackwell's?
11   A.   To Blackwell's?  Numerous.  I
12   couldn't tell you.
13   Q.   Okay.  Did you have to pay
14   anything extra to stay, when you stayed at the
15   trailer?
16   A.   No.
17   Q.   And that saved you from having to
18   travel back to Birmingham and then back to the
19   job?
20   A.   No.  Black -- I think you have
21   Blackwell's and Haymon confused.
22   Q.   Okay.
23   A.   Haymon Homes had the trailer.

Page 95

1   That is where The Lovelady trailer was.
2   Q.   Okay.  So the only time that you
3   would have stayed in the trailer was when you
4   were working with Haymon Homes?
5   A.   Correct.
6   Q.   And we went over that, that when
7   you working there earlier, we looked at those
8   documents.
9   A.   Correct.
10   MR. MILLER:  That is all I have.
11
12   REEXAMINATION BY ADAMS:
13   Q.   And when you said trips, would
14   sometimes you be at the trailer for like a week
15   at a time?
16   A.   Yes.
17   Q.   Did you have any control over when
18   you came back and forth?
19   A.   No.
20   Q.   Did the housemother tell you what
21   your hours were and give you your schedule?
22   A.   Yes.
23   MR. MILLER:  Object to the form.

Page 96

1   Okay.  That is all.
2   MR. ADAMS:  We are done.
3   MR. MILLER:  Thank you.
4
5   FURTHER THE DEPONENT SAITH NOT
6
7   (Deposition concluded at 5:03 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



Page 97

1  C E R T I F I C A T E

2

3

4  STATE OF ALABAMA

5  JEFFERSON COUNTY

6

7       I hereby certify that the above

8  and foregoing deposition was taken down by me

9  in stenotypy, and the questions and answers

10  thereto were reduced to typewriting under my

11  supervision, and that the foregoing represents

12  a true and correct transcript of the deposition

13  given by said witness upon said hearing.

14       I further certify that I am

15  neither of counsel nor of kin to the parties to

16  the action, nor am I in anywise interested in

17  the result of said cause.

18

19

20       /s/ LAURA H. NICHOLS

21       Commissioner-Notary Public, State of AL
        ACCR License No. 3, Exp. 9/30/2016
22       GA CCR No. 2714, Exp. 4/1/2016
        TN LCR No. 679, Exp. 6/30/16
23       Transcript Certified on 10/26/2015

**WORD LIST**

**< 1 >**
**1**  *(5)*
**10**  *(1)*
**10th**  *(3)*
**13**  *(6)*
**16**  *(1)*
**1819**  *(1)*
**19**  *(2)*
**19th**  *(3)*

**< 2 >**
**2**  *(5)*
**2:15-CV-274-MHH**
 *(1)*
**2:39**  *(1)*
**2:42**  *(1)*
**2012**  *(6)*
**2013**  *(9)*
**2015**  *(6)*
**2016**  *(2)*
**205.314.0500**  *(1)*
**205.521.8000**  *(1)*
**20th**  *(1)*
**23**  *(1)*
**26**  *(1)*
**27**  *(1)*
**2714**  *(1)*
**280**  *(3)*
**2nd**  *(1)*

**< 3 >**
**3**  *(3)*
**3:21**  *(1)*
**30**  *(2)*
**301**  *(3)*
**31**  *(1)*
**31st**  *(2)*
**35203**  *(4)*

**< 4 >**
**4**  *(7)*
**4:17**  *(1)*
**4:22**  *(1)*
**4:51**  *(1)*
**4:59**  *(1)*
**40**  *(1)*
**41**  *(1)*

**44**  *(1)*

**< 5 >**
**5**  *(9)*
**5:03**  *(1)*
**59**  *(1)*

**< 6 >**
**6**  *(6)*
**679**  *(1)*

**< 7 >**
**7**  *(7)*

**< 8 >**
**8**  *(3)*
**88**  *(2)*

**< 9 >**
**9**  *(1)*
**90**  *(1)*
**92**  *(1)*
**95**  *(1)*

**< A >**
**aaveritt@babc.com**
 *(1)*
**ability**  *(2)*
**able**  *(3)*
**Absolutely**  *(1)*
**ACCR**  *(1)*
**accurate**  *(3)*
**Act**  *(3)*
**acting**  *(2)*
**ACTION**  *(2)*
**actual**  *(1)*
**Adams**  *(38)*
**ADAMS:**  *(2)*
**addition**  *(1)*
**additional**  *(2)*
**additionally**  *(1)*
**administrative**  *(1)*
**administrator**  *(1)*
**admitted**  *(1)*
**advancing**  *(1)*
**advice**  *(1)*
**affect**  *(1)*
**afternoon**  *(1)*
**agency**  *(2)*

**ago**  *(2)*
**agree**  *(1)*
**AGREED**  *(1)*
**Agreement**  *(7)*
**ahead**  *(3)*
**al**  *(2)*
**ALABAMA**  *(10)*
**alcohol**  *(1)*
**allowed**  *(2)*
**amount**  *(1)*
**Anne**  *(1)*
**answer**  *(17)*
**answering**  *(2)*
**answers**  *(1)*
**anybody**  *(7)*
**anybody's**  *(1)*
**anymore**  *(2)*
**anywise**  *(1)*
**appear**  *(2)*
**appears**  *(1)*
**application**  *(3)*
**applied**  *(3)*
**apply**  *(1)*
**appropriate**  *(1)*
**Arant**  *(2)*
**area**  *(1)*
**arrangement**  *(1)*
**arrest**  *(1)*
**asked**  *(1)*
**asking**  *(8)*
**assessment**  *(1)*
**assign**  *(1)*
**assigned**  *(1)*
**assignments**  *(2)*
**assistant**  *(6)*
**assisting**  *(1)*
**assume**  *(2)*
**Attorney**  *(1)*
**Attorneys**  *(1)*
**audio**  *(1)*
**August**  *(4)*
**Avenue**  *(1)*
**Averitt**  *(2)*
**aware**  *(12)*

**< B >**
**babysitting**  *(1)*
**back**  *(13)*
**bad**  *(2)*

**bag**  *(2)*
**balance**  *(1)*
**bankruptcy**  *(1)*
**Barbara**  *(1)*
**basic**  *(2)*
**basically**  *(7)*
**batch**  *(1)*
**Bates**  *(1)*
**beginning**  *(1)*
**behalf**  *(1)*
**believe**  *(9)*
**benefit**  *(3)*
**benefited**  *(1)*
**benefits**  *(3)*
**better**  *(1)*
**beyond**  *(1)*
**big**  *(1)*
**bills**  *(1)*
**Birmingham**  *(9)*
**bit**  *(7)*
**Black**  *(1)*
**Blackwell**  *(1)*
**Blackwell's**  *(62)*
**book**  *(3)*
**books**  *(1)*
**bottom**  *(1)*
**Boult**  *(2)*
**bowel**  *(1)*
**box**  *(1)*
**Bradford**  *(1)*
**Bradley**  *(2)*
**break**  *(9)*
**breaks**  *(1)*
**BRIANA**  *(6)*
**broke**  *(2)*
**brought**  *(3)*
**Building**  *(2)*
**Burdette**  *(1)*
**bus**  *(1)*

**< C >**
**cab**  *(1)*
**call**  *(9)*
**called**  *(10)*
**calls**  *(5)*
**car**  *(1)*
**card**  *(1)*
**care**  *(7)*
**case**  *(11)*

| | | | |
|---|---|---|---|
| **Casey** *(2)* | **common** *(1)* | **Defendants** *(23)* | **employee** *(9)* |
| **catch** *(1)* | **community** *(1)* | **DeKalb** *(1)* | **employees** *(2)* |
| **caught** *(1)* | **company** *(2)* | **Department** *(2)* | **employment** *(7)* |
| **cause** *(2)* | **compares** *(1)* | **depended** *(1)* | **ended** *(2)* |
| **CCR** *(1)* | **compensated** *(1)* | **depending** *(4)* | **enrollment** *(1)* |
| **Celsea** *(1)* | **compensation** *(1)* | **depends** *(2)* | **entering** *(1)* |
| **CENTER** *(38)* | **complain** *(2)* | **DEPONENT** *(1)* | **equipment** *(1)* |
| **certain** *(1)* | **complained** *(1)* | **DEPOSITION** *(11)* | **escort** *(3)* |
| **certificate** *(1)* | **compliance** *(1)* | **depositions** *(1)* | **escorting** *(7)* |
| **Certified** *(4)* | **computer** *(2)* | **descriptions** *(1)* | **et** *(1)* |
| **certify** *(4)* | **concluded** *(1)* | **details** *(2)* | **everyday** *(2)* |
| **chance** *(1)* | **conclusion** *(1)* | **determined** *(1)* | **evidence** *(2)* |
| **change** *(1)* | **conditions** *(1)* | **DHR** *(1)* | **exactly** *(3)* |
| **characterization** *(3)* | **confused** *(1)* | **difference** *(2)* | **EXAMINATION** |
| **characterized** *(1)* | **connection** *(1)* | **different** *(11)* | *(6)* |
| **chart** *(1)* | **consent** *(3)* | **differentiation** *(1)* | **examined** *(1)* |
| **charts** *(2)* | **continue** *(1)* | **difficult** *(2)* | **example** *(1)* |
| **check** *(4)* | **Continuing** *(2)* | **discovery** *(1)* | **Exhibit** *(24)* |
| **checks** *(2)* | **contribute** *(1)* | **discussed** *(1)* | **EXHIBITS** *(2)* |
| **Chevron** *(6)* | **control** *(1)* | **discussion** *(1)* | **Exp** *(3)* |
| **child** *(2)* | **conversation** *(3)* | **dismissed** *(6)* | **expect** *(1)* |
| **children** *(4)* | **convicted** *(1)* | **DISTRICT** *(3)* | **explains** *(1)* |
| **Childs** *(3)* | **copy** *(1)* | **DIVISION** *(1)* | **explanation** *(1)* |
| **Choice** *(2)* | **Correct** *(62)* | **document** *(21)* | **extent** *(7)* |
| **chores** *(2)* | **correctly** *(1)* | **documents** *(6)* | **externally** *(1)* |
| **church** *(3)* | **cost** *(2)* | **doing** *(18)* | **extra** *(1)* |
| **churches** *(2)* | **costs** *(2)* | **dollars** *(6)* | |
| **church-related** *(1)* | **counsel** *(5)* | **doors** *(1)* | **< F >** |
| **circled** *(1)* | **counseling** *(6)* | **drive** *(1)* | **fact** *(4)* |
| **City** *(2)* | **County** *(2)* | **driving** *(2)* | **failure** *(1)* |
| **CIVIL** *(3)* | **couple** *(3)* | **dropped** *(1)* | **fair** *(6)* |
| **claim** *(1)* | **COURT** *(7)* | **drug** *(1)* | **faith-based** *(1)* |
| **claiming** *(1)* | **courthouse** *(1)* | **drugs** *(1)* | **familiar** *(5)* |
| **claims** *(1)* | **Court's** *(1)* | **duly** *(1)* | **far** *(1)* |
| **clean** *(3)* | **credit** *(5)* | **duties** *(1)* | **Fason** *(1)* |
| **cleaning** *(2)* | **credited** *(1)* | | **fast** *(1)* |
| **client** *(16)* | **credits** *(18)* | **< E >** | **Favoritism** *(1)* |
| **clients** *(9)* | **crimes** *(1)* | **earlier** *(4)* | **February** *(3)* |
| **clock** *(1)* | **criminal** *(1)* | **eating** *(1)* | **Federal** *(3)* |
| **coincides** *(1)* | **Cummings** *(2)* | **educational** *(1)* | **fee** *(3)* |
| **Collective** *(2)* | **current** *(2)* | **effect** *(1)* | **feel** *(3)* |
| **Colonnade** *(3)* | **currently** *(1)* | **eight** *(1)* | **feeling** *(1)* |
| **colostomy** *(2)* | | **eighteen** *(2)* | **feels** *(1)* |
| **come** *(5)* | **< D >** | **either** *(4)* | **fees** *(24)* |
| **coming** *(3)* | **date** *(3)* | **Eleven** *(2)* | **feet** *(1)* |
| **commencing** *(1)* | **dated** *(3)* | **eligible** *(1)* | **felt** *(3)* |
| **Commissioner** *(2)* | **day** *(5)* | **eliminate** *(1)* | **fewer** *(1)* |
| **Commissioner-Notar** | **days** *(3)* | **emergency** *(1)* | **Fifteen** *(1)* |
| **y** *(1)* | **deducted** *(1)* | **employed** *(3)* | **Fifth** *(1)* |

fifty  (10)
figure  (3)
filed  (4)
fill  (3)
filled  (7)
Financial  (1)
find  (1)
fine  (2)
finish  (1)
first  (15)
Fisher  (3)
five  (9)
floor  (1)
Florencia  (1)
following  (2)
follows  (1)
food  (9)
force  (1)
foregoing  (3)
form  (22)
formal  (1)
formerly  (1)
forms  (4)
forth  (1)
Forty  (12)
four  (9)
FREEDOM  (1)
Friday  (1)
friend  (4)
front  (2)
full  (1)
full-time  (3)
funded  (2)
FURTHER  (2)
future  (1)
Fyffe  (2)

< G >
GA  (1)
Gadsden  (8)
games  (1)
gas  (2)
general  (2)
getting  (6)
give  (8)
given  (2)
giving  (1)
gloves  (1)
go  (32)

going  (23)
Goldfarb  (3)
Good  (6)
government  (3)
graduate  (5)
graduation  (2)
Green  (2)
Greene  (1)
gross  (1)
grounds  (1)
group  (2)
guess  (1)
guy  (1)

< H >
hair  (1)
half  (6)
hamburgers  (2)
Hampton  (8)
handled  (1)
happen  (5)
happened  (1)
happening  (1)
Haymon  (35)
Haymon's  (1)
head  (11)
hear  (2)
heard  (3)
hearing  (1)
heck  (1)
held  (1)
help  (4)
helpful  (5)
helping  (1)
Hey  (4)
Highway  (1)
hire  (1)
hired  (5)
holding  (1)
Holly  (9)
home  (4)
Homes  (15)
Homewood  (1)
honest  (1)
Honestly  (1)
hospital  (1)
hour  (6)
hours  (42)
house  (12)

Housekeeper  (1)
housekeeping  (3)
housemother  (5)
houses  (3)
housing  (2)
huh-uh  (2)
hundred  (8)

< I >
idea  (4)
identification  (8)
II  (3)
III  (8)
ill  (1)
illegal  (1)
immediate  (1)
immediately  (2)
included  (1)
including  (2)
income  (1)
INDEX  (3)
indicating  (1)
individually  (3)
information  (1)
Inn  (8)
inside  (3)
instance  (2)
instruct  (1)
instruction  (2)
intake  (3)
interact  (1)
interested  (3)
internally  (1)
interrogatories  (1)
Interrogatory  (1)
interview  (6)
interviewed  (2)
Inverness  (1)
investigation  (1)
investigators  (1)
issue  (3)
its  (2)
IV  (3)

< J >
Jackie  (1)
jail  (1)
January  (3)
JEFFERSON  (1)

job  (32)
jobs  (5)
Join  (4)
joining  (3)
judge  (1)
July  (11)
jury  (1)

< K >
Kanesha  (10)
keep  (5)
keeping  (1)
kept  (1)
Kerry  (2)
kin  (1)
kind  (7)
Kmart  (1)
knew  (2)
know  (46)
knowledge  (11)
Knox  (1)
Kress  (1)

< L >
labeled  (1)
Labor  (5)
lady  (1)
Laketta  (1)
Laquisha  (2)
Large  (1)
latex  (1)
laundry  (1)
Laura  (4)
Law  (4)
laws  (1)
lawsuit  (4)
lawsuits  (1)
lawyer  (1)
lawyers  (3)
lawyer's  (1)
LCR  (1)
leading  (1)
learn  (1)
learned  (1)
learning  (1)
leasing  (1)
leave  (5)
leaving  (3)
left  (15)

**Briana Walker** 4

legal  *(1)*
letters  *(1)*
levels  *(1)*
License  *(1)*
life  *(2)*
liked  *(3)*
limited  *(1)*
lines  *(1)*
list  *(1)*
little  *(7)*
live  *(5)*
lived  *(1)*
living  *(1)*
LLP  *(1)*
located  *(1)*
location  *(1)*
locations  *(1)*
long  *(5)*
look  *(6)*
looked  *(2)*
looking  *(3)*
looks  *(3)*
lot  *(4)*
Loveladies  *(1)*
LOVELADY  *(69)*

**< M >**
Mackins  *(1)*
main  *(2)*
maintain  *(1)*
maintaining  *(1)*
maintenance  *(1)*
making  *(2)*
manager  *(6)*
manual  *(3)*
mark  *(9)*
marked  *(9)*
math  *(1)*
Matt  *(1)*
Matthew  *(1)*
meals  *(2)*
mean  *(6)*
meant  *(1)*
medical  *(3)*
medication  *(6)*
medicine  *(1)*
MeGahee  *(2)*
Melinda  *(5)*
mentally  *(1)*

mentioned  *(1)*
Milk  *(1)*
Miller  *(29)*
MILLER:  *(32)*
mind  *(1)*
mine  *(2)*
Minimum  *(6)*
minutes  *(2)*
Mischaracterizes
 *(1)*
Miyoshi  *(1)*
Monday  *(3)*
money  *(7)*
months  *(4)*
Mooyah  *(6)*
mother  *(2)*
motivated  *(1)*
motivation  *(2)*
mountains  *(1)*
move  *(4)*
moved  *(4)*
movements  *(1)*
Murphy's  *(8)*

**< N >**
name  *(5)*
named  *(2)*
names  *(1)*
nature  *(1)*
necessary  *(2)*
need  *(3)*
needed  *(7)*
needs  *(1)*
neither  *(1)*
never  *(9)*
new  *(1)*
Nichols  *(4)*
Nine  *(2)*
nod  *(1)*
Nodding  *(2)*
nondiscrimination
 *(2)*
normal  *(1)*
North  *(6)*
NORTHERN  *(1)*
not,  *(1)*
Notary  *(4)*
number  *(7)*
Numerous  *(1)*

nurse  *(11)*
nurses  *(1)*
nursing  *(1)*

**< O >**
oath  *(4)*
obey  *(1)*
Object  *(26)*
objections  *(2)*
Obligation  *(1)*
Obviously  *(1)*
October  *(4)*
offered  *(1)*
office  *(4)*
offices  *(1)*
Off-the-record  *(1)*
Oh  *(2)*
Okay  *(82)*
old  *(1)*
once  *(2)*
on-site  *(5)*
open  *(2)*
Opportunity  *(18)*
opposed  *(1)*
option  *(1)*
oral  *(1)*
order  *(2)*
outside  *(11)*
outstanding  *(1)*
overtime  *(5)*
owe  *(1)*
owed  *(2)*
owned  *(1)*
owns  *(1)*

**< P >**
p.m  *(8)*
Page  *(3)*
paid  *(12)*
painted  *(1)*
Pantazis  *(3)*
paperwork  *(2)*
parens  *(1)*
part  *(18)*
participated  *(1)*
participating  *(1)*
particular  *(2)*
parties  *(3)*
patient  *(5)*

patients  *(2)*
Pause  *(1)*
pay  *(26)*
paycheck  *(1)*
paychecks  *(1)*
paying  *(2)*
payment  *(2)*
Pell  *(2)*
penalty  *(1)*
pending  *(1)*
people  *(22)*
percent  *(1)*
performance  *(1)*
performed  *(1)*
performing  *(1)*
perimeter  *(2)*
period  *(5)*
periods  *(2)*
perjury  *(1)*
person  *(14)*
personal  *(1)*
Phase  *(23)*
phases  *(2)*
pick  *(1)*
picked  *(1)*
piece  *(1)*
Piggly  *(1)*
Pinson  *(2)*
Place  *(4)*
placed  *(1)*
placement  *(9)*
places  *(5)*
Plaintiffs  *(2)*
planning  *(1)*
plans  *(2)*
play  *(2)*
plus  *(1)*
point  *(3)*
policy  *(4)*
position  *(3)*
positive  *(6)*
possible  *(1)*
premises  *(1)*
PRESENT  *(1)*
pretty  *(2)*
prior  *(2)*
private  *(1)*
probably  *(1)*
problems  *(1)*

**Procedure**  *(2)*
**proceedings**  *(1)*
**process**  *(1)*
**Professional**  *(3)*
**program**  *(28)*
**programs**  *(1)*
**progressed**  *(2)*
**property**  *(1)*
**provide**  *(3)*
**provided**  *(7)*
**providing**  *(1)*
**Public**  *(4)*
**punch**  *(2)*
**put**  *(7)*

**< Q >**
**question**  *(5)*
**questions**  *(9)*
**Quick**  *(1)*
**Quicksey**  *(4)*
**Quicksey's**  *(1)*
**quit**  *(1)*

**< R >**
**radams@wigginschil**
**ds.com**  *(1)*
**RAIN**  *(1)*
**ran**  *(1)*
**read**  *(2)*
**reading**  *(1)*
**ready**  *(2)*
**realize**  *(1)*
**really**  *(5)*
**Realtime**  *(3)*
**reason**  *(3)*
**recall**  *(10)*
**receive**  *(3)*
**received**  *(3)*
**receiving**  *(2)*
**recognize**  *(1)*
**record**  *(3)*
**recordings**  *(2)*
**recovery**  *(3)*
**reduce**  *(1)*
**reduced**  *(1)*

**REEXAMINATION**
  *(4)*
**referred**  *(1)*

**reflected**  *(1)*
**regain**  *(1)*
**Registered**  *(3)*
**regulations**  *(1)*
**rehab**  *(2)*
**Rehabilitation**  *(5)*
**relapsed**  *(2)*
**relating**  *(1)*
**remember**  *(10)*
**rent**  *(1)*
**rep**  *(4)*
**repeat**  *(1)*
**report**  *(1)*
**REPORTED**  *(1)*
**Reporter**  *(8)*
**represent**  *(1)*
**represents**  *(1)*
**required**  *(1)*
**requirement**  *(3)*
**reserve**  *(2)*
**Resident**  *(4)*
**Residential**  *(2)*
**respective**  *(1)*
**response**  *(1)*
**responses**  *(3)*
**responsible**  *(1)*
**result**  *(2)*
**resume**  *(4)*
**retail**  *(3)*
**riding**  *(2)*
**right**  *(59)*
**rights**  *(3)*
**rolled**  *(1)*
**room**  *(1)*
**rooms**  *(1)*
**rules**  *(5)*
**running**  *(1)*
**Russell**  *(1)*

**< S >**
**safe**  *(1)*
**safety**  *(3)*
**SAITH**  *(1)*
**sanctions**  *(1)*
**sat**  *(1)*
**saved**  *(1)*
**saying**  *(3)*
**says**  *(15)*
**schedule**  *(1)*

**school**  *(1)*
**scope**  *(1)*
**search**  *(2)*
**second**  *(1)*
**security**  *(6)*
**see**  *(13)*
**seeking**  *(1)*
**Sell**  *(2)*
**send**  *(6)*
**sent**  *(7)*
**separately**  *(1)*
**September**  *(5)*
**service**  *(3)*
**services**  *(5)*
**seven**  *(2)*
**shakes**  *(1)*
**sheet**  *(10)*
**Shelton**  *(1)*
**show**  *(9)*
**showed**  *(3)*
**showing**  *(1)*
**shows**  *(2)*
**sign**  *(4)*
**signature**  *(6)*
**signed**  *(6)*
**signing**  *(2)*
**similarly**  *(1)*
**simply**  *(1)*
**sitting**  *(1)*
**situated**  *(1)*
**situation**  *(2)*
**six**  *(1)*
**sixteen**  *(1)*
**sixty**  *(1)*
**skills**  *(1)*
**sleep**  *(2)*
**slept**  *(1)*
**slung**  *(1)*
**small**  *(1)*
**sober**  *(2)*
**somebody**  *(20)*
**sort**  *(3)*
**sounds**  *(3)*
**SOUTHERN**  *(1)*
**speak**  *(1)*
**specific**  *(1)*
**specifically**  *(6)*
**specified**  *(1)*
**speculation**  *(4)*

**speeding**  *(3)*
**spoke**  *(4)*
**staff**  *(3)*
**stamp**  *(3)*
**stamps**  *(3)*
**Standards**  *(3)*
**standpoint**  *(2)*
**start**  *(2)*
**Started**  *(5)*
**State**  *(3)*
**Statement**  *(3)*
**STATES**  *(2)*
**station**  *(2)*
**stay**  *(6)*
**stayed**  *(4)*
**staying**  *(2)*
**stenotypy**  *(1)*
**step**  *(1)*
**sterile**  *(1)*
**Steve**  *(1)*
**STIPULATED**  *(1)*
**stipulation**  *(1)*
**store**  *(4)*
**Street**  *(3)*
**stub**  *(1)*
**stuff**  *(5)*
**subject**  *(1)*
**submit**  *(5)*
**substances**  *(3)*
**Success**  *(6)*
**suggested**  *(1)*
**suing**  *(1)*
**suit**  *(1)*
**Summer**  *(8)*
**supervision**  *(1)*
**supervisor**  *(2)*
**supplies**  *(2)*
**support**  *(2)*
**supposed**  *(3)*
**sure**  *(7)*
**suspended**  *(1)*
**sweep**  *(1)*
**sworn**  *(3)*

**< T >**
**take**  *(17)*
**taken**  *(5)*
**talk**  *(7)*
**talked**  *(18)*

Case 2:15-cv-00274-MHH   Document 53-17   Filed 04/08/16   Page 32 of 33

talking *(4)*
talks *(1)*
teaching *(1)*
technically *(3)*
tell *(23)*
temp *(1)*
temporary *(1)*
ten *(5)*
terminated *(1)*
terms *(1)*
test *(1)*
tested *(2)*
testified *(2)*
testify *(2)*
testing *(2)*
Thank *(2)*
therapy *(3)*
thereto *(2)*
thing *(2)*
things *(5)*
think *(13)*
thinking *(1)*
thirdhand *(1)*
thirty-four *(1)*
thought *(4)*
three *(10)*
threw *(1)*
thrift *(1)*
ticket *(3)*
tickets *(3)*
time *(41)*
time-consuming *(1)*
times *(12)*
TLC *(2)*
tmmiller@babc.com
  *(1)*
TN *(1)*
today *(2)*
toenails *(1)*
told *(9)*
top *(4)*
Total *(4)*
touch *(1)*
track *(1)*
trailer *(14)*
trailers *(1)*
trained *(1)*
training *(6)*
transcript *(2)*

Transportation *(2)*
transported *(1)*
travel *(1)*
treated *(3)*
treatment *(1)*
trial *(2)*
Tried *(1)*
trips *(5)*
trouble *(1)*
true *(1)*
Trussville *(1)*
try *(1)*
trying *(4)*
Turned *(3)*
twenty *(6)*
twenty-five *(1)*
Twenty-four *(1)*
Two *(8)*
type *(6)*
typewriting *(1)*

< U >
U.S *(1)*
Uh-huh *(11)*
understand *(11)*
Understanding *(7)*
understood *(8)*
UNITED *(2)*
unruly *(1)*
use *(10)*

< V >
varied *(1)*
verbal *(1)*
video *(1)*
violated *(1)*
violation *(1)*
voluntarily *(1)*
voluntary *(4)*
Volunteer *(21)*
vs *(1)*

< W >
wage *(1)*
waive *(1)*
waived *(1)*
walk *(2)*
WALKER *(7)*
walks *(1)*

want *(11)*
wanted *(3)*
warrant *(2)*
Warren *(3)*
watch *(1)*
watching *(1)*
way *(8)*
week *(9)*
weekly *(1)*
weeks *(1)*
well *(21)*
Wendy's *(1)*
went *(24)*
Wiggins *(3)*
Wiggly *(1)*
wipes *(1)*
witness *(3)*
word *(2)*
work *(50)*
worked *(18)*
working *(13)*
workplace *(1)*

< Y >
y'all *(2)*
Yeah *(9)*
year *(2)*
years *(2)*

< Z >
zero *(2)*

## Statement of Understanding and Agreement

**This is to certify that I understand and agree to the following terms and conditions while receiving recovery services through The Lovelady Center.**

1. I, _Driana Walker_, am a voluntary/court ordered admission to The Lovelady Center, and understand that I have been determined through assessment of my drug or alcohol use, am eligible for residential rehabilitation, or that I have been determined through other circumstances harmful to myself or others, to be eligible to complete The Lovelady Center rehabilitation program.

2. I hereby consent to provide urine and/or saliva samples for alcohol and screening upon request so long as I remain in residence at The Lovelady Center, and that I am subject to immediate dismissal from the program if any chemical use is discovered. Nonconformity of this policy could result in a "positive drug test" to be recorded.

3. I do hereby give my consent to The Lovelady Center staff to search my room and personal property at any time deemed necessary as long as I remain a resident of this facility, whether I am present or not.

4. I have received a copy of the Client Policy Manuel and hereby agree to obey all rules and regulations of The Lovelady Center.

5. I do hereby waive all rights to claim suit against The Lovelady Center and the Board of Directors of The Lovelady Center.

6. I understand that The Lovelady Center is a non-medical facility. If I should require medical treatment, I authorize The Lovelady Center staff to arrange for any treatment, but it is understood that any expenses incurred are my sole responsibility and not the responsibility of The Lovelady Center. In the event of a medical emergency I authorize The Lovelady Center to contact the following persons:

Name: _JESSIKA WALKER_   Name: _DENISE WALKER_

Address: _____   Address: _____

_Bham, AL._

Telephone: _____   Telephone: _____

7. I also understand that I have the right to revoke this agreement by voluntarily discharging myself from the program. At such time I am no longer bound under any authorization I initially agreed to accept to the extent of actions that had already been taken in reliance through my initial authorization.

Client Signature: _Driana Walker_   Date: _9/10/12_

Witness: _Heidi King_   Date: _9/10/12_

The Lovelady Center
Revised 3/6/2008



**DEFENDANT'S EXHIBIT**

1 BWalker

Walker v. LC 0004

REDACTED