FILED
2017 Mar-07 AM 09:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRIANA WALKER, individually and on behalf of herself and all others similarly situated,** | } | |
| **Plaintiff,** | } | **Case No.: 2:15-cv-00274-MHH** |
| **v.** | } | |
| **FREEDOM RAIN, INC., d/b/a The Lovelady Center,** | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

In this putative class action, plaintiff Briana Walker alleges that defendant Freedom Rain, Inc., d/b/a The Lovelady Center, violated the Fair Labor Standards Act (FLSA) by failing to pay her and the opt-in plaintiffs the minimum wage required by the Act and by failing to adequately compensate them for work performed in excess of forty hours per week. (Doc. 1). Pursuant to Federal Rule of Civil Procedure 56, each party has asked the Court to enter judgment on the threshold issue of whether the plaintiffs were Freedom Rain's "employees" under the FLSA. (Docs. 52, 58). For the reasons stated below, the Court denies Freedom Rain's and grants the plaintiffs' motion for partial summary judgment.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

"In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conference of NAACP v. Fayette Cty.*

*Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)) (internal quotation marks and brackets omitted). "If both parties proceed on the same legal theory and rely on the same material facts . . . the case is ripe for summary judgment." *NAACP*, 775 F.3d at 1345 (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)) (internal quotation marks omitted).

## II. BACKGROUND

Freedom Rain is a 501(c)(3) nonprofit corporation that operates a residential rehabilitation program at a facility called the Lovelady Center. (Doc. 54, p. 6; Doc. 58, p. 4). Freedom Rain charges program participants a $500 intake fee to cover the first month of their enrollment and a $150 weekly fee thereafter.[1] (Doc. 54, p. 7). Many of the program's participants have been convicted of state or federal crimes, and the participants enter the program to comply with a court order. (Doc. 54, p. 7). Others enter the program voluntarily to obtain treatment for substance addiction, assistance managing their lives, or "because they are homeless and have nowhere else to go." (Doc. 54, p. 7). Ms. Walker and opt-in plaintiffs Laketta Mackins, Myoshi Bates, Melissa Saturday, Rhonda Gaddis, and Monica Stager voluntarily enrolled in the Lovelady Center rehabilitation program between 2010 and 2014. (Doc. 54, pp. 19–20). Opt-in plaintiff Megan Deweber-White

enrolled in 2014 as part of a supervised reentry program for prisoners. (Doc. 54, p. 19).

In the program, the plaintiffs attended classes and church services. (Doc. 54, p. 9). The plaintiffs also received counseling, housing, food, medical services, childcare services, and transportation. (Doc. 54, pp. 7, 9). In addition, they participated in "work therapy." (Doc. 54, p. 13).

As part of work therapy, the plaintiffs worked at the Lovelady Center in a department such as the kitchen, daycare, maintenance, or security, or at the Lovelady Center's offsite thrift store performing tasks such as sorting, tagging, cleaning clothes, assisting donation drivers, assisting customers, and operating the cash register. (Doc. 58, p. 10). Some of the plaintiffs also worked at assisted-living facilities Blackwell's Way and Haymon Homes, where they assisted residents with daily activities, prepared meals, performed housework, and monitored the residents for safety. (Doc. 58, ¶ 15; Doc. 64, ¶ 15). The work therapy program, according to Freedom Rain, enables participants to learn "to work effectively and efficiently" and "provides lessons of discipline, self-esteem, perseverance, and obedience to authority." (*See* Doc. 54, p. 13; Doc. 55-4, p. 77; Doc. 58, p. 9).

---

[1] When the plaintiffs enrolled in the program, the intake fee was $950. (Doc. 54, p. 7).

In addition to its purported rehabilitative functions, Freedom Rain's work therapy program provided the plaintiffs with compensation. In the "Success Program," if a plaintiff worked 32 hours in a week at the Lovelady Center or the thrift store, Freedom Rain credited her account $150 and considered her fees for that week paid.[2] (Doc. 55-4, p. 69). Freedom Rain also provided these plaintiffs with an additional stipend of $25 to $100, depending on how long the plaintiff had been in the program. (Doc. 54, p. 13; Doc. 55-4, p. 69). The plaintiffs knew that they would be working as part of the rehabilitation program and that they would use the money they earned in work therapy to pay their program fees. (Doc. 53-2, p. 16; Doc. 53-17, p. 11; Doc. 64, ¶ 22). Melinda MeGahee, Freedom Rain's Executive Vice President, testified that "when a lady signs up for the Success Program, they . . . know that they're going to work, that they're working their fees off and getting a stipend." (Doc. 55-4, p. 64).

The plaintiffs who worked at Blackwell's Way or Haymon Homes did not receive a $150 weekly credit or a stipend. Instead, Freedom Rain billed the facilities for the plaintiffs' work and, after deducting the plaintiffs' "current

[2] The "Success Program" is a rehabilitative module in which participants perform work therapy according to a structured schedule. (*See* Doc. 55-4, p. 69; Doc. 56, p. 6). Under the heading "opportunity credits," participants not enrolled in the Success Program earned $7.25 per hour in account credits for performing substantially the same work as Success Program participants on an *ad hoc* basis. (Doc. 55-4, p. 69; Doc. 56, p. 6). According to Melinda MeGahee, Freedom Rain's Executive Vice President, "[i]t's all work therapy." (Doc. 55-4, p. 76).

program fees, current fines, and any back fees or fines," paid the plaintiffs an hourly wage. (Doc. 55-14; Doc. 58, ¶ 24; Doc. 55-2, p. 72; Doc. 55-1, pp. 56–58; Doc. 55-4, p. 86).

The parties dispute whether work therapy was mandatory. (*See* Doc. 56, p. 8; Doc. 64, p. 10). Freedom Rain contends that participants were allowed to remain in the program even if they did not pay their fees. (Doc. 54, p. 7). According to Ms. MeGahee, participants received housing and food "whether [they were] working or not." (Doc. 55-4, p. 80). At the same time, Freedom Rain encouraged program participants to work and tried to "avoid idle time." (Doc. 55-4, p. 79).

## III. DISCUSSION

The parties seek summary judgment on the issue of whether the plaintiffs who worked at the Lovelady Center and at its offsite thrift store were Freedom Rain's "employees" under the FLSA. (Docs. 52, 58). In addition, the plaintiffs seek summary judgment on the same issue with respect to their work at Blackwell's Way and Haymon Homes.[3]

The FLSA provides that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of

[3] Freedom Rain does not seek summary judgment at this juncture regarding the employment status of the plaintiffs who worked at Blackwell's Way or Haymon Homes. (Doc. 54, p. 5 n. 1).

goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce . . . $7.25 an hour," beginning in July of 2009. *See* 29 U.S.C. § 206(a). Likewise, no employer shall employ any such employee "for a workweek longer than forty hours unless such employee receives compensation for his employment . . . at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a).[4]

The FLSA's minimum wage and overtime provisions apply only to "employees." *See* 29 U.S.C. §§ 206(a), 207(a); *Villareal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997). The FLSA broadly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ" means "to suffer or permit to work." 29 U.S.C. § 203(g).

To determine whether an individual is an employee under the FLSA, the Eleventh Circuit uses an "economic realities" analysis under which a court must, in part, examine whether the employer derives an economic benefit from the

[4] In its response to the plaintiffs' motion for summary judgment and in its reply to the plaintiffs' response to its motion for summary judgment, Freedom Rain argues that the FLSA does not apply to this case because neither the Lovelady Center nor the thrift store constitutes an "enterprise engaged in commerce" within the meaning of the FLSA. (Doc. 64, pp. 28–32; Doc. 77, p. 8). This argument exceeds the scope of discovery and of Freedom Rain's motion for summary judgment, both of which are limited to the question of whether an employment relationship existed between the plaintiffs and Freedom Rain. (Doc. 32, ¶ 1; Doc. 32-1, ¶ 7; Doc. 52). The ultimate applicability of the FLSA will require an additional showing that the plaintiffs engaged in commerce or that the Lovelady Center or thrift store is an enterprise engaged in commerce. *See* 29 U.S.C. §§ 206(a), 207(a). Those issues are not properly before the Court on the parties' motions for summary judgment.

employee's work and whether there exists an express or implied agreement for compensation. *See Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 (11th Cir. 1982); *see also Kaplan v. Code Blue Billing & Coding, Inc.*, 504 Fed. Appx. 831, 834 (11th Cir. 2013); *see generally Williams v. Strickland*, 87 F.3d 1064, 1066–1068 (9th Cir. 1996). An individual who works "without promise or expectation of compensation, but solely for his personal purpose or pleasure," is not an employee for FLSA purposes. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (internal quotation marks omitted). But "when there is an expectation of . . . benefits in exchange for services," there is generally employment under the FLSA. *Villareal*, 113 F.3d at 205.

**1. The Lovelady Center and the thrift store**

Freedom Rain argues that the Ninth Circuit's holding in *Williams* controls this case. (Doc. 54, pp. 26–28; Doc. 77, p. 7). In *Williams*, the Ninth Circuit held that a work therapy program participant was not an employee subject to the minimum wage and overtime provisions of the FLSA. *Williams*, 87 F.3d at 1068. The plaintiff in *Williams*, Mr. Williams, enrolled in a rehabilitation program run by the Salvation Army, a nonprofit religious and charitable organization. *Id.* at 1065. As part of the program, Mr. Williams "engaged in work therapy on a full-time basis." *Id.* For three months, he restored furniture that the Salvation Army sold in

its thrift stores. *Id.* For three months after that, he sorted donations at the rehabilitation center's loading dock. *Id.* While enrolled in the program, Mr. Williams "received food, clothing, shelter, and a small [weekly] stipend." *Id.* The circuit court concluded that, because Mr. Williams "had neither an express nor an implied agreement for compensation with the Salvation Army," and because Mr. Williams's "relationship with the Salvation Army was solely rehabilitative," Mr. Williams was not an employee. *Id.* at 1067.

In reaching its decision in *Williams*, the Ninth Circuit distinguished its facts from those in *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985), a case that Ms. Walker and the opt-in plaintiffs argue controls here and a case, unlike *Williams*, that is binding authority on this Court. The Court in *Williams* stated:

> Williams's relationship with the Salvation Army was solely rehabilitative. This fact . . . distinguishes this case from *Alamo* where the associates [*sic*] work contemplated both rehabilitation and compensation. Williams's work therapy was not performed in exchange for in-kind benefits, but rather was performed to give him a sense of self-worth, accomplishment, and enabled him to overcome his drinking problems and reenter the economic marketplace.

*Williams*, 87 F.3d at 1067. As evidence that Mr. Williams's relationship with the Salvation Army "contemplated only rehabilitation," the Ninth Circuit cited Mr.

Williams's intake form, on which Mr. Williams indicated his acknowledgment that he was a "beneficiary and not an employee of [the] Center." *Id.* at 1065.

In his dissent in the *Williams* case, Judge Poole pointed out that rights under the FLSA cannot be waived. *Williams*, 87 F.3d at 1069 (Poole, J., dissenting); *see also Barrentine v. Arkansas-Best Freight Sys, Inc.*, 450 U.S. 728, 740 (1981) ("[W]e have held that FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate.") (internal citation and quotation marks omitted). Because Mr. Williams explained that he expected compensation for his work and because his work resulted in economic benefit to the Salvation Army, Judge Poole concluded that a material dispute of fact existed regarding Mr. Williams's employment status. *Williams*, 87 F.3d at 1069 (Poole, J., dissenting).

As noted above, the plaintiffs argue that *Alamo*, not *Williams*, controls here. (Doc. 58, p. 25). In *Alamo*, the Supreme Court held that unpaid "associates" at a nonprofit religious organization who received "food, clothing, shelter, transportation, and medical benefits," were employees, despite the associates' own insistence that they expected no compensation for their work. *Alamo*, 471 U.S. at 292–94, 301–02, 305. The associates, "most of whom were drug addicts, derelicts, or criminals before their conversion and rehabilitation," worked at the Tony and

Susan Alamo Foundation's various commercial businesses, including service stations, clothing outlets, hog farms, and a motel. *Id.* at 292. Citing *Walling*, the Supreme Court concluded that the extended length of the volunteers' service and their dependence on the foundation, combined with the foundation's provision of "in-kind benefits," created an implied agreement for compensation. *See id.* at 301. Despite their protestations to the contrary, the associates were employees, according to the Supreme Court. *Id.* at 306.

*Alamo* controls here. Although the plaintiffs may have come to the Lovelady Center seeking rehabilitation and support, the plaintiffs have stated that they expected compensation for their work.[5] (Doc. 58, p. 12). Moreover, "a rehabilitative motive does not preclude an employment relationship." *Williams*, 87 F.3d at 1069 (Poole, J., dissenting) (citing *Alamo*, 471 U.S. at 299). Like the plaintiffs in *Alamo*, the Lovelady plaintiffs received benefits in exchange for work. (Doc. 54, p. 9; Doc. 55-4, p. 69). If a plaintiff worked 32 hours in a week, she received a $150 credit against her program fees and an additional stipend. (Doc. 54, p. 9; Doc. 55-4, p. 69; Doc. 58, p. 12). If a plaintiff did not work in a week, she received $0. This apparent "quid pro quo arrangement between the parties"

[5] Opt-in plaintiff Myoshi Bates, for example, testified that when she enrolled in the Lovelady Center's rehabilitation program, she understood that she "was going to have to work in order to get the fees paid down." (Doc. 53-2, p. 16).

demonstrates that the plaintiffs' relationship to the Lovelady Center was not solely rehabilitative. *Williams*, 87 F.3d at 1067, 1069 (Poole, J., dissenting). Rather, just as in *Alamo*, the plaintiffs worked "in contemplation of compensation." *See Alamo*, 471 U.S. at 306.[6]

Furthermore, the plaintiffs' work at the Lovelady Center and the thrift store conferred a direct economic benefit on Freedom Rain. *See* (Doc. 58, pp. 14–15; Doc. 55-1, p. 52); *compare Walling*, 330 U.S. at 153 (holding that plaintiffs whose work resulted in "no 'immediate advantage'" to the employer were not employees under the FLSA). If not for the plaintiffs, Freedom Rain would have had to hire W-2 employees, at a statutorily mandated expense of $7.25 an hour, to provide the work that the plaintiffs performed. *See* 29 U.S.C. § 206(a); (Doc. 58, p. 15; Doc. 55-1, p. 52). Thus, although it may be true that work therapy is a "critical component of rehabilitation" and that the plaintiffs gained therapeutic benefits

[6] In *Alamo*, the Supreme Court considered the foundation's provision of food, clothing, shelter, transportation, and medical services to be "wages in another form." *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985). Because it was not clearly erroneous for the district court to regard these benefits as payment for the associates' work, the Supreme Court found an implied agreement for compensation and, consequently, an employment relationship. *Id.* Here, the plaintiffs do not argue that the benefits they received in the form of food, clothing, shelter, transportation, and medical services constitute "wages in another form" that supply the basis for an implied compensation agreement. *Alamo*, 471 U.S. at 301. Rather, the plaintiffs contend that they expected actual wages in the form of account credits and weekly stipends as compensation for their work at the Lovelady Center and thrift store. (Doc. 58, p. 12). Thus, Freedom Rain's argument that the plaintiffs were not required to work to receive food, clothing, shelter and other benefits of the rehabilitation program is of little moment. (Doc. 54, p. 7; Doc. 64, p. 10).

from working, it cannot be said that the plaintiffs worked "solely for [their] personal purpose or pleasure." *Walling*, 330 U.S. at 152; (Doc. 64, p. 16). Freedom Rain's eleemosynary mission statement notwithstanding, the plaintiffs performed work that, in economic reality, served both parties' interests. The Court therefore finds that the plaintiffs who worked at the Lovelady Center and thrift store were Freedom Rain's employees for purposes of the FLSA. *See id.* at 152 (excluding from the FLSA's definition of employee an individual "whose work serves *only* his own interest") (emphasis added).

**2. Blackwell's Way and Haymon Homes**

Freedom Rain does not dispute that the plaintiffs who worked at Blackwell's Way and Haymon Homes were employed by those facilities within the meaning of the FLSA. (*See* Doc. 64, ¶ 31; Doc. 55-8, p. 45). For purposes of the plaintiffs' motion for summary judgment, the Court must determine whether the plaintiffs who were employed by Blackwell's Way and Haymon Homes were also employed by Freedom Rain.

An "employer" under the FLSA is "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . ." 29 U.S.C. § 203(d). "An employee may have more than one employer, and 'whether the employment by the employers is to be considered joint employment or separate and distinct

employment for purposes of the [FLSA] depends upon all the facts in the particular case.'" *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012) (quoting 29 C.F.R. § 791.2(a)). Generally, a joint employment relationship exists where: (1) "there is an arrangement between the employers to share the employee's services," (2) one employer is acting directly or indirectly in the interest of the other employer . . . in relation to the employee[,]" or (3) "the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." *Layton*, 686 F.3d at 1175 (quoting 29 C.F.R. § 791.2(b)).

In 2014, the Department of Labor (DOL) conducted an investigation into Freedom Rain's relationship with Blackwell's Way and Haymon Homes. (Doc. 75-1, pp. 35–47). Applying the above framework, the DOL concluded that, "an employment relationship exist[ed] between the [plaintiffs who worked at Blackwell's Way and Haymon Homes] and The Lovelady Center as a joint employer." (Doc. 75-1, pp. 42–43). Although the DOL investigation does not demand deference, the Court agrees with its conclusion. *Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1191 (D. Colo. 2012) (finding that a DOL

investigation "does not even rise to the level of an opinion letter or other statement of agency policy" and "is not entitled to deference"); *see also Saglimbene v. Venture Indus. Corp.*, 895 F.2d 1414, 1990 WL 10709, at *9 (6th Cir. 1990) (unpublished opinion) (suggesting that, although DOL interpretations of the FLSA are due deference, the results of a DOL investigation are not).

It is undisputed that Freedom Rain compensated the plaintiffs for their work at Blackwell's Way and Haymon Homes. (Doc. 55-4, p. 86; Doc. 55-6, p. 9; Doc. 55-1, pp. 56–58). Freedom Rain and the group homes had an arrangement whereby Freedom Rain would bill the group homes for the plaintiffs' services and, once Freedom Rain received payment from the group homes, Freedom Rain would deduct program fees and fines from the plaintiffs' accounts and then pay the plaintiffs an hourly wage. (Doc. 55-1, pp. 56–58; Doc. 55-2, p. 72; Doc. 55-6, p. 9; Doc. 55-14). The record shows that Freedom Rain and the group homes jointly supervised the plaintiffs. Freedom Rain's "contact person" for Blackwell's Way and Haymon Homes, Amanda Harrison, testified that it was her job to make sure that the plaintiffs' time sheets matched those provided by the group homes and that the plaintiffs "were able to work . . . at Blackwells [*sic*] or Haymon Homes, and do their program at the same time." (Doc. 55-6, p. 7). Ms. Harrison testified that she also worked "[o]ccasionally" with Blackwell's Way employee Robin White to

ensure, among other things, that the plaintiffs properly filled out their hiring paperwork. (Doc. 55-6, p. 12).[7]

Judy Haymon, shareholder of Blackwell's Way and president of Haymon Homes, testified that, prior to the plaintiffs' employment with the group homes, she and Freedom Rain's founder and executive director Brenda Spahn discussed Freedom Rain's and Haymon Homes' overlapping needs: Haymon Homes needed workers, and Freedom Rain's program participants needed work. (Doc. 55-8, pp. 33–37). These discussions led ultimately to the plaintiffs' employment at Blackwell's Way and Haymon Homes.

These facts demonstrate that Freedom Rain and the group homes had an arrangement to share the plaintiffs' services and acted in each other's interest in relation to the plaintiffs. The FLSA is a remedial statute, and the Court must broadly construe its definitions. *Antenor v. D&S Farms*, 88 F.3d 925, 933 (11th Cir. 1996). Accordingly, the Court finds that the plaintiffs who worked at Blackwell's Way and Haymon Homes while participating in Freedom Rain's rehabilitation program were Freedom Rain's employees under the FLSA. *See Layton*, 686 F.3d at 1175 (quoting 29 C.F.R. § 791.2(b)).

[7] Ms. Harrison testified that Ms. White was employed by Freedom Rain before Ms. White began her employment with Blackwell's Way. (Doc. 55-6, pp. 11–12).

## IV. CONCLUSION

For the reasons stated above, the Court finds as a matter of law that the plaintiffs who worked at the Lovelady Center, the thrift store, Blackwell's Way, and Haymon Homes were Freedom Rain's employees within the meaning of the FLSA. Accordingly, the Court **GRANTS** the plaintiffs' motion for partial summary judgment (Doc. 58) and **DENIES** Freedom Rain's motion for partial summary judgment (Doc. 52). In ruling on the parties' motions for partial summary judgment, the Court did not rely on the evidence that is the subject of the parties' respective motions to strike. (Docs. 78, 79, 80, 83). Therefore, the Court **DENIES** the motions to strike as **MOOT**.

**DONE** and **ORDERED** this March 7, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE